Bernard Daskal, Esq.
Lynch Daskal Emery LLP
264 West 40th Street
New York, New York 10018
212.302.2400

Farkas + Toikka LLP
1101 30th Street, N.W., Suite 500
Washington, DC 20007

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

**NEWMARKETS PARTNERS LLC,**          :
    In its own capacity and derivatively,          :
    As a limited partner in, in the right, and          :
      For the benefit of:          :
    CAM NEWMARKETS PARTNERS LP,          :
                    :          Case No. 08 CV 4213 (WHP)

**TOMOKO TATARA,**          :
    Individually and derivatively as a member,          :
      And for the benefit, of:          :
    NEWMARKETS PARTNERS, LLC,          :
    In the right and for the benefit of          :
    CAM NEWMARKETS PARTNERS LP,          :
                    :

          Plaintiffs,          :

      vs.          :          **FIRST AMENDED**
                    :          **VERIFIED COMPLAINT**

**SAL. OPPENHEIM JR. & CIE. S.C.A.**          :          **JURY TRIAL DEMANDED**

**CAM PRIVATE EQUITY CONSULTING**          :
**& VERWALTUNGS GmbH,**          :

**BVT BERATUNGS-, VERWALTUNGS-**          :
    **UND TREUHANDGESELLSCHAFT**          :
    **FÜR INTERNATIONALE VERMÖGENS-**          :
    **ANLAGEN MBH, and**          :

**MARIE-FRANCE MATHES,**          :

          Defendants.          :
------------------------------------------------------------X

## COMPLAINT

Plaintiffs, through counsel, allege for their First Amended Verified Complaint against defendants as follows:

## I. PARTIES

1. Plaintiff Tomoko Tatara, an individual residing at 400 East 52nd Street, New York, New York 10022, is a citizen of Japan and has resided in the United States continuously since 1989, first under a student visa, then under a visa for employment by an international organization, and since 2001 as a permanent resident and is President and CEO of plaintiff CAM Newmarkets Partners LP.

2. Plaintiff NewMarkets Partners LLC ("NMP") is a limited liability company organized and existing under the laws of Delaware with its principal places of business at 1700 Pennsylvania Avenue NW, Washington, D.C. 20016 and an office at 641 Lexington Avenue, New York, New York 10022. Plaintiff Tatara has a 50 percent membership interest in plaintiff NMP. Defendant Ms. Marie-France Mathes owns the remaining 50% of NMP.

3. Plaintiff CAM NewMarkets Partners LP ("JV" or the "joint venture") is a joint venture of Plaintiff NMP and Defendant CAM Private Equity Consulting & Verwaltungs GmbH ("CAM"). NMP and CAM each own 50% of JV which is organized and exists under the laws of Delaware with its principal place of business at 1700 Pennsylvania Avenue NW, Washington, D.C. 20016 and an office at 641 Lexington Avenue, New York, New York 10022.

2

4.      On information and belief, Defendant Sal. Oppenheim Jr. & Cie. S.C.A. ("Oppenheim") is a corporation organized under the laws of Luxembourg; is headquartered at 4, rue Jean Monnet, 2017 Luxembourg, Luxembourg; and conducts business in this District through a wholly-owned subsidiary, Sal. Oppenheim jr. & Cie. Securities, Inc., which has a regular place of business at 444 Madison Avenue, New York, New York 10022.

5.      On information and belief, Defendant CAM is a corporation organized under the laws of Germany; has its principal place of business at Zeppelinstrasse 4-8 50667 Cologne, Germany; and has a wholly-owned subsidiary, CAM Private Equity LLC, which has a regular place of business at 22 Oak Drive, Greenwich, Connecticut 06878, and is now controlled by Oppenheim.

6.      On information and belief, Defendant BVT Beratungs-, Verwaltungs- und Treuhandgesellschaft für Internationale Vermögensanlagen mbH ("BVT") is a corporation organized under the laws of Germany; has its principal place of business at Leopoldstrasse 7, 80802 Munich, Germany; and conducts business throughout the United States, including this District through a wholly-owned subsidiary, BVT Equity Holdings, Inc. ("BVT-USA"), which has a regular place of business at 400 Interstate North Parkway, Atlanta, Georgia 30339. BVT markets its financial products in the U.S., including this District, through, among others, wallstreet:online.com and fondsclick.com.

7.      Defendant Marie-France Mathes ("Mathes") is an individual residing at 2853 Brandywine Street NW, Washington D.C. 20008. On information and belief, Mathes is a citizen of Luxembourg and a temporary resident of the United States under a visa for employment by an international organization.

## II.  **JURISDICTION AND VENUE**

8.      This Court has jurisdiction over this matter pursuant to 15 USC §1121, and 28 USC §§1331, 1332, 1337, 1367 and 2201.

9.      Venue is proper in this court pursuant to 28 USC §1391.

10.     Personal jurisdiction exists in this District over Defendant Oppenheim by virtue of its presence here; over Defendant CAM by its consent and over Defendant BVT and Defendant Mathes through their and their co-conspirator defendants' contacts with this judicial district and pursuant to New York's long arm statute, N.Y. C.P.L.R. §§301-302.

11.     The individual and concerted acts of Defendants Oppenheim, CAM, BVT, and Mathes, their respective agents and principals set forth in this Complaint were conducted in furtherance of an illegal conspiracy to maliciously harm the business, contracts and property of plaintiffs Tatara, NMP and JV; were intended by Defendants to have such effects; and have resulted in their intended adverse effects on Plaintiffs in the Southern District of New York.  Accordingly, such acts of each co-conspirator apply to personal jurisdiction over each Defendant.  Furthermore, this action is not a collusive action designed to confer jurisdiction upon the Court that it would otherwise lack.

## III.    **DERIVATIVE STANDING**

12. Plaintiff Tatara is authorized as a member of NMP under the Delaware Limited Liability Company Act, Del. Code Ann., Title 6, §18-1001 *et seq.*, to bring a derivative action in the right of NMP.  Article 2.02 of NMP's Limited Liability Company

Agreement requires management decisions by members possessing 100% aggregate ownership interest. Tatara, through counsel, has made significant efforts during December 2007 and January 2008 to secure the consent of Ms. Mathes to initiate this action by NMP. These efforts included at least four in person meetings to explain the nature of a proposed action, numerous exchanges of emails and telephone calls of similar nature, and negotiation of a Memorandum of Understanding ("MOU") between Plaintiff Tatara and Defendant Mathes. The MOU was to address Tatara and Mathes' business relationship and handling of operational matters during the conduct of any litigation. However after the parties essentially agreed to an MOU, Defendant Mathes sought to condition NMP's hiring of counsel on an agreement that no legal action to enforce NMP's rights would ever be brought against CAM, Oppenheim and BVT (collectively the "Original Defendants").

13. On December 4, 2007, CAM Associate Partner Emile van der Burg ("Burg"), a CAM employee, sent a memorandum to NMP rejecting NMP's previously expressed concerns about CAM and BVT's joint funds and CAM's interpretation of the JV Agreement. *See* ¶¶ 99 *et seq*, *infra*.

14. On January 3, 2008, Mathes emailed CAM's representatives on the JV's board, Rolf Wickenkamp ("Wickenkamp"), a founding and Executive Partner of CAM, and Emile van der Burg ("Burg"), a CAM employee, a copy of a draft opinion by the JV's New York counsel concerning CAM and BVT's joint funds and NMP and CAM's disagreement over CAM's interpretation of the JV Agreement. On January 11, 2008 Burg summarily rejected the opinion of counsel. *Id.* ¶ 112, *infra*.

15. On January 10, 2008, Tatara requested an inspection of NMP's books and records relating to Mathes' communications with defendants CAM, Oppenheim and BVT. Mathes failed to honor the request.

16. On January 16, 2008, at a meeting of the board of directors of the JV at the JV's office in New York, counsel for Plaintiff Tatara hand-delivered to Mathes, and to Wickenkamp and Burg, CAM's representatives on the JV Board a copy of a cease and desist letter and draft complaint in this action and offered to answer questions about it. Mathes, Wickenkamp and Burg reviewed the letter, leafed through the draft complaint, adjourned the Board meeting and conferred into the evening.

17. At 10:32 a.m. on January 17, 2008, barely 10 hours and less than two business hours after her meetings with Wickenkamp and Burg, Mathes "formally" notified Tatara that she "did not consent to any legal action in the name of NMP" and, further, requested the dissolution of NMP.

18. On February 8, 2008, Ms. Tatara, through counsel, made a request pursuant to Article 6.01 of NMP's LLC Agreement to inspect NMP's books and records in Mathes' possession, particularly records of Mathes' communications with CAM and its affiliates since October 2007. On February 14, Mathes' personal counsel informed Tatara's counsel that he had instructed Mathes not to comply with Tatara's request for inspection.

19. On February 27, 2008, Mathes' purported to exercise an option to purchase Tatara's 50% interest in NMP for $100.00 under the NMP LLC Agreement. However, no such option existed. On March 5, 2008, Mathes abandoned her reliance on any option.

20.    On June 4, 2008, Tatara renewed her request to inspect NMP's books and records, specifying documents relating to, among other things, any investigation by Mathes of claims by NMP against Defendants Sal. Oppenheim, CAM and BVT.  On June 19, 2008, Mathes made certain documents available for inspection but they included no documents reflecting any investigation by Mathes or on NMP's behalf.  On June 27, 2008, Mathes' personal attorney refused even to state whether Mathes purports to have conducted an investigation.

21. Accordingly, reasonable doubt exists whether (a) Mathes conducted any investigation and/or (b) acted in good faith in rejecting Ms. Tatara's request that NMP bring this action.

22.    On information and belief based upon recent conduct by the Original Defendants and Mathes and recently discovered evidence, Mathes, at a time as yet unknown, joined the conspiracy of original defendants.  *See* ¶¶ 114-122, *infra*. Accordingly, reasonable doubt exists whether Mathes is independent of the Original Defendants and whether Mathes' denial of Tatara's request that NMP bring this action was an exercise of independent judgment.

23.    Plaintiff NMP, as a limited partner of JV, is authorized under the Delaware Limited Partnership Act, Del. Code Ann., Title 6, §17-100 *et seq.*, to bring a derivative action in the right of JV.  Article 4.5 of the Strategic Alliance Agreement (which has come to be referred to by the parties as the joint venture agreement ("JV Agreement")), attached as Exhibit A, requires the unanimous consent of a four member Board of

Directors whose members include Ms. Tatara, Ms. Mathes and CAM's two representatives, Wickenkamp and Burg.

24.    Ms. Mathes' unreasonable, bad faith refusal as a director of NMP to consent to the initiation of the derivative claims by NMP against Defendants, *see* ¶¶ 12-23, *supra*, renders it futile to have sought her consent as a director of JV to consent to the initiation of the same derivative claims by JV against the Defendants. Accordingly, reasonable doubt exists that Mathes is disinterested or independent, and therefore demand is excused.

25.    For Tatara to seek the consent of Wickenkamp and Burg, the two CAM representatives on the JV Board, to the initiation of the derivative action by JV against Defendants would have been futile, because they are not disinterested or independent or willing even to acknowledge the existence of legal issues:

(a)    Wickenkamp and Burg had previously, at least twice, rejected NMP's complaints concerning CAM and BVT's joint funds and NMP and CAM's disagreement over CAM's interpretation of the JV Agreement resolution in bad faith at leas twice, *see* ¶¶ 13-14, *supra;*

(b)    Wickenkamp and Burg effectively refused to consent to the initiation of the derivative claims by the JV against Defendants by their abrupt termination of the January 16, 2008 JV Board meeting, conferring with Mathes about her response, Mathes' refusal and request for dissolution of NMP;

(c).    Wickenkamp, as an Executive Partner of CAM, and Burg, as an Associate Partner of CAM, had conflicts of interest in considering consent to a derivative suit by JV against Defendants CAM, Sal. Oppenheim and BVT; and

(d).    Indeed, Wickenkamp, Burg and CAM's management's position was that these were business, not legal issues.

## IV.    **NATURE OF THE CASE**

26.    This case is about a conspiracy by Defendants Oppenheim, CAM and BVT, later joined by Defendant Mathes, to steal Plaintiffs' intellectual property and good will relating to investment in new private equity markets and to stymie Plaintiffs' launch of its own funds for such investments.  Specifically, Defendants conspired: (1) to gain access to Plaintiffs' intellectual property and good will through a sham joint venture with NMP; (2) to misappropriate Plaintiffs' intellectual property and good will by Defendants' unauthorized use of Plaintiffs' intellectual property and good will in the Defendants' competing investment products; (3) to deceive regulators and induce vendors and investors into the false belief that Plaintiffs are active investment managers and advisors to Defendants' competing funds; (4) to delay Plaintiffs from launching their own investment fund by concealing the conspiracy's acts and making bad faith arguments in defense of Defendants' acts and arguments; and (5) to block Plaintiffs' entry into the market for such investments by leapfrogging the joint venture into the market so as to create conflicts of interests that fatally undermine the legal and economic viability of the joint venture's funds.

27.    First, in early 2007, the Original Defendants, secretive German asset management firms, targeted Plaintiffs' intellectual property and good will by luring Plaintiff Tatara and Ms. Mathes into a joint venture with Defendant CAM, ostensibly to launch funds to invest in new private equity markets.  The Original Defendants lagged their competitors in private equity investment funds.  So CAM, fronting for Oppenheim and BVT, courted Tatara and Mathes, for their experience in such investments from their years of work in emerging market investments at the International Finance Corporation of the World Bank Group in Washington, DC. "New private equity markets" include developing economies ("emerging markets") where private equity finance is relatively new as well as advanced economies which have not traditionally relied upon private equity financing for company growth and restructuring.

28.    In March 2007, Tatara and Mathes agreed to enter a joint venture with CAM through NMP, which they organized for that purpose.  CAM agreed to invest $3 million dollars in the joint venture.  NMP would contribute its members' reputations, experience, investment model and contacts in new private equity markets.

29.    CAM and NMP entered into a joint venture agreement which: (a) protected shared confidential information against use for any purpose other than to advance the joint venture, (b) granted exclusivity to the joint venture for any investment by NMP, CAM and their affiliates in new private equity markets; and (c) specified that neither party could act as the agent of the other.

30.    Second, by May 2007, Ms. Tatara prepared a confidential initial draft private placement memorandum ("ppm") for the joint venture's "Core Fund" and

circulated it to CAM as a joint venture partner.    Without Plaintiffs' knowledge and consent, Defendants CAM and BVT immediately used the JV's draft ppm to prepare Defendants' own ppm that plagiarized from Ms. Tatara's draft and misappropriated Tatara and Mathes' good will for a competing fund planned by Defendants.

31.    By July 2007, Defendants CAM and BVT prepared a second ppm that, without Plaintiffs' knowledge and consent, plagiarized major portions of Ms. Tatara's draft ppm in support of a second competing fund planned by Defendants.    Defendants' second ppm misappropriated the Core Fund's name, the joint venture's name, Plaintiffs' intellectual property and good will.    Defendants specifically misrepresented that Tatara and Mathes were investment managers and investment advisors to Defendants' second fund.

32.    Third, Defendants conspired to cause actual confusion.    Defendants submitted their two false and misleading ppms to German bank regulators and deceived them into approving the funds.    Defendants launched and marketed the two funds by using the false and misleading ppms and other false and misleading promotional materials in Germany, the U.S. and elsewhere with, among others, third party on-line vendors.    Defendants have misled such vendors into the false belief that Plaintiffs are investment managers and consultants to, and compensated by, Defendants' funds, which the vendors have promoted to the investing public worldwide.    Defendants' ppms, promotional materials and funds also caused actual confusion and a likelihood of further confusion by Defendants' failure to disclose that the ppms, promotional materials and funds violate NMP's intellectual property rights and the joint venture agreement's confidentiality, exclusivity and agency provisions.

11

33.    During the first three months of sales through October 2007, Defendants sold more than $5 million in participation in their two funds to unsuspecting investors, using Plaintiffs' intellectual property and good will without Plaintiffs' knowledge and consent and without compensation to NMP or the joint venture.

34.    Fourth, Defendants conspired to delay launch of Plaintiffs' Core Fund by actively concealing from Plaintiffs Defendants' misappropriation and other acts in furtherance of Defendants' conspiracy.  By withholding information from, and providing false and misleading information to Plaintiffs, Defendants misled Tatara into believing that Defendants' ppms were only in draft; their funds would not compete with Plaintiffs' Core Fund; Defendants' activities were simply honest misunderstandings and that Defendants would launch no fund without a written agreement supplementing the joint venture agreement and compensating Plaintiffs.  Defendants further delayed the launch of Plaintiffs' fund by refusing to answer NMP's and the joint venture's lawyers questions about the details of CAM's participation in the BVT funds, and making evasive and bad faith arguments in defense of Defendants' breaches of the joint venture agreement.

35.    Fifth, Defendants' used concealment and delay to leapfrog the Core Fund into the market by launching: (1) BVT's funds and (2) Oppenheim's operation to invest in Asian markets.  Defendants' first launch fatally undermined the legal and economic viability of the joint venture's funds by creating conflicts of interest that cannot pass muster under U.S. law without required disclaimers that would render the JV Core fund and future funds  economically unviable among sophisticated U.S. investors.

36.    Defendants created numerous conflicts of interests without Plaintiffs' knowledge and consent by dividing the loyalties of Defendants' investment committee members, between Defendants' own funds and the joint ventures' prospective funds-- whose investments they could veto.    This would allow Defendants' investment managers to usurp investment opportunities brought to the joint venture by NMP and to influence the joint venture's allocations in attractive funds in new private equity markets.

37.    Defendant Mathes joined the Original Defendants' conspiracy in late 2007 or early 2008.    Mathes reversed her intent to seek guarantees that NMP be compensated for BVT's copied, unauthorized and literally false private placement memoranda; reversed her initial agreement that NMP be compensated for Sal. Oppenheim's violation of the exclusivity provision of joint venture agreement; after secret discussions with Defendant CAM, Mathes rejected legal action for compensation without any investigation into the proposed claims and twice sought to extinguish NMP's claims by demanding the dissolution of NMP and the purchase of Tatara's interest in NMP for a token amount by a bad faith assertion of a non-existing option; and has actively and in bad faith obstructed Tatara's efforts to gain compensation for NMP by refusing to comply with her disclosure obligations under NMP's LLC agreement, secreting bank accounts, and, upon information and belief, entering into secret agreements with the Original Defendants.

38.    Ms. Tatara seeks actual damages for injury to herself and derivatively to NMP and the JV, punitive damages, injunctive and declaratory relief and attorneys' fees.  NMP and the JV have been damaged by, among other things, the loss of profits from the loss of management fees from the Core Fund, follow-on funds and the BVT-

CAM funds; (b) the loss of profits from management fees diverted by Defendant Oppenheim's investments in violation of the exclusivity provision of the JV Agreement; and (c) BVT's misappropriation of NMP's intellectual property. Alternatively, Ms. Tatara seeks recovery on behalf of NMP and the JV of BVT's unjust enrichment.

## V.    FACTUAL STATEMENT

### A.    Defendants Conspire to Enter Into the Joint Venture To Gain Access to Plaintiffs' Intellectual Property

#### 1. NMP's Members

39. Plaintiff Tomoko Tatara is a Japanese citizen and permanent U.S. resident. She was educated in Canada, earning a B.A. in International Relations and an M.A. in Development Studies from the University of Toronto, and in the U.S., earning an M.B.A in Finance from Columbia University.   She is fluent in Japanese, English and Spanish.

40.    Prior to forming NMP, Ms. Tatara, worked for 13 years at the International Finance Corporation ("IFC"), the private sector investment arm of the World Bank Group. As a Senior Investment Officer, she specialized in equity and debt investments in emerging markets in Asia, Africa, the Middle East, Eastern and Central Europe, former Soviet Republics and Latin America.   From 2004 to 2005 Ms. Tatara was in charge of business development in emerging markets at the Bank of Tokyo-Mitsubishi's New York Office.

41.    With more than 20 years of experience in emerging and new markets, Ms. Tatara developed an investment and evaluation model and a qualified list of first tier private equity investment funds and active contacts at such funds. Such contacts are

14

essential when funds are in great demand in order to obtain fund "allocations" for investments.

42.    Prior to forming NMP, Defendant Mathes worked for 11 years at the IFC, specializing principally in sales, placements and fund-raising of equity investments in emerging markets products.

### 2.    Defendants Oppenheim, CAM and BVT

43.    Oppenheim, established in Germany in 1789, is a private bank focused on asset management and investment banking for affluent individuals, corporations and institutional investors.    On July 1, 2007 defendant Oppenheim moved its world headquarters from Cologne, Germany to Luxembourg in order "to escape what it saw as slow moving regulators and ebbing banking secrecy in Germany." International Herald Tribune, July 27, 2007.

44.    CAM was established in 1998 by Executive Partners Constantin von Dziembowski and Dr. Rolf Wickenkamp.    CAM makes private equity fund investments in the U.S. and Europe and provides administrative services for private equity funds.    In 2003 CAM took over the private equity fund-of-funds activities of Defendant Oppenheim, which until 2007 held a 15% interest in CAM.

45.    On July 11, 2007 defendant Oppenheim announced a "strategic partnership" with CAM in a press release touting the JV's expertise in "invest[ing] in emerging private equity markets" as a prized component of the strategic partnership that will contribute to Oppenheim's international expansion.    On November 22, 2007,

15

Oppenheim issued a press release belatedly disclosing that July's "strategic partnership" was actually an acquisition by Oppenheim of a "majority stake" in CAM.

46.    Defendant BVT is a German asset management firm specializing in U.S. and German real estate, tax-sheltered funds, environmental and alternative investments from its bases in Munich and Atlanta.   Since approximately 2000, BVT and CAM have partnered on six in a series of Global Funds which as of June 2007 had raised € 260 million.

47.    On information and belief, prior to engaging in discussions with Tatara and Mathes, Defendants lagged behind their competitors in creating investment products for investing in new private equity markets and internally identified an urgent need to catch up.

### 3. The CAM-NMP Joint Venture

### a. The Joint Venture Agreement

48.    Defendant CAM began discussions with Ms. Mathes who brought Ms. Tatara into discussions with CAM to form an entity to create investment vehicles to invest in new private equity markets.  In November 2006 and January 2007, Ms. Tatara and Ms. Mathes met in New York with senior management of CAM from Germany to discuss the formation of a joint venture to exploit Ms. Tatara's personal experience and expertise with private equity funds investments in emerging markets, and Defendant Mathes' experience in fund raising for such funds, gained from their respective years of experience at the IFC and other financial institutions.

49.    On March 7, 2007 Ms. Tatara and Defendant Mathes formed plaintiff NMP, which on March 14, 2007 entered into an agreement with defendant CAM, designated as the "Strategic Alliance Agreement,"  which has since come to be known by the parties as the JV Agreement.  The JV Agreement provided for the establishment of CAM-NewMarkets Partners LP owned equally (50% each) by CAM and NMP, Recital (A), for the purpose of the sponsoring and managing of "one or more funds or pooled investment schemes focused on investing in other funds, pooled investment, or direct investment schemes that primarily invest in opportunities in new private equity markets." Recital (B).

50.    The JV Agreement requires CAM to invest up to $3 million in the JV in return for 45% of the JV's profits.  Ms. Tatara and Ms. Mathes would provide "sweat equity" and their respective knowledge and experience in private equity investing in new private equity markets in return for 55% of the JV's profits.  Article 2.

51.    The JV Agreement provides among other things, as follows:

- That "each party and the Company undertake to the other Parties to maintain the confidentiality … of, and not to disclose, any and all confidential information received by it regarding the business and affairs of any Group Company or the other Parties.  Each Party and the Company further undertake to the other Parties not to make use of such confidential information other than for the purpose of this Agreement;…"  Article 7;

- That "neither party may terminate this Agreement prior to the second anniversary of the effective date of this Agreement."  Article 9;

- That "during the term of this Agreement, the Company shall be the exclusive vehicle through which NMP and CAM and their respective Affiliates shall carry out the Business or pursue any Potentially Suitable Investment opportunity in respect of the Initial Fund and any Subsequent Funds in new private equity markets (i.e., outside of North America and Western Europe). . . ."  Article 10;

- That [e]ach party agrees that it will not transfer …any right under this Agreement without all the other Party's [sic] prior written consent." Article 16;

- That "[n]one of the Parties shall be the agent, partner or legal representative of the other … nor shall any Party have the right or power to enter into any contractual obligation on behalf of the other …" Article 17;

- That "any and all notices or requests and other communications required or contemplated to be made under this Agreement shall be in writing and in English …. Article 18; and

- That the JV "Agreement shall be governed and construed in accordance with the internal laws of the State of New York… The Parties hereby agree and consent to be subject to the exclusive jurisdiction of any federal court sitting in the County of New York…. in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby." Article 21.

52.    Between March and November 2007, CAM senior management made at least five trips from Germany to New York to attend JV operational and/or board of directors meetings with NMP partners pursuant to the JV Agreement.

53.    In May 2007, Oppenheim senior management traveled to New York from Germany to meet with Ms. Tatara, apparently to investigate NMP, presumably as part of Oppenheim's due diligence for confidential negotiations to acquire CAM for, among other things, NMP's expertise in new private equity markets.

### b.    The Joint Venture's "Core Fund"

54.    In May 2007, after initial drafting by Ms. Tatara which incorporated her proprietary new market private equity fund investment model ("Investment Model") and after disclosing drafts to CAM as early as April 2007, the JV finalized and began limited

18

distribution for the European market of a confidential private placement memorandum for CAM NewMarkets Partners Fund I LP ("JV-PPM") to raise $350 to $500 million "to pursue private equity fund investments in new private equity markets outside the U.S., Canada and Western Europe…"   In July 2007, the JV began distribution of a version of the JV-PPM in the U.S.  Distribution of the U.S. version of the JV-PPM was delayed for 90 days on advice of counsel as a result of CAM's unauthorized issuance of a press release about the JV Core Fund to the financial media, including the Wall Street Journal, in potential violation of S.E.C. regulations.

55.    The JV Core Fund strategy was developed by plaintiff Tatara based on years of experience at the IFC and the Bank of Tokyo Mitsubishi, which allowed her exposure to investment conditions in emerging and new private equity markets. However, the specific Investment Model, as defined ¶ 48, *infra*, was her own creation.

56.    The Investment Model of the JV Core Fund has unique allocation, due diligence, diversification, market segmentation and post-investment monitoring models.

57.    The Investment Model calls for investing up to $500 million in 15-20 funds. This would produce a large enough position in each fund so that the JV could have board or observer representation to have better access to information which is important because the conditions in these countries are dynamic and risk-laden.

58.    The JV Core Fund's allocation and diversification strategy calls for investing in a mix of developed and developing countries, a mix of hard and soft currencies, and a mix of regions (e.g., more than half in Asia and the rest spread over Latin America, Eastern Europe, Russia, South Africa and Israel). It also calls for

investing up to 20 percent in venture funds and to consider investing in some secondary limited partner positions to allow further vintage year diversification. This, combined with relatively lower debt components in the investee funds, gives the investor in the Core Fund a much safer product than a pure emerging market fund, but still provides the investor an opportunity to test the markets outside the more conventional markets in the United States and Western Europe.

59.    The JV Core Fund also focuses on post-investment follow up, including hands-on monitoring through regular country visits and in-depth interviews, to safeguard investor interests.

60.    The Core Fund embodied: (a) NMP and its members' names, resumés and experience in investing in and fundraising for new private equity markets ("Business Identities"); (b) Ms. Tatara's proprietary investment strategies and due diligence, monitoring and fund models, qualified fund lists, established personal contacts necessary for access to allocations in hot funds, and qualified institutional investor lists, also with personal contacts, to raise money ("Investment Model") and (c) NMP's "Confidential Information" as defined in the JV Agreement (collectively, "Intellectual Capital"). It also embodied the members' personal good will.

**B.    Defendants Conspire to Misappropriate
Plaintiffs' Intellectual Capital and Good Will**

61.    On information and belief, at approximately the same time that the JV began distribution of the JV PPM – Europe in May, U.S in July 2007 – to market CAM NewMarkets Partners Fund I ("JV Core Fund"), BVT with CAM's knowledge and approval, but without Plaintiffs' knowledge and consent, began distribution of two

German language private placement memoranda ("ppms") for investment vehicles: (1) the "BVT-CAM Private Equity Global Fund VI.", dated July 2, 2007 ("Global Fund"), and (2) the "BVT-CAM Private Equity New Markets Fund," dated July 27, 2007 ("New Markets Fund"). BVT's funds misappropriated significant features of the JV Core Fund developed by Plaintiff Tatara. Defendants' adoption of the official name of Plaintiffs' Core Fund (with the mere addition of a space between New and Markets) was obviously intentional, bound to be confusing given the identical pronunciation and predatory.

### 1.     BVT's Global Fund

62.     BVT's Global Fund and New Markets ppms both explain the U.S. origins and model for private equity funds and the investment opportunities in new private equity markets. The BVT-CAM Global Fund Prospectus, for example, states that it intends to: "Target Investments in New Markets-Zielfonds."

63.     The BVT-CAM's Global Fund ppm defines "Zielfonds" as private equity funds and "New Markets" as the Asia-Pacific Rim (Australia, China, India, Japan, Southeast Asia), Latin America, South Africa, Israel, Central and Eastern Europe, as well as Russia; in other words, the JV's target markets outside the U.S., Canada and Western Europe, as defined in the JV Agreement.

64.     The Global Fund ppm also includes a section headed "Conflicts of Interests" which purports to disclose conflicts attending the Global Fund. However, BVT fails to disclose CAM's conflict of interest in the Global Fund based on (1) the exclusivity provision of the JV Agreement and (2) the participation of CAM senior management on the investment committees of both the JV Fund and the BVT's Global Fund.

### 2.    BVT's New Markets Fund

65.    BVT's New Markets ppm contains much of the boilerplate from the Global Fund ppm, including the U.S. model for private equity funds: the BVT-CAM NM Fund ppm again states its intention of investing in 15-20 new market private equity funds and copies its allocation strategy, market analysis and NMP members' biographical information.  BVT has also misappropriated other confidential information from the JV's confidential marketing document into this ppm, including pages 18-23 of the "Opportunity" chapter, paragraphs from page 26 of the "Investment Strategy" chapter, and a chart from page 32 of the JV's ppm.

66.    Both of BVT's ppms include a chart styled "Parallel Investments with CAM fund of funds," depicting the JV as an example of a CAM fund of funds parallel to the BVT-CAM NM Fund.    This has the effect of misleading regulators and investors into falsely believing that the two funds share management, investment committees and that BVT's fund will invest proportionately in all transactions on effectively the same terms and conditions as the JV's Core Fund.  BVT's ppm extols the benefits of piggybacking on institutional quality funds, namely, the JV's Core Fund.

67.  BVT's funds ppms are available in the U.S. on an Internet web site called wallstreet:online with the domain name, "wo-capital.de," operated by wallstreet:online capital AG, Michaelkirchstrasse 17/18, 10179 Berlin Germany.  The dropdown menu to order additional materials includes USA as a target market.

22

### 3. Defendants' Brazen Misappropriations of NMP's Intellectual Capital and Good Will

68.     The Global Fund ppm, under the heading of "BVT and CAM: Experience and Partnership" and in the section describing CAM that leads to the heading of [fund] "Management," relies upon, indeed extols, the expertise and experience of NMP and its individual partners [hereinafter "NMP Names, Identities and Experience"] acquired through their years of service as "Investment Professionals" for "new private equity markets" with the IFC.  The ppm further exploits the JV's "focus on complex and highly attractive private equity markets in Asia, Eastern Europe, Latin America and South Africa."

69.     Neither BVT nor CAM ever sought or obtained the permission of JV, NMP, Ms. Tatara or Ms. Mathes to reference NMP Names, Identities and Experience in the promotion of BVT's retail investment products in 15-20 private equity funds and thereby compete with the JV's fund.

70.     Contrary to statements in the BVT-CAM Global Fund Prospectus neither JV, nor NMP, nor Ms. Tatara nor Ms. Mathes has any management or investment selection role in BVT's Global Fund.   Indeed, BVT and CAM purposely withheld information about the unauthorized use of NMP Names, Identities and Experience and thinly veiled reference to Ms. Tatara and Ms. Mathes in the Prospectus from NMP and its partners.

71.     BVT's New Markets ppm places even greater reliance than its Global Fund ppm on its purported but non-existing ties to NMP and its partners:

- The opening section styled "Editorial" extols the "extensive experience of NewMarkets Partners in Washington D.C. ... in private equity structures, strategies and funds in the target markets" of the PPM;

- The "Offering Overview" section lists as "Experienced Partners" NMP partners Ms. Mathes and Ms. Tatara by name and includes them in the 148 years cumulative experience of JV's experience in "private equity and asset management;"

- Under the section headed "Investment Decisions," the ppm states that investment decisions would be made by a BVT subsidiary and CAM management with the "support and advice" of, and within the framework of parallel investments by, the JV;

- In a section headed "Top Quarter Funds," the PPM explains that the partnership with NMP secures the opportunity to identify and gain access to existing and future "Top Performer[s];"

- In a section headed "BVT and CAM: Experience and Partnership," the PPM provides extensive biographical information on NMP's two partners, identified by name, and their professional experience in emerging market investments during their prior work at the IFC. (Uncertified summary and translation from German).

72.    Between them, BVT's two ppms make a total of 43 references to NMP, JV, Plaintiff Tatara and Defendant Mathes.

73. BVT's 100-page New Markets ppm and its downloadable 16-page German short form version, available on the web and marketed in the "USA" through wallstreet:online, touts NMP and its partners:

> The partnership with New Market Partners guarantees the opportunity to identify and gain access to existing and future top performers in new markets. Based on their many years experience, the responsible investment managers Tomoko Tatara and Marie-France Mathes know the most experienced [investment] teams, their respective track records and understand the regional peculiarities well. To evaluate possible [fund] allocations, they can reach out to an eminently wide network that reaches from regional bank and industrial managers, national and supranational organizations and their members to the relevant departments of the IFC, a World Bank affiliate. (Uncertified translation from German).

74.    Neither NMP, nor the JV has any partnership with BVT.  Ms Tatara and Ms. Mathes are not investment managers for BVT.  Ms. Mathes is not an investment manager at all.  Neither Ms. Tatara nor Ms. Mathes advises BVT on new market investment teams.  BVT has no call on either Ms. Tatara or Ms. Mathes' global network.  Neither Ms. Tatara nor Ms. Mathes evaluates possible allocations for BVT.  Indeed, no agreement of any kind, written or oral, exists between NMP and its partners, on one hand, and BVT on the other hand.

### 4.    Defendant's Misappropriation of Ms. Tatara's Person

75.    On August 13, 2007 BVT Managing Partner Robert List emailed Ms. Tatara to invite her on a road show for the "BVT-CAM-NMP Fund." (sic).  In the body of the email, Mr. List suggested that Ms. Tatara join him in Hamburg, Frankfurt and Munich.  Ms. Tatara agreed to attend the Munich road show in the belief that she was marketing the JV's fund, what the email referred to as "CAM NEW MARKET PARTNERS FUND I" (sic).

76.    Mr. List's August 13 email, at a time when Ms. Tatara did not know the contents of either BVT ppm,  presented Ms. Tatara a bullet point list of items that "would be very important to be mentioned in your presentation," including:

- What is the New Markets?  What is the difference to Emerging Markets?

- Why is investing in New Markets attractive – especially now?

- What is your rating / estimation of the different New Market regions?

- Networking: what is your special access to New Markets?

- What makes your special expertise – especially resulting from your job / working with world bank?

77.     Mr. List's list of topics for Ms. Tatara to address at the road show parallel the unauthorized representations about NMP and its partners in BVT's still secret ppms.

78.     Prior to her attendance at the road show in Munich on September 18, 2007, Ms. Tatara was asked to come late at the end of the conference and thus denied the opportunity to question BVT personnel about Defendants' ppms, funds and business arrangement.  The proceedings were in German, which she doesn't speak.  However she discovered that BVT was distributing glossy printed ppms for the BVT funds to the attendees and then requested that BVT immediately send copies to her office and to Ms. Mathes.

79.     BVT's invitation to Ms. Tatara was part of BVT and CAM's surreptitious scheme to fool NMP into marketing BVT's funds in accordance with Defendants' unauthorized representations in the BVT-CAM ppms.  In BVT's pursuit of this scheme, on October 30, 2007, BVT's senior partner Andreas Graf von Rittenberg emailed Ms. Tatara that he was in New York until the following day and would like to meet with her that afternoon.  Ms. Tatara could not meet with Graf von Rittenberg that afternoon due to her prior commitments.

C.    **Defendants Conspired to Deceive Regulators
      And Have Actually Confused Vendors and Investors**

1.    **Defendants Conspired to Submit False and Misleading
      PPM's to the BaFin, the German Counterpart to the SEC**

80.    Both the Global Fund and New Market ppms are signed by BVT's

Founder, President and Managing Partner Harald von Scharfenberg.    During the

summer of 2007, BVT submitted the Global Fund ppm and the New Markets Fund ppm

to the German Federal Finance Supervisory Authority ("BaFin"), the German

counterpart to the U.S. Securities and Exchange Commission.    CAM knew of and

approved BVT's submission of the Global Fund and New Market fund ppms to BaFin.

Neither BVT nor CAM disclosed the contents of BVT's two ppms to NMP prior to BVT's

submission of the ppms to BaFin.

81.    Neither NMP nor its partners have agreed to BVT's use of NMP Names,

Identities and Experience in, or in connection with, BVT's ppms.    Neither NMP nor its

partners have agreed to promote or to the use of NMP Names, Identities and

Experience to promote BVT's Global and New Market funds.    Neither NMP nor its

partners have been asked, and have not agreed, to advise BVT in any way.

82.    The JV agreement specifically prohibits CAM from acting as NMP's agent.

Thus CAM could not lawfully authorize BVT to use the statements about NMP and its

partners in BVT's ppms.

83.    BVT and CAM conspired to submit the materially false and misleading BVT-

CAM Global Fund and the BVT-CAM New Markets Fund ppms to BaFin in order to gain

regulatory approval for an investment vehicle that breaches the JV Agreement,

interferes with the JV's, NMP's and NMP's partners business opportunities under the JV Agreement and misappropriates for BVT and CAM's advantage NMP and its partners investment model, identities and good will.

### 2.    Defendants Have Actually Confused the Market

84.    BVT's misrepresentations have caused actual confusion in the market. Fondsklick.com offers BVT's New Markets Fund on the Internet.   Under the heading "Management Team and Management Compensation" fondsclick.com names:

CAM NewMarkets Partners, Washington

Uniquely 0.30% for 2007: lfd 1.65% per annum of subscribed

85.    The JV has no role in the BVT New Markets Fund and derives no compensation from it.

### 3.    Defendants Misappropriation Is So Complete
### That Defendants Confused Even Themselves

86.    A measure of the likelihood of confusion that Defendants' misappropriation is likely to cause in the market, is the degree to which Defendants' own managements, confused, assuming their benign intent, the names of Plaintiffs' and Defendants' products.

87.    BVT's Managing Partner List's August 13, 2007 email to Ms. Tatara, abbreviated Defendants' New Markets (with a space) Fund as Plaintiffs' "NMP" and referred to JV's Core Fund as "CAM NEW MARKET PARTNERS[with a space]FUND I" that should have been "NMP." *See* ¶¶ 75-76, *supra*.

88.    CAM's Egbert von Cramm's December 4, 2007 email to NMP of a draft "Cooperation Agreement" relating to the two BVT funds erroneously abbreviated "BVT-CAM Private Equity New Markets [with a space] Fund" as "('BVT-NMP I')" as if NMP were somehow associated with that fund. *See* ¶ 98, *infra*.

89.    CAM's Basic Principles Memorandum that Emile van der Burg emailed to NMP on December 4, 2007 mistakenly refers to Defendants' fund as the "BVT-CAM-NewMarkets [no space] fund. *See* ¶ 99, *infra*.

**C.    Defendants Conspired to Delay Launch of the JV's Core Fund To Leapfrog the Launch of Defendants' Competing Funds**

**1.    Defendants' Evasions and Delay**

90.    CAM and BVT intentionally withheld information about CAM's relationship with BVT and BVT's New Market ppm offering parallel investment strategies piggy-backing on NMP's partners experience from NMP and its partners. At first during the spring of 2007, CAM informed NMP that BVT was a potential client of the JV and enticed NMP partners to meetings with BVT by the prospect of BVT's investment in the JV's fund. When NMP began hearing about BVT's ppms, and requested copies, CAM and BVT delayed and told NMP that everything was in draft.

91.    At the request of NMP through its New York counsel, BVT's German law firm eventually sent purported draft electronic versions to the JV's outside counsel in German. When the JV's lawyers asked for English translations, BVT refused. But when NMP and its lawyers learned that translations would run $10,000 per ppm, it decided to continue pressing BVT and CAM for the critical information.

92.    In the summer and fall of 2007, as CAM continued to dodge NMP's questions about its arrangement with BVT, NMP sought assistance from its counsel at Dewey & Ballantine, now Dewey & LeBoeuf ("Dewey").   At Ms. Tatara's behest, on September 11, 2007 Dewey provided Ms. Tatara with a detailed email about "Questions for BVT/CAM Regarding the German Retail Vehicles."   Dewey sought, among other things:

- "Confirmation" that BVT's two funds are required to invest in each investment that is made by the JV's Core Fund on pro rata non-discriminatory bases;

- "Explanation" of why the BVT funds would not be admitted to the JV's Core Fund as a feeder limited partner rather than on a purely parallel basis;

- "Confirmation" of the management structure of the two funds; and

- "A detailed explanation" of the fee structure and "economic interests (profits or otherwise)" of CAM, NMP, and NMP's partners Tatara and Mathes in connection with the two BVT funds.

93.    NMP forwarded Dewey's questions to CAM, which continued to evade Dewey's questions.  Instead of responding, CAM: (1) complained about the legal fees in an email dated Sunday, November 18, 2007, and (2) tried indirectly to amend the JV Agreement.

## 2.    Pre-Launch of BVT Funds

94.    BVT has reported "strong sales' of its funds. According to the latest figures available, for the week ending November 9, 2007, BVT sold €1.5 million of its New Markets Fund, driven by sales to Postbank, "one of the most powerful retail banks" in Germany, that brought total sales up to that point to €1.1 million.  BVT's sales of its Global Fund were €230,000 for the same week, bringing total sales of that fund to

nearly €2.3 million. In sum, in a mere four months, BVT had sold €3.3million for investing in funds in new private equity markets under its pretense that NMP, Ms. Tatara and Ms. Mathes were supporting and supervising these investments

### 3.    Pre-Launch of Oppenheim Hong Kong

95.    In meetings with defendant Oppenheim senior management in Cologne from October 24-25, 2007, Oppenheim informed NMP that it has obtained a business license to operate, and, is accordingly opening an office in Hong Kong.  Oppenheim has hired local employees.

96.    In October 2007, Oppenheim told NMP that it would be dispatching a senior manager from Cologne, Stefan Ufer, to start and head, among other things, a private equity group that will invest in Asian funds, thereby competing directly with the JV.  In fact, Mr. Ufer viewed the JV as a competitor and was upset that Oppenheim might invest in the JV.

97.    Since Oppenheim acquired CAM in July 2007 it is an "affiliate," as defined by the JV Agreement and is covered by the exclusivity provision.  Oppenheim's current and on-going expansion to Asia and other investments in Asian private equity funds and other transactions in Asia have or will imminently breach the JV Agreement.

### 4.    CAM's Bad Faith Attempts to Evade the JV Agreement

98.    On December 4, 2007, CAM's Egbert von Cramm sent NMP a draft "Cooperation Agreement" relating to the two BVT funds.  Significantly, even CAM was confused as to the funds.  It abbreviated "BVT-CAM Private Equity New Markets Fund" as "('BVT-NMP I')."  The proposed Cooperation Agreement would have: (1) carved the

BVT and other "Retail Funds" out of the exclusivity provision of the JV Agreement; and (2) allowed CAM to bypass the financial terms of the JV Agreement and pay the JV fees at a discriminatory and disproportionately lower rate. The NMP rejected the draft Cooperation Agreement which was never executed by either CAM or the JV.

99.    On December 4, 2007, the same day that Mr. von Cramm sent a draft Cooperation Agreement seeking to narrow the JV Agreement's exclusivity provision, CAM's Emile van der Burg sent the NMP partners an email attaching a document dated November 23, 2007 setting forth what it termed "The Basic Principles governing exclusivity ("Basic Principles Memo," attached as Exhibit B). Curiously, Mr. van der Burg's Basic Principles Memo interpreted the JV Agreement as obviating Mr. von Cramm's proposed Cooperation Agreement.

100.    Specifically, CAM's Basic Principles Memo interprets the JV Agreement as "limited" by the organizational purpose of the investor (whether CAM, its affiliates or its customers), not by the nature of the investment as provided by the JV Agreement. CAM contends that:

> Whenever CAM, its affiliates and any funds, managed accounts or of any of its other investment vehicles want to make an investment in new private equity markets out of vehicles not organized primarily for the purpose of investing in new private equity markets, they are free to do so without any obligation whatsoever to do so through CAM-NMP. (Emphasis in original).

101.    The Basic Principles Memo also falsely implies that the BVT funds are also exempted by the organizational purpose limitation:

> Concerning new private equity markets investments to be offered by CAM-NMP to BVT-CAM-NewMarkets (sic) and/or any other CAM fund or account not organized primarily for the purpose of investing in new private equity markets, CAM and CAM-NMP will negotiate a (non exclusive)

32

advisory mandate which will govern if, when and how and on what economic terms and conditions CAM-NMP will[:]

> (a) offer investment opportunities to such CAM-managed funds or accounts.
> (b) Manage, monitor and report on investments accepted by such managed funds or accounts.

102.    In addition, CAM admits that it too has funds "existing or in the process of being raised" which it erroneously contends are exempt from the JV Agreement's exclusivity clause, including CAM Europe I LP, CAM IV, CAM-BVT VI, and certain of defendant Oppenheim's new funds, but contends that they are exempt from the JV Agreement exclusivity provision.  In addition, CAM contends that it and its affiliates can make further new investments in funds that invest up to 30% of total commitments in new private equity markets.

103.    Between them, BVT's two ppms mention "new markets" and "emerging markets" 81 times and "private equity" 744 times.  As such, BVT's two funds (1) are "organized primarily for the purpose" of investing in new private equity markets and (2) will directly compete with the JV's Core Fund.  Indeed, BVT's New Markets Fund is essentially identical to the JV's Core Fund.

### E.    Defendants' Conspiracy Created Conflicts of Interests That Block NMP's Entry and Economic Viability

#### 1.    Conflicts of Interests

104.    Defendants' rush to pre-launch into the market caused immediate and permanent damage to the JV and NMP by creating: (a) a wide and permanent breach of the exclusivity provision; (b) decision making conflicts; and (c) conflicts of access to desirable investment funds and confidential information.

33

105.    As concerns exclusivity, Defendants CAM (through its own current and future funds), BVT-CAM retail funds, and Oppenheim's Asian operations will permanently compete against JV's Core Fund and future funds and will create permanent conflict for investing in desirable funds in new private equity markets.

106.    CAM investment committee members of the JV will have all the access to valuable, hard-to-get confidential information on private equity and venture funds, some of which does not circulate publicly due to SEC rules.    Defendants will be able to start developing their own relationships with hot funds in new markets by using NMP's information and due to their size will have more cash to invest.

107.    Such conflicts issues are normally the subject of due diligence, particularly by sophisticated institutional fund investors.    Yet the required disclosure of the conflicts will inevitably shake investor confidence, drive away investors and handicap the JV's fund because of persistent actual and potential competition from affiliated Defendants' funds.

## 2.    Dewey & LeBoeuf Opinion

108.    On December 20, 2007, the JV obtained an opinion of New York corporate counsel which concluded "that CAM's interpretation ... of the JV Agreement seem to contradict our understanding of the JV Agreement and may result in arrangements that could adversely affect the marketability of the Core Fund."    Attached as Exhibit C.

109.    Dewey analyzed CAM's contentions as to retail funds such as BVT's and determined that:

34

CAM's proposal would have the Retail Funds with lower fee structures than that of the [JV's] Core Fund, directly compete with the Core Fund while allowing affiliates of the Core Fund to receive compensation from such competing Retail Funds.

\*\*\*\*

CAM proposes that Sal. Oppenheim and its affiliates not be considered affiliates of CAM.  Such exclusion of Sal Oppenheim (and its affiliates) may create another large source of vehicles with which the [JV's] Core Fund would compete for investment opportunities.

110.      Dewey rejected CAM's interpretation of "affiliates:"

With Sal. Oppenheim acquiring a majority stake of CAM in the summer of 2007,   Sal Oppenheim (and its Affiliates) would be an "affiliate" of CAM under the JV   Agreement and, therefore, should be subject to the JV Agreement's exclusivity clause.

111.   Dewey concluded that:

Unfortunately, it appears that there is a fundamental disagreement regarding the very basis of the joint venture between NMP and CAM.  It will be difficult to continue drafting agreements for the Core Fund and representing the Core Fund if this conflict is not resolved.

### 3.      Defendants' Intemperate and Telling Retort

112.   On January 3, 2008, NMP sent the Dewey opinion to CAM and sought a proposal to resolve the disputes at the January 16, 2008 board of directors meeting.  On January 11, 2008, CAM's Associate Partner Emile van der Burg responded with an email on behalf of himself and Executive Partner Rolf Wickenkamp summarily rejecting the opinion, attached as Exhibit D:

We have read the Dewey memos.

We find the Dewey memo(s) a repetition of earlier stated positions and as such do not contribute much to what are the business issues rather [than] legal ones.

\*\*\*\*\*

35

In summary, the position taken by Dewey and you(?) would unless CAM-NMP is prepared to act as a non-exclusive advisor to CAM funds, force CAM to refrain from offering any allocation to new markets investments within its diversified funds and oblige Sal. Oppenheim to also withdraw from such investments, wherever its affiliates operate. Clearly, this is totally impossible, was never CAM's intention, we could not possibly have agreed to it and the JV agreement is consistant (sic) with this position.

113.   Clearly the dispute among the parties is real, intractable and has made it impossible to draft Limited Partnership Agreements, documents necessary "to close on" investments into JV's Core Fund.  CAM has effectively killed the JV before it truly got off the ground.  Meanwhile CAM continues to market and profit from its competing BVT funds, free riding on NMP and its partners.

## F. **DEFENDANT MATHES JOINS THE CONTINUING CONSPIRACY**

114.   Beginning January 10, 2008, Ms. Tatara made several requests to Defendant Mathes to inspect NMP's books and records pursuant to Article 6.01 of NMP's LLC Agreement, attached as Exhibit E.  The requests related, among other things, to Mathes' communications with defendants.  On June 19, 2008, NMP purported to comply with the requests, but in fact limited documents available for inspection to communications prior to December 6, 2007, excluded, among other things, telephone records and notes of meeting and telephone conversations and agreements between Mathes and defendants.

115.   A document produced on June 19, 2008, reveals that on or about September 28, 2007, Mathes, who speaks German, reviewed, and made handwritten marginal comments in English on, the BVT-CAM New Markets Fund ppm dated July 27, 2007. Mathes' notes, among other things, that:

- "CAM has an economic interest in BVT-CAM-NMP?" (sic);

- "How can we be guaranteed that we get 50 basis points;"

- That such payments would be "OK for informal advice without DD [due diligence];"

- Who "guarantees" these BVT commitments to the NMP?

- The ppm represents that it would be advised by the CAM-NMP JV's management through the JV's Core Fund, next to which Mathes added dual exclamation points;

- The ppm paragraph quoted in ¶ 73, *supra*, is wrong or that she disagrees in particular with BVT making the statements that Tatara and Mathes would be the responsible investment managers, and BVT's reference to Tatara and Mathes' prior experience at the IFC, next to which Mathes place dual exclamation points and "No;"

- The CAM-NMP JV should protect itself from liability from the BVT-CAM New Markets Fund's "overcommitment" strategy;

- Other statements concerning investment strategy were "Wrong," a "Contradiction" and "X"-ed out; and

- Questioned other statements about her personal background and about BVT's management with underscoring and question marks in the margins.

116. Defendant Mathes never shared her comments with Ms. Tatara.

117. Defendant Mathes' files also included a copy of the BVT-CAM New Markets Fund ppm in which each mention of Ms. Tatara, defendant Mathes, NMP and the CAM-NMP was highlighted in yellow.

118. Accordingly, as of September 28, 2007, Defendant Mathes secretly agreed with key claims of Tatara's complaint as concerns at least: (a) BVT and CAM's unauthorized use of Plaintiff Tatara and Defendant Mathes' personal identities and backgrounds, and NMP and the CAM-NMP JV's corporate identities; and (b) the literal falsity of the BVT-CAM New Markets Fund ppm's designation of Defendant Tatara,

Defendant Mathes, Plaintiff NMP and Plaintiff JV as investment advisors and investment managers of the BVT-CAM New Markets Fund.

119.    Defendant Mathes also agreed openly with the allegations in Tatara's complaint as concerns the exclusivity provision of the JV Agreement.

120.    Defendant Mathes never voiced any disagreement with the Dewey Opinion with respect to either the BVT-CAM New Markets Fund or the exclusivity provision and has failed to conduct an investigation as to any claims in Tatara's Complaint.

121.    Defendant Mathes has: (a) engaged in continued secret communications with at least CAM among the Original Defendants; (b) refused to comply with Tatara's requests for inspection of books and records; (c) specifically refused to produce records of her communications and agreements with original defendants; (d) refused to disclose whether original defendants were paying her personal counsel's legal fees; and (e) shortly after the filing of the original complaint on May 2, 2008, secretly closed all significant corporate bank accounts, on which Ms. Tatara had informational access and signatory authority, and moved approximately a quarter of a million dollars to new accounts, to which Ms. Tatara has neither informational access nor signatory authority.

122.    On information and belief, Mathes and one or more of Original Defendants have entered into a secret agreement to obstruct, impede and frustrate this action.

## CAUSES OF ACTION

Plaintiffs assert the following derivative claims unless plaintiff is otherwise specified:

## Count 1
## Breach of Contract
## (Against CAM)

123.    Plaintiffs hereby incorporate paragraphs 1-122 by reference as if fully set forth herein.

124.    NMP and CAM entered the JV Agreement which limits CAM's use of NMP's confidential information and provides the JV with exclusivity among the parties of investment vehicles for new private equity markets.

125.    NMP has performed under the Agreement.

126.    Defendant CAM breached the JV Agreement by among other things, its joint new markets funds with, and marketed by, BVT.

127.    Oppenheim's decision to open a Hong Kong office for the purpose of making investments in private equity funds in new market constitutes a breach or imminent breach of the JV Agreement.

128.    CAM and Oppenheim's breach of the JV Agreement has proximately caused injury and harm to plaintiffs JV, NMP and NMP partner Tatara.

## Count 2
## Tortious Interference
## (Against Defendant BVT)

129.   Plaintiffs hereby incorporate paragraphs 1-128 by reference as if fully set forth herein.

130.   The JV Agreement was a valid contract between plaintiff NMP and defendant CAM.

131.   Defendant BVT knew of the existence of the JV Agreement.

132.   CAM's breach of the JV Agreement intentionally and improperly induced by BVT caused damage to plaintiffs Tatara and NMP.  Said breach would not have occurred absent BVT's inducement.

## Count 3
## Unfair Competition
## (Against Original Defendants)

133.   Plaintiffs hereby incorporate paragraphs 1-132 by reference as if fully set forth herein.

134.   Plaintiff Tatara held a title or name well established in the public mind.

135.   NewMarkets Partners LLC and the JV, CAM New Markets LP, are known and identified as sources of and/or potential sources for investing in funds in new private equity markets.

136.   Original Defendants unfairly used such title or name, biographical information and corporate names in such a manner as to deceive the public.

137.    Plaintiffs Tatara, NMP and JV were injured and harmed as a result of defendants' acts.

### Count 4
### Lanham Act, 43(a), 15 U.S.C. §1125
### (Against Defendants BVT and CAM)

138.    Plaintiffs hereby incorporate paragraphs 1-137 by reference as if fully set forth herein.

139.    Defendants BVT and CAM made false or misleading statements regarding the nature and characteristics of Defendants' products or services.

140.    Defendants' said misrepresentations were used in commerce.

141.    Defendants' said misrepresentations were made in the context of commercial advertising and promotion.

142.    Defendants' actions made the plaintiffs believe that they would be and they were in fact damaged by the misrepresentations.

143.    Defendants misrepresentations have an effect on Commerce in the United States.

### Count 5
### Civil Conspiracy
### (Against CAM, Sal. Oppenheim, BVT and Mathes)

144.    Plaintiffs hereby incorporate paragraphs 1-143 by reference as if fully set forth herein.

145.   Defendants CAM, Sal Oppenheim, BVT, later joined, aided and abetted by Defendant Mathes, entered into a corrupt agreement to: (a) gain access to, and convert or misappropriate, NMP's intellectual property and good will; (b) make unauthorized use of NMP and its members names and identities, (c) unfairly compete with NMP and the JV in investing in new private equity markets; and (d) delay and prevent NMP and the JV's entry into the market for investment in new private equity markets.

146.   Original Defendants engaged in numerous overt acts in pursuit of their corrupt agreement, including but not limited to their submitting false and misleading private placement memoranda to German bank regulators and distributing and publishing false and misleading private placement memoranda and promotional materials.

147.   Defendants intentionally participated in the furtherance of the plan and purpose of their corrupt agreement.

148. Defendants' conspiracy resulted in damage and injury to the JV and NMP.

### Count 6
### Declaratory Judgment, 28 U.S.C §2201
### (Against Defendants CAM and Oppenheim)

149.   Plaintiffs hereby incorporate paragraphs 1-148 by reference as if fully set forth herein.

150.   An actual jurisdictionally requisite controversy over the rights of the parties under the JV Agreement exists.

151.    The court should declare that: (1) the JV Agreement's exclusivity provision is not limited to firms and funds which are organized primarily to invest in new private equity markets; and (2) Oppenheim is an affiliate as defined by the JV Agreement.

### Count 7
### Unjust Enrichment
### (Derivatively Against BVT and Tatara Individually Against CAM and BVT)

152.    Plaintiffs hereby incorporate paragraphs 1-151 by reference as if fully set forth herein.

153.    Defendants BVT benefited and continue to benefit from Defendants' use of the names and reputations of plaintiffs NMP and Tatara.

154.    Plaintiffs NMP and Tatara have not been and are not adequately compensated for the unauthorized use of their names, reputations and good will by Defendants.

155.    Under the circumstances, the enrichment of defendants BVT and CAM is unjust.

### Count 8
### Breach of Fiduciary Duty
### (Against CAM)

155.    Plaintiffs hereby incorporate paragraphs 1-155 by reference as if fully set forth herein.

157.    Defendant CAM, as a partner in the JV, owed fiduciary duties of undivided and undiluted loyalty and full disclosure to NMP, also a partner in the JV.

158.    Defendant CAM breached its duty of loyalty to NMP by misusing NMP Names, Identities and Experience for CAM's own benefit and to the detriment of NMP and its individual members.

159.    Defendant CAM breached its duty of full disclosure by repeatedly failing to provide requested information to NMP regarding CAM's involvement with retail funds that were being designed to compete with the JV's funds.

160.    Defendant CAM's breach of its fiduciary duties caused damage and injury to the JV and to NMP and its members.

### Count 9
### Breach of Fiduciary Duty
### (By Tatara Individually Against Mathes)

161.    Plaintiffs hereby incorporate paragraphs 1-160 by reference as if fully set forth herein.

162.    Defendant Mathes, as a member of NMP, owed fiduciary duties of undivided and undiluted loyalty and full disclosure to Tatara, also a member of NMP.

163.    Defendant Mathes breached her duty of loyalty to Tatara by her bad faith refusal to consent to action against Original Defendants for Mathes' own benefit and to the detriment of NMP and Tatara.

164.    Defendant Mathes breached her duty of full disclosure by repeatedly failing to provide requested information to Tatara regarding her involvement and cooperation with CAM, against the interests of NMP and Tatara.

165.   Defendant Mathes' breach of her fiduciary duties caused damage and injury to NMP and Tatara.

## Count 10
## Breach of Contract
## (By Tatara Individually Against Mathes)

166.   Plaintiffs hereby incorporate paragraphs 1-165 by reference as if fully set forth herein.

165.   Tatara and Mathes entered the NMP LLC Agreement which provides for inspection of NMP's books and records by its members.

166.   Tatara has performed under the Agreement.

167.   Defendant Mathes breached the NMP LLC Agreement by, among other things, her refusal to allow Tatara to inspect NMP's books and records in accordance with the NMP LLC Agreement.

168.   Defendant Mathes' breach of the NMP LLC Agreement has proximately caused injury and harm to plaintiff Tatara individually.

## Count 11
## Tortious Interference
## (By Tatara Individualy Against Defendants CAM, BVT)

169.   Plaintiffs hereby incorporate paragraphs 1-168 by reference as if fully set forth herein.

170.   The NMP LLC Agreement was a valid contract between plaintiff Tatara and defendant Mathes.

171. Defendants CAM and BVT knew of the existence of the NMP LLC Agreement.

172. Defendant Mathes' breach of the NMP LLC Agreement intentionally and improperly induced by CAM and BVT caused damage to plaintiff Tatara. Said breach would not have occurred absent CAM and/or BVT's inducement.

**WHEREFORE** plaintiffs pray for judgment against defendants as follows:

A. Award of compensatory damages in an amount to be determined;

B. Award of lost profits or an adequate license or royalty fee in an amount to be determined;

C. Award of declaratory relief;

D. Award of punitive or exemplary damages in an amount to be determined;

E. Award of reasonable attorneys' fees;

F. Order of preliminary and permanent injunctive relief, including but not limited to:

(a) Enjoin Oppenheim from implementing or continuing its implementation of the plan to open a Hong Kong office for the purpose of making private equity investments in Asia and the Pacific Rim;

(b) Enjoin CAM from participating in any way in the BVT Global and New Markets Funds and using Tatara's and/or NMP confidential information;

    (c) Enjoin BVT and CAM from using JV, NMP and Ms. Tatara's names, identities, and biographical information without authorization in its promotional materials; and

    (d) Enjoin BVT from marketing its Global and New Markets funds.

G. Grant of such other and further relief as the court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury for all issues triable to a jury.

Dated:    New York, New York
           July 9, 2008

Lynch Daskal Emery LLP

By: _____
       Bernard Daskal, Esq.
246 West 40th Street
New York, New York  10018
(212) 302-2400

       -and-

Farkas + Toikka LLP

By: _L. Peter Farkas /ss_
      L. Peter Farkas, Esq.
      Richard S. Toikka, Esq.
1101 30th Street, N.W., Suite 500
Washington, DC  20007

Attorneys for Plaintiffs

TO:    James P. Tallon, Esq.
       SHEARMAN & STERLING LLP
       599 Lexington Avenue
       New York, NY 10022-6069

       *Counsel for Defendants Sal. Oppenheim, jr. & Cie, S.C.A., and
       CAM Private Equity Consulting Verwaltungs GmbH*


       BVT Beratungs-, Verwaltungs- und Treuhandgesellschaft
          für Internationale Vermögensanlagen mbH
       Leopoldstrasse 7
       80802 Munich, Germany


       Marie-France Mathes
       2853 Brandywine Street NW
       Washington D.C. 20008

## VERIFICATION

I, Tomoko Tatara, being duly sworn according to law, deposes and states that I am the individual plaintiff and a fifty percent owner in NewMarkets Partners LLC, that I have read the foregoing First Amended Verified Complaint, that I know the contents of the factual allegation paragraphs and that said paragraphs are true to the best of my knowledge, except as to matters stated herein to be alleged on information and belief, and as to those matters, I am informed and believe them to be true.


Dated:   July 9, 2008

_____
Tomoko Tatara


Sworn to and subscribed
Before me this _9_ day of
_July_ , 2008

_____
Notary Public

LAWRENCE G. LEE
Notary Public, State of New York
No. 02LE6155200
Qualified in New York County
Commission Expires November 6, 20_10_

**EXHIBIT A**

**CONFIDENTIAL** *— Original —*

*14.03.07*

## STRATEGIC ALLIANCE AGREEMENT

THIS STRATEGIC ALLIANCE AGREEMENT (this **"Agreement"**) is made and entered into on March 14, 2007, by and between **CAM PRIVATE EQUITY CONSULTING & VERWALTUNGS-GMBH**, a company with limited liability (*Gesellschaft mit beschränkter Haftung (GmbH)*) organized under the laws of Germany (**"CAM"**), and **NEWMARKETS PARTNERS, LLC**, a Delaware limited liability company (**"NMP"**). The parties to this Agreement are sometimes referred to herein as the **"Parties"** and individually as a **"Party."**

**WHEREAS:**

(A)     CAM and NMP desire to establish CAM-NewMarkets Partners, L.P., a Delaware limited partnership (or a similar entity in another eligible legal form) (the **"Company"**), whose Interests shall be owned equally (50% each) by CAM and NMP.

(B)     CAM and NMP have determined to use the Company for the purpose of sponsoring and managing one or more funds or pooled investment schemes focused on investing in other funds, pooled investment, or direct investments schemes that primarily invest in opportunities in new private equity markets (i.e., outside of North America and Western Europe) and wish to enter into this Agreement to regulate their respective responsibilities in connection with the management of the proposed business and affairs of the Company.

**NOW IT IS HEREBY AGREED:**

1.     **DEFINITIONS**

    1.1     In this Agreement, the following words shall, where not inconsistent with the context, have the following meanings:

**"Affiliate"** means, as to any Person, a Person that is: (a) controlled by, controls or is under common control with, such Person (collectively, a **"Controlled Person"**); or (b) controlled by, controls or is under common control with, any Controlled Person, in each case for so long as such control continues. For the purposes of this definition, **"control"** means the possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise) of the Controlled Person.

**"Agreement"** is defined in the preamble.

**"Annual Business Plan and Budget"** means the annual budget and plan of operations in respect of the Company prepared by Chief Executive Officer and approved by the Board.

**"Applicable Law"** means, as to any Person, any statute, law, rule, regulation, directive, treaty, judgment, order, decree or injunction of any Governmental Authority that is applicable to or binding upon such Person or to which such Person is subject.

**"Board of Directors"** is defined in Section 4.1 and is sometimes referred to as the "Board."

"**Business**" is defined in Section 2.1.

"**Business Day**" means a day on which commercial banks in New York, New York are generally open to conduct their regular banking business.

"**Chairman**" is defined in Section 4.2.

"**Chief Executive Officer**" means the chief executive officer for the time being of the Company.

"**Claim**" is defined in Section 8.2.

"**Claim Notice**" is defined in Section 8.2.

"**Closing**" means the closing of the subscription for the Interests in the Company on the Closing Date in accordance with Section 4.

"**Closing Date**" is defined in Section 5.1.

"**CAM**" is defined in the preamble.

"**Director**" means a member of the Board.

"**ERISA**" is defined in Exhibit A hereto.

"**Final Closing**" is defined in Exhibit A hereto.

"**Governmental Authority**" means any domestic or foreign government, governmental authority, court, tribunal, agency, or other regulatory, administrative or judicial agency, commission or organization, and any subdivision, branch or department of any of the foregoing.

"**Group**" means the Company and any Subsidiary or Affiliate of the Company including, without limitation, NMP and CAM.

"**Group Company**" means a company within the Group.

"**Incentive Fee**" is defined in Exhibit A hereto.

"**Indemnified Losses**" is defined in Section 8.1.

"**Indemnified Party**" is defined in Section 8.1.

"**Indemnifying Party**" is defined in Section 8.1.

"**Initial Closing**" is defined in Exhibit A hereto.

"**Initial Fund**" means CAM-NewMarkets Partners Fund I, an investment fund or other pooled investment scheme to be established under the laws of the Cayman Islands (or any other jurisdiction deemed appropriate by the Initial General Partner).

"**Initial General Partner**" means CAM-NewMarkets Partners GP, L.P., a limited partnership organized under the laws of the Cayman Islands and wholly owned by the Company, which shall act as general partner of the Initial Fund.

"**Initial Manager**" means CAM-NewMarkets Partners Investment Manager, L.P., a limited partnership organized under the laws of the Cayman Islands and wholly owned by the Company, which shall act as investment manager of the Initial Fund.

"**Investment Committee**" is defined in Section 4.4.

"**Investment Management Fee**" is defined in Exhibit A hereto.

"**Investment Objective and Policy**" means, in relation to the Initial Fund and each Subsequent Fund, the investment objective of the Initial Fund or the Subsequent Fund and the policy for achieving that objective.

"**Major Decisions**" is defined in Section 4.5.

"**Management Agreement**" means the management agreement between the Initial Manager and the Initial Fund in respect of the Initial Manager's management of the Initial Fund.

"**Operating Expenses**" is defined in Exhibit A hereto.

"**Organizational Expenses**" is defined in Section 3.2.

"**Party**" and "**Parties**" are defined in the preamble.

"**Person**" means any individual, partnership, limited liability company, corporation, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity, whether acting in an individual, fiduciary or other capacity.

"**Potential Suitable Investment**" means, with respect to the Initial Fund or a Subsequent Fund, investments which meet the Investment Objective and Policy.

"**Interests**" means the limited liability company interests of the Company.

"**NMP**" is defined in the preamble.

"**Services Agreement**" means the services agreement between CAM and the Company whereby Cam and/or its Affiliates will provide back office and administration services to the Company.

"**Subsequent Fund**" means any fund or other pooled investment scheme, including but not limited to an account or similar investment arrangement, sponsored, formed, managed and/or advised by a Group Company from time to time or in respect of which a Group Company from time to time acts as the primary source of investments, which has an Investment Objective and Policy focussed on investing in other funds or pooled investment schemes that primarily invest in opportunities in new private equity market (i.e., outside of North America and Western Europe).

"**Subsequent General Partner**" means any general partner of any Subsequent Fund.

"**Subsequent Manager**" means any investment manager of any Subsequent Fund.

"**Subsidiary**" means, with respect to any person, (a) any corporation of which an aggregate of more than 50% of the outstanding equity securities having ordinary voting power is at the time, directly or indirectly, owned by such person, (b) such person has the power to appoint or remove a majority of the board of directors of such corporation or (c) such person otherwise has the power to direct the business and policies of that corporation.

"**U.S.**" means the United States of America.

"**U.S.$**" or "**U.S. Dollars**" means the lawful currency of the United States of America.

1.2   The headings in this Agreement shall not affect the interpretation of this Agreement.

2.   **THE COMPANY**

2.1   The business of the Company shall be to sponsor one or more funds or pooled investment schemes focused on investing in other funds   pooled investment or direct investments schemes that primarily invest in opportunities in new private equity markets (i.e., outside of North America and Western Europe), including the Initial Fund and any Subsequent Funds, and, in connection therewith, to do all acts and things and perform all obligations as the sponsor of the Initial Fund and/or Subsequent Fund(s), including, without limitation, taking any and all actions necessary, appropriate, convenient, permitted, allowed or required of each such investment fund or pooled investment scheme (the "**Business**").

2.2   In furtherance of the other provisions set forth in this Agreement:

2.2.1   CAM shall commit to make an investment of up to U.S.$ 3 million (in detail to be approved within the annual budgets) in the Company to be used as seed capital to fund Organizational Expenses and Operational Expenses and related activities pursuant to the Annual Business Plan and Budget. CAM's funding commitment shall be paid over 24 months starting on or about April 1, 2007. CAM's funding commitment shall be drawn down quarterly in advance in such amounts as set forth in the Annual Business Plan and Budget.

2.2.2   Prior to the Final Closing of the Initial Fund, the Company shall pay each of Tomoko Tatara and Marie-France Mathes an annual salary of U.S.$200,000 and CAM shall not charge the Company for back office and administration services. After the Final Closing of the Initial Fund, the Company shall (i) (subject to the subscription of capital commitments to the Initial Fund which justify a positive EBITA anticipation in respect of the Company (hereinafter a "Cash Positive Anticipation") pay CAM market-based fees for back office and administration services provided under the Services Agreement and (ii) (subject to a Cash Positive Anticipation considering the respective fee payments of the Company to CAM) pay each of Tomoko Tatara and Marie-France Mathes a market-based annual salary and bonus.

2.2.3   The operating agreement of the Company shall contain terms and conditions consistent with arrangements of this nature. The Company shall allocate profits and losses (and net distributions of cash flow after payment of all expenses and maintenance of appropriate cash reserves for operations) such that NMP will receive 55% of the profits and losses and CAM will receive 45% of the profits and losses.

2.2.4   The role of CAM and/or an Affiliate of CAM, with respect to the Initial Fund, shall include, but not be limited to: (i) providing input on marketing materials; (ii) providing back office and administration services under the Services Agreement; (iii) assistance regarding the valuation and due diligence of Potential Suitable Investment opportunities; (iv) enhancement of the overall image and position of the Company with respect to the business community internationally and in the target markets; (v) assistance in fundraising activities for the Initial Fund and any Subsequent Funds; and (vi) participation in the Investment Committee.

2.2.5   The role of the management of the Company with respect to the Initial Fund shall include, but not be limited to: (i) formation and management of the various entities contemplated by this Agreement and any other legal matters related thereto; (ii) providing the Annual Business Plan and Budget and the Investment Objective and Policy; (iii) providing services with respect to the Company's fund raising, operational and investment activities, including expertise and access to general partners and other important resources in the target markets; (iv) identification, valuation and due diligence of Potential Suitable Investment opportunities; (v) enhancement of the overall image and position of the Company with respect to the business community in internationally and in the target markets; (vi) management of fundraising activities for the Initial Fund and any Subsequent Funds; and (vii) participation in the Investment Committee.

3.   **EXPENSES OF THE COMPANY**

3.1   Except as otherwise provided herein, costs and expenses incurred in connection with the negotiation and preparation of this Agreement and related agreements, including without limitation fees and expenses of legal counsel, accountants, brokers, consultants and other representatives used or hired by the Parties, shall be borne by the Company.

3.2   Expenses have been or will be incurred in connection with the organization and formation of the Company, the Initial Fund, the Initial General Partner, the Initial Manager, and the offering of interests in the Initial Fund, including, without limitation, legal and accounting fees and expenses, printing costs, filing fees and travel and accommodation expenses ("**Organizational Expenses**"). As part of its commitment to invest the necessary seed capital, CAM shall advance Organizational Expenses at the Closing in amounts to be agreed upon in the Annual Business Plan and Budget, and all such Organizational Expenses related to the Initial Fund shall be borne by the Initial Fund upon the occurrence of its Initial Closing and subsequent Closings and reimbursed to CAM.

## 4.   MANAGEMENT OF THE COMPANY

4.1   The Company shall be supervised and managed by CAM and NMP by means of a governing body consisting of four (4) voting members appointed by CAM and NMP ("**Board of Directors**"). CAM shall have the right to appoint two (2) voting members and NMP shall have the right to appoint two (2) voting members. In case of split vote, the Chairman or President to be appointed by NMP will have the determining vote.

4.2   The Board will be overseen by the chairman of the Board (the "**Chairman**"). If the Chairman is unable to attend any meeting of the Board, then the Directors present shall be entitled to appoint another director present at the meeting to act as chairman of such meeting in his place.

4.3   On or before the Closing Date, each of the Parties shall hold the necessary meetings of the Board and general meetings of the members of the Company to transact, among other things, the following business insofar as not already transacted:

4.3.1   to appoint Marie-France Mathes as the first Chairman of the Company;

4.3.2   to appoint Tomoko Tatara as President and Chief Executive Officer of the Company; and

4.3.3   to execute and deliver an operating agreement for the Company.

4.4   Effective immediately upon the Closing Date, CAM shall nominate 2 persons and NMP shall nominate 2 persons (for a total of 4 persons), who may or may not be Directors of the Company, to serve on the investment committee of the Company (the ("**Investment Committee**"). The Investment Committee shall be responsible for reviewing, approving and administration of the Investment Objective and Policy. All investment decisions for any fund or other pooled investment scheme managed or advised by the Company or any of its Affiliates shall require unanimous consent of the members of the Investment Committee.

4.5   Any and all "**Major Decisions**" shall require the unanimous consent of the members of the Board of Directors. Such Major Decisions shall include:

4.5.1   Significant financing and refinancing decisions, capital expenditure plans, acquisitions, developments and other important decisions relating to the expansion of the Company, other than those approved in the Annual Business Plan and Budget (whereas any financing decisions in respect of an amount of more than U.S.$100,000 shall be considered as significant until initial closing, thereafter, until the three year anniversary of the formation of the Company, this amount will increase to U.S.$250,000);

4.5.2   Sale of securities in the Company;

4.5.3   Sale, merger or recapitalization of the Company;

4.5.4    Approval of the Company's Annual Business Plan and Budget; provided, however, if unanimous consent is not obtained, the Company shall operate under the prior year's Annual Business Plan and Budget until a new Annual Business Plan and Budget is approved;

4.5.5    Changes in allocation of profits and losses;

4.5.6    Policy for net distributions;

4.5.7    Material litigation matters;

4.5.8    Appointments of auditors;

4.5.9    Appointment of officers and other executives of the Company and of members of the Investment Committee;

4.5.10    The conclusion or amendment of any agreement between the Company and any of its owners or any Affiliates thereof;

4.5.11    Establishment of any fund-of-funds products or similar collective investment schemes other than the Initial Fund; and

4.5.12    Employment of additional investment manager or other personnel with an annual salary of U.S.$100,000 or more until initial closing, thereafter, until the three year anniversary of the formation of the Company, this amount will increase to U.S.$250,000.

5.    **THE CLOSING**

5.1    Each Party and the Company shall perform their respective obligations hereunder so as to cause the Closing to occur on or ~~before March __, 2007~~ *April 1st* (or such other date as the Parties may agree in writing) (the "**Closing Date**"), subject to the representations and warranties herein being true, complete and correct in all material respects on such date.

6.    **ORGANIZATION AND MANAGEMENT OF THE INITIAL FUND**

6.1    The Parties intend to establish the Initial Fund (and certain other entities), whose terms are generally described in Exhibit A hereto. The Initial Fund shall engage in the Business.

6.2    The Initial Fund shall be managed by the Initial Manager pursuant to the Management Agreement.

7.    **CONFIDENTIAL INFORMATION**

7.1    Each Party and the Company hereby undertake to the other Parties to maintain the confidentiality (using the same degree of care that such Party uses to protect its own confidential information) of, and not to disclose, any and all confidential information received by it regarding the business and affairs of any Group Company or the other Parties. Each Party and the Company further undertake to the other Parties not to make use of such confidential information other than for

the purposes of this Agreement; provided, however, that such Party or the Company may disclose such information to its employees, directors, officers, advisers or agents to the extent necessary to fulfil the purposes of this Agreement, in which event it shall procure that any such employees, directors, officers, advisers or agents is made aware of and complies with the obligations of confidentiality under this Agreement.

7.2    Section 7.1 shall not apply to any information if:

(a)    the information is or becomes available to the public (other than through a breach of Section 7.1);

(b)    the information is already known to the recipient as evidenced by written records maintained in the ordinary course of business and the time it is furnished by, as the case may be, the Company or any Party to the recipient;

(c)    the information becomes known or available to the recipient from a person other than a Party who is not under an obligation of confidentiality to the Company or is independently developed by the recipient;

(d)    disclosure is required by Applicable Law, a court of competent jurisdiction or any Governmental Authority; or

(e)    the disclosure of such information to a specified recipient has been agreed upon by all Parties in writing provided that such information may only be disclosed subject to obtaining undertakings from such recipient to keep such information confidential.

8.    **INDEMNIFICATION**

8.1.    Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold harmless each other Party (acting for itself and as trustee for its Affiliates) and the Company (each an "**Indemnified Party**"), from and against any and all claims, demands, liabilities, costs, damages, expenses (including, without limitation, reasonable legal fees and expenses) and causes of action of any nature whatsoever (collectively, "**Indemnified Losses**") arising from or out of any breach of this Agreement or any representation or warranty made hereunder or any act of fraud, wilful default or gross negligence of the Indemnifying Party hereunder. The obligations of each Indemnifying Party under this Section 8 shall survive any termination of this Agreement.

8.2    In relation to any claim, demand, action or proceeding that is brought, made or raised against an Indemnified Party by a Person other than a Party with respect to which such Indemnified Party is entitled to indemnification under this Section 8 (a "**Claim**"), the Indemnified Party shall give written notice (a "**Claim Notice**") to the Indemnifying Party as soon as reasonably practicable after the Indemnified Party becomes aware that any Claim has been, or is about to be, brought, made or raised against it and which is covered by the indemnity in this Section 8. The failure of an Indemnified Party to give a timely Claim Notice hereunder shall not affect its rights to indemnification hereunder, except to the extent that the

Indemnifying Party demonstrates that such failure actually damaged the Indemnifying Party. At the expense of the Indemnifying Party, the Indemnified Party shall liaise with the Indemnifying Party with regard to the conduct of such Claim and keep the Indemnifying Party informed of all matters relevant to the conduct of such Claim. At the expense of the Indemnifying Party and subject to the Indemnified Party being secured to its reasonable satisfaction against all Indemnified Losses arising, directly or indirectly, in connection with such Claim, the Indemnified Party shall take such action as the Indemnifying Party may reasonably request to avoid, resist, dispute, appeal, compromise or defend such Claim provided that following such request the Indemnified Party shall have sole conduct of the Claim save that all material decisions relating to such Claim shall be made in conjunction with and shall be subject to the written approval of the Indemnifying Party (such approval not to be unreasonably withheld or delayed) who shall be entitled to require the Indemnified Party to review regularly with the Indemnifying Party the strategy adopted by the Indemnified Party in the conduct of such Claim. The Parties shall cooperate with each other in any notifications to insurers.

9. **TERM AND TERMINATION**

This Agreement shall be effective as of the date of this Agreement and shall continue in effect until terminated. Either Party may terminate this Agreement upon sixty (60) days' prior written notice, which shall be deemed given as of the close of business on the day such notice is actually received by the other Party; provided that neither Party may terminate this Agreement prior to the second anniversary of the effective date of this Agreement. If either Party terminates this Agreement (other for any of the reasons set forth in the following sentence) prior to the fifth anniversary of the effective date of this Agreement, either Party shall have the right to acquire the Interests held by the other Party in the Company for a purchase price of 1 US-Dollar. Either Party may terminate this Agreement immediately if the other Party becomes bankrupt, is placed in receivership or is no longer authorized to do business in the capacity contemplated by this Agreement.

10. **EXCLUSIVITY; RIGHT OF FIRST REFUSAL; COMMITMENT TO NEGOTIATE**

During the term of this Agreement, the Company shall be the exclusive vehicle through which NMP and CAM and their respective Affiliates shall carry out the Business or pursue any Potentially Suitable Investment opportunity in respect of the Initial Fund and any Subsequent Funds in new private equity markets (i.e., outside of North America and Western Europe), except for any existing funds sponsored or managed by CAM or any of its Affiliates that is currently investing in such new private equity markets (i.e., outside of North America and Western Europe) and except for any non-discretionary CAM accounts which may be established in the future.

11. **AMENDMENT AND MODIFICATION**

11.1 Except as otherwise expressly provided for herein, this Agreement may be amended or modified only upon the written consent of the Parties.

11.2   Except as otherwise expressly provided for herein, the rights and obligations of the Company and the Parties under this Agreement may be waived only by the written consent of the Parties.

11.3   Any amendment, modification or waiver effected pursuant to this Section 11 shall be binding upon the Company and the Parties.

## 12.   ENGLISH LANGUAGE

This Agreement was prepared and negotiated in the English language.

## 13.   SEVERABILITY

If any provision of this Agreement is found to be invalid or unenforceable, then such provision shall be construed, to the extent feasible, so as to render the provision enforceable and to provide for the consummation of the transactions contemplated hereby on substantially the same terms as originally set forth herein, and if no feasible interpretation would save such provision, it shall be severed from the remainder of this Agreement, which shall remain in full force and effect unless the severed provision is essential to the rights or benefits received by any Party.  In such event, the Parties shall use their best efforts to negotiate, in good faith, a substitute, valid and enforceable provision or agreement which most nearly affects the Parties' intent in entering into this Agreement.

## 14.   FURTHER ASSURANCES

The Parties shall each perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonably necessary to accomplish the transactions contemplated in this Agreement.

## 15.   ENTIRE AGREEMENT

The terms and conditions contained in this Agreement constitute the entire agreement among the Parties and supersede all previous agreements and understandings, whether oral or written, with respect to the subject matter contained herein.

## 16.   ASSIGNMENT

Each Party agrees that it will not transfer, whether voluntarily or involuntarily, or by operation of law, any right or obligation under this Agreement without all the other Party's prior written consent.  Any purported transfer in violation of this Section 16 shall be null and void.  This Agreement will be legally binding upon the Parties and their respective permitted successors, heirs and assigns.

## 17.   NO AGENCY

None of the Parties shall be the agent, partner or legal representative of the other, either expressed or implied, nor shall any Party have the right or power to enter into any contractual obligation on behalf of the other, except as specifically provided herein.

## 18.   DELAYS OR OMISSIONS

The Parties agree that no delay or omission to exercise any right, power or remedy accruing to any Party, upon any breach, default or non-compliance of the Parties under this Agreement

shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or non-compliance, or any acquiescence therein, or of any similar breach, default or non-compliance thereafter occurring. The Parties further agree that any waiver, permit, consent or approval of any kind or character on any Party's part of any breach, default or non-compliance under this Agreement or any waiver on such Party's part of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement, by law, or otherwise afforded to the Parties, shall be cumulative and not alternative.

19.    NOTICES

Any and all notices, requests, demands and other communications required or otherwise contemplated to be made under this Agreement shall be in writing and in English to the address set forth on the signature pages hereto (or any other address that a Party subsequently provides written notice of to the other Party) and shall be deemed to have been duly given in the absence of evidence of earlier receipt:

19.1    if delivered personally, when received;

19.2    if transmitted by facsimile, upon receipt of an error-free transmittal report; or

19.3    if by international courier service, on the fourth Business Day following the date of deposit with such courier service, or such earlier delivery date as may be confirmed to the sender by such courier service.

20.    FORCE MAJEURE

Neither Party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused (i) by causes beyond that Party's reasonable control and occurring without its fault or negligence, including, without limitation, failure of suppliers, subcontractors, and carriers, or party to substantially meet its performance obligations under this Agreement, provided that, as a condition to the claim of nonliability, the Party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

21.    MISCELLANEOUS

This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any conflict of law principles. The Parties hereby agree and consent to be subject to the exclusive jurisdiction of any federal court sitting in the County of New York, and the jurisdiction of the courts of the State of New York in the County of New York, in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby. Each Party hereby irrevocably consents to the service of any and all process in any such suit, action or proceeding by the delivery of such process to such party at the address and in the manner provided in Section 19 hereof. Notwithstanding anything to the contrary contained herein, no provision of this Agreement is intended to benefit any party other

than the Company, the signatories hereto and their permitted successors and assigns, nor shall any such provision be enforceable by any other party. The Parties shall not issue any press release or otherwise publicize or disclose the terms of this Agreement without the consent of the other Parties. This Agreement may be executed in any number of counterparts with the same effect as if each of the parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXECUTED BY THE PARTIES:

CAM PRIVATE EQUITY CONSULTING &
VERWALTUNGS-GMBH

By: _____

Name: _ROLF WICKENKAMP_____

Title: _EXECUTIVE PARTNER_____

Address for Notices:

_ZEPPELINSTR. 4-8_____

_D-50667 COLOGNE_____

_____


CAM PRIVATE EQUITY CONSULTING &
VERWALTUNGS-GMBH

By: _____

Name: _Eberhard Witt_____

Title: _Executive Partner, CFO_____

Address for Notices:

_Zeppelinstr. 4-8_____

_D-50667 Köln_____

_____


[SIGNATURE PAGE TO STRATEGIC ALLIANCE AGREEMENT]

NEWMARKETS PARTNERS, LLC

By: _____

Name: MARIE-FRANCE HATHER

Title: FOUNDING PARTNER

Address for Notices:

2853 BRANDYWINE ST , NW

WASHINGTON  DC  20008

USA .

NEWMARKETS PARTNERS, LLC

By: _____

Name: Tomoko Tatara

Title: Founding Partner

Address for Notices:

400 East 52nd Street, 14D

New York , NY 10022

USA

## EXHIBIT A

## TERMS OF INITIAL FUND

| | |
|---|---|
| Initial Fund | The Initial General Partner shall establish the Initial Fund (or such other structure that meets the needs of Investors), which shall be domiciled in the Cayman Islands (or any other jurisdiction deemed appropriate by the Initial General Partner). The Initial Fund shall focus on investing in other funds or pooled investment schemes that primarily invest in opportunities in new private equity markets (i.e., outside of North America and Western Europe) as well as opportunistically in direct investments in such new private equity markets. |
| | The Initial Fund will target an assets size of U.S. $350 million to U.S. $400 million. |
| Borrowings and Other Activities | The Initial Fund may incur indebtedness in connection with its investments. Additionally, the Initial Fund may enter into a credit facility from time to time in order to enable the Initial Fund to pay the Operating Expenses or to provide for interim acquisition financing in furtherance of the Initial Fund's business. Investors may be required to confirm the terms of their Commitments (as defined below), to provide financial information and to execute other documents as may be reasonably required by such credit provider. |
| Investors | Initial Fund interests shall be offered to various investors, in addition to CAM and NMP and their Affiliates (collectively, the "Investors"). |
| Closing | The initial closing will occur in 2008 (the "Initial Closing"); the final closing is expected approximately 12 months after the initial closing (the "Final Closing"). |
| Investment Management Fee | For providing services to the Initial Fund and pursuant to the Management Agreement, the Initial Manager shall receive a fee equal on an annual basis to 1.2% of the assets of the Initial Fund (the "Investment Management Fee") during the investment period. Thereafter, a reduced fee schedule will be introduced. |
| Incentive Fee | The Initial Fund shall also pay the Initial General Partner an incentive fee of 5% of any profits enjoyed by the Initial Fund (the "Incentive Fee"). |
| Organizational Expenses | All Organizational Expenses shall be borne by the Initial Fund. |
| Operating Expenses | All ongoing expenses related to investments or the formation of the Initial Fund, including but not limited to the Investment Management Fees, administrative, custody, audit, appraisal, analysis, legal, advisory, evaluation, due diligence incurred in connection with actual or proposed investments, tax document preparation, bookkeeping, report, accounting, and legal advice (collectively, the "Operating Expenses") also will be payable by the Initial Fund. |
| Transfer of | Assignment of interest in the Initial Fund and Initial General Partner by |

| Interest | CAM or NMP is permissible, so long as expressly agreed by the other Party, provided that NMP, CAM and their respective principals shall continue to be principally involved in the operation of the Initial Fund. |
|----------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| ERISA | Investment in the Initial Fund (or other such structure that meets the needs of the Investors) is open to institutions, including corporate pension and other plans subject to the U.S. Employee Retirement Income Security Act of 1974 ("**ERISA**"). The Initial Fund may require certain representations or assurances from Investors subject to ERISA to comply with ERISA requirements. The Initial General Partner intends to operate the Initial Fund as an "operating company" (within the meaning of the U.S. Department of Labor regulations), so that the assets of the Initial Fund will not be considered "plan assets" under ERISA. |
| Term | The term of the Initial Fund and the transactions contemplated herein shall be for a period of 12-13 years after the Initial Closing of the Initial Fund's offering, which may be extended by the Initial General Partner in its sole discretion for up to two (2) additional one-year periods for purposes of liquidating the Initial Fund's assets. |

**Exhibit B**                                                    **CONFIDENTIAL**

<u>23 November 2007</u>

**Basic principles governing exclusivity, CAM's and CAM-NMP's obligations to offer one another investment opportunities in New Private Equity Markets and pro-rata co-investing.**

1.  The reach of the exclusivity granted to CAM-NMP under Clause 10 of the Strategic Alliance Agreement (Exclusivity etc) is limited to:

    a.  Carrying out the Business (defined under 2.1., the essence of which is sponsoring funds or investment schemes that <u>primarily </u>invest in new PE markets)

    b.  Pursuing any Potentially Suitable Investment Opportunity <u>in respect of the Initial Fund and any Subsequent Funds in new private equity markets</u>

    Whenever CAM, its affiliates and any of its funds, managed accounts or any of its other investment vehicles want to make an investment in new private equity markets out of vehicles <u>not organized primarily</u> for the purpose of investing in new private equity markets, they are free to do so without any obligation whatsoever to do so through CAM-NMP.

2.  CAM, its affiliates, and its staff (CAM), when presented with an opportunity to invest in new private equity markets, will offer this opportunity also to CAM-NMP. However, CAM has never had the intention that such opportunities be offered to CAM-NMP without CAM retaining the right to invest in such opportunities out of vehicles not primarily organized for the purpose of investing in new private equity markets that are managed by CAM (on a discretionary or non-discretionary basis), and neither the Strategic Alliance Agreement nor the PPM contain any wording to the contrary.

3.  CAM-NMP, when presented with an investment opportunity in new private equity markets, may, but has no obligation to, offer such an opportunity also to CAM. However, we would expect that CAM-NMP, whenever presented with an attractive investment opportunity but where the total amount offered for investment exceeds CAM-NMP own requirements (including those of funds or accounts advised on an exclusive or non-exclusive basis by CAM-NMP and desired co-investments by CAM-NMP's LP's), will offer such an opportunity to CAM.

4.  If CAM and any of its funds etc not primarily organized for the purpose of investing in new private equity markets, having been presented with such an investment opportunity and after having offered it to CAM-NMP and both CAM and CAM-NMP decide to pursue such an opportunity, and assuming the available allocation for investing in such an opportunity is less than the combined appetite of CAM and CAM-NMP, then CAM and CAM-NMP will invest on a pro-rate basis.

5.  Concerning new private equity markets investments to be offered by CAM-NMP to BVT-CAM-NewMarkets and/or any other CAM fund or account not organized primarily for the purpose of investing in new private equity markets, CAM and CAM-NMP will negotiate a (non-exclusive) advisory mandate, which will govern if, when and how and on what economic terms and conditions CAM-NMP will

1

a. offer investment opportunities to such CAM-managed funds or accounts.

b. manage, monitor and report on investments accepted by such CAM-managed funds or accounts.

**Practical implications of the Basic principles governing exclusivity, CAM's and CAM-NMP's obligations to offer one another investment opportunities in New Private Equity Markets and pro-rata co-investing.**

Note: When reference is made to CAM and/or its affiliates such affiliates do not include Sal. Oppenheim and any of its affiliates other than CAM.

I.  How will investment opportunities be allocated between (x) CAM NewMarkets Partners Fund I, L.P. (the "Core Fund") and (y) either (1) any pooled investment vehicle not focused on investing in funds that primarily invest in opportunities in new private equity markets and sponsored or managed by CAM Private Equity Consulting & Verwaltungs-Gmbh ("CAM") and/or its affiliates ("Other Funds") or (2) any Other Fund existing or in the process of being raised as of March 14, ("Existing CAM Fund")?

A.  Existing Framework.  Under the Confidential Private Placement Memorandum of the Core Fund (the "PPM") (and it follows that the current draft of the Amended and Restated Agreement of Limited Partnership of the Core Fund (the "Draft LPA") should not state anything to the contrary, just as the Strategic Alliance Agreement does nor state anything to the contrary ):

1.  100% of any investment opportunities presented to CAM-NMP Fund I GP, LLC (the "General Partner"), CAM-NewMarkets Partners, L.P. (the "Investment Manager") or Tomoko or Marie-France (collectively, the "NMP Sourcing Persons") that the Investment Manager believes (in good faith) are suitable for the Core Fund are offered to the Core Fund

2.  Investment opportunities that have been presented to CAM and/or its affiliates will be offered to the Core Fund. (but with CAM and/or its affiliates retaining the right to also invest in such opportunities out of Other Funds).

3.  The following investment opportunities need not be offered to the Core Fund:

    a) investment opportunities related to "pre-existing investments" (i.e., investments held by any NMP Sourcing Person or its affiliates as of the Initial Closing Date of the Core Fund);

    b) investment opportunities presented to any NMP Sourcing Person prior to the Initial Closing Date of the Core Fund;

    c) investment opportunities presented to any of Tomoko, Marie-France or an affiliate of CAM in his or her capacity as a director of a company and in similar circumstances where fiduciary duties apply;

    d) investment opportunities presented to CAM or any of its affiliates in connection with any Existing CAM Fund;

2

e) investments of any permitted "Successor Fund" to the Core Fund (i.e., pooled investment fund or similar entity with primary investment objectives substantially similar to those of the Core Fund that may be raised (x) after the Core Fund's investment period or (y) when 75% of the Core Fund's committed capital has been utilized or reserved);[1] or

f) investments intended to protect or enhance the value of investments included in above.

B. Conflicts Hypotheticals.

1. Hypothetical 1. If the NMP Sourcing Persons are presented with an opportunity to make a $20 million investment, will either of them be obligated to offer all or any portion of such investment to an Existing CAM Fund and/or an Other Fund?

   o Answer. No, it being understood, however, that if the available allocation for investing in such a fund exceeds the combined approved investment amount sought by the Core Fund, its co-investing LP's and/or of any other fund advised by CAM-NMP, then any excess available allocation will be offered to CAM and/or its affiliates for investment by any Other Fund.

2. Hypothetical 2. If Tomoko or Marie-France propose that the Core Fund make a $20 million investment in an Underlying Fund that has not been presented to CAM and/or its affiliates and such investment is not approved by the CAM appointed members of the investment committee of the Core Fund, can such investment be offered to an Existing CAM Fund and/or an Other Fund?

   o Answer. No, except when approved by (i) Tomoko and Marie-France or (ii) the Advisory Board of the Core Fund.

3. Hypothetical 3. If Tomoko or Marie-France propose that the Core Fund make a $20 million investment in an Underlying Fund that has not been presented to CAM and/or its affiliates and the CAM appointed members of the investment committee of the Core Fund approves a $10 million investment (rather than the full $20 million), can the remaining $10 million be offered to an Existing CAM Fund?

   o Answer. Same solution as in hypothetical 2 above.

4. Hypothetical 4. If CAM, any of CAM's affiliates or an investment committee member of the Core Fund appointed by CAM (including either of Constantine von Dziembowski or Rolf Wickencamp) has been presented with an opportunity to make a $20 million investment, will CAM or its affiliates (or such CAM-appointed investment committee member) be obligated to offer such investment to the Core Fund?

   o Answer. Yes, but with CAM and/or its affiliates retaining the right to also invest in such opportunities out of Other Funds, unless such opportunity falls under one of the exclusions delineated in Section I.A.3. above.

II. Which are the Existing CAM Funds?

Answer: CAM Europe I, L.P. ,CAM IV, CAM-BVT VI, SOP, DEVK, Signal Iduna.

---

[1] Although not in the PPM, this carve-out was added to the current Draft LPA (which is subject to further negotiation).

<u>Note</u>. CAM is not, nor does it intend, raising or contemplating any funds focused on investing in funds that primarily invest in opportunities in new private equity markets. CAM and/or its affiliates may however, from time to time, seek to establish funds, pooled investment schemes etc with a limited partial allocation (< 30% of total commitments) to new private equity markets.

III. CAM's "non-discretionary accounts" referenced in Section 10 of the Strategic Alliance Agreement.

A. How does CAM propose to define "non-discretionary accounts"?

Answer: All funds, pooled schemes, managed accounts etc, managed by CAM but where CAM and/or its affiliates do not have discretionary investment decision making power.

B. How many non-discretionary accounts does CAM currently manage? What is the amount of capital managed by CAM on behalf of such non-discretionary accounts?

Answer: To be made available

C. How many non-discretionary accounts does CAM anticipate managing in the future?

Answer Impossible to answer and irrelevant

D. What fees, expense reimbursements and other economic interests (profits or otherwise) are to be received from any non-discretionary account by any of:
1. CAM: not relevant;
2. The entities listed below: none, unless advisory mandates are concluded between a non-discretionary account and any of the entities listed below:
   a. NewMarkets Partners LLC;
   b. CAM-NMP;
   c. CAM-NewMarkets Partners, L.P. (Manager of Core Fund); and/or
   d. Their respective affiliates and/or members (<u>e.g.</u>, Tomoko, Marie-France, CAM principals).

IV. How will investments be allocated between the Core Fund and the CAM Other Funds?

A. <u>Proposed Allocation Solution</u>.
1. If an investment opportunity has been presented to the NMP Sourcing Persons then 100% of such opportunity may be offered to the Core Fund without any portion offered to these Other Funds.
2. If an investment opportunity has been presented to CAM or its affiliates (or an investment committee member of the Core Fund appointed by CAM), then such opportunity shall be offered to
   a. the Core Fund (but with CAM and/or its affiliates retaining the right to also invest in such opportunities out of Other Funds) and
   b. to such Other Funds (which include CAM sponsored or managed non-discretionary accounts that have expressed an interest in such an opportunity)

4

and final allocations are to be made on a pro rata based on their respective amounts of committed capital (subject to, in each case, the consideration of factors such as the Core Fund's and the Other Funds respective investment limitations, strategic objectives, capital available for investment, positions in similar securities specific liquidity or other requirements of each entity, with the overall objective of allocating such investment opportunity in a manner equitable to the Core Fund and the Other (collectively, "Mitigating Factors"). Any (part of an) investment opportunity so offered and allocated on such pro rata basis to the Core Fund but not approved by the CAM appointed members of the investment committee of the Core Fund cannot be taken up by the Other Funds except when approved by Tomoko and Marie-France or the Advisory Board of the Core Fund.

3. Dispositions by the Core Fund and the Other Funds (excluding non-discretionary accounts) would be at the same time, on the same terms and conditions and generally on a pro rata basis.[2]

---

[2] Circumstances on which investments would not be disposed of on a pro rata basis could include where (1) necessitated by the obligation of any fund to redeem the interests of an investor in such fund, (2) if after the commitment period of any such fund, the general partner (or similar entity) of such fund determines in good faith that such non-pro rata disposition is appropriate, (3) the sale is made for a specific tax purpose or (4) any other reason where the respective general partners determine in good faith such non-pro rata disposition is appropriate.

**EXHIBIT C**                                           D&L Draft 12/17/07

# DEWEY & LEBOEUF LLP

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY  10019-6092
tel+1 212 259 8000
fax+1 212 259 6333

## MEMORANDUM

To:     Tomoko Tatara
        Marie-France Mathes

From:   John J. Altorelli
        Edward D. Nelson
        Shawn R. McCune
        Michael J. Spratt

Date:   December 17, 2007

Re:     CAM NewMarkets Partners Fund I, L.P. - Conflicts of Interest

At your request, we have reviewed the most recent responses submitted by CAM Private Equity Consulting & Verwaltungs-GmbH ("CAM") regarding potential conflicts of interest that may exist in connection with CAM's and NewMarkets Partners LLC's ("NMP") joint management of CAM NewMarkets Partners Fund I, L.P. (the "Core Fund") through CAM's and NMP's management of the Core Fund's investment manager (CAM-NewMarkets Partners, L.P. (the "Investment Manager")) and general partner (CAM-NMP Fund I GP, LLC (the "General Partner")).  Such responses were contained in (a) the attachment to Emile van der Burg's email to you of November 30, 2007 (such attachment, the "CAM Memorandum") and (b) the attachment to Emile van der Burg's email to you of December 4, 2007 (such attachment, the "BVT Memorandum").  As noted below, we believe that CAM's interpretation of the Strategic Alliance Agreement, entered into on March 14, 2007, by and between CAM and NMP (the "JV Agreement"), seem to contradict our understanding of the JV Agreement and may result in arrangements that could adversely affect the marketability of the Core Fund.   In this memorandum, we explain our understanding of the JV Agreement and provide some alternative proposals regarding resolution of conflicts for you to consider.

I.     **The JV Agreement's Exclusivity Clause**

Broadly speaking, based upon our review of the CAM Memorandum and the BVT Memorandum, it appears that CAM's understanding of the JV Agreement's exclusivity clause is premised on the following three readings of the exclusivity clause:

A.     The "Business" described in the JV Agreement's exclusivity clause is the sponsoring of funds or other investment schemes that primarily invest in new private

NEW YORK  |  LONDON MULTINATIONAL PARTNERSHIP  |  WASHINGTON, DC

ALBANY  |  ALMATY  |  AUSTIN  |  BEIJING  |  BOSTON  |  BRUSSELS  |  CHARLOTTE  |  CHICAGO  |  EAST PALO ALTO
FRANKFURT  |  HARTFORD  |  HONG KONG  |  HOUSTON  |  JACKSONVILLE  |  JOHANNESBURG (PTY) LTD.  |  LOS ANGELES
MILAN  |  MOSCOW  |  PARIS MULTINATIONAL PARTNERSHIP  |  RIYADH AFFILIATED OFFICE  |  ROME  |  SAN FRANCISCO  |  WARSAW

equity markets, and any other CAM vehicles that do not primarily invest in new private equity markets are permitted to compete with the Core Fund;

B.    Existing CAM funds (which are carved-out as an exception to the JV Agreement's exclusivity clause) include funds existing or in the process of being raised as of the current date; and

C.    Sal. Oppenheimer is not an affiliate of CAM.

Based on our many conversations with you and CAM during the negotiation and drafting of the JV Agreement and Confidential Private Placement Memorandum of the Core Fund (the "PPM"), it was our understanding that the exclusivity clause was intended to make the Core Fund the exclusive vehicle of both CAM and NMP with respect to carrying out the Business which we understood to mean forming, sponsoring and managing a fund-of-funds to invest in new equity private markets. The only carveout to this exclusive joint venture arrangement was for CAM Europe I, L.P., the only existing CAM fund that we were aware of at the time. Any other interpretation of exclusivity would seem problematic for NMP and also could adversely affect the marketability of the Core Fund, and we would have identified this potential problem to you and CAM.

For the sake of completeness, we offer the following analysis of CAM's current interpretation of the exclusivity clause.

A.    Definition of "Business"

First, CAM states that the JV Agreement's exclusivity clause is limited to (x) carrying out the Business (which CAM interprets to mean sponsoring funds or other investment schemes that primarily invest in new private equity markets) and (y) pursuing Potential Suitable Investment Opportunities in respect of the Initial Fund and any Subsequent Funds (each as defined in the JV Agreement) in new private equity markets. From this interpretation, CAM concludes that "whenever CAM, its affiliates and any of its funds, managed accounts or any of its other investment vehicles want to make an investment in new private equity markets out of vehicles not organized primarily for the purpose of investing in new private equity markets, they are free to do so without any obligation whatsoever to do so through CAM-NMP" (CAM Memorandum, p. 1), and that CAM and/or its affiliates may seek to establish funds, pooled investment schemes and other vehicles "with a limited partial allocation (< 30% of total commitments) to new private equity markets." (CAM Memorandum p. 5).[1]

CAM's interpretation is neither consistent with our recollection nor with our reading of the language of the JV Agreement. Specifically, the JV Agreement provides that:

During the term of the [JV] Agreement, the Company [i.e., the Investment Manager] shall be the exclusive vehicle through which NMP and CAM and their

---

[1] Note, however, that CAM states in other portions of the CAM Memorandum that allocations of investments are between (x) the Core Fund and (y) CAM funds not focused on investing in funds that primarily invest in opportunities in new private equity markets and existing CAM funds. (CAM Memorandum p. 3).

2

respective Affiliates shall carry out the Business[2] or pursue any Potentially Suitable Investment[3] opportunity in respect of the Initial Fund and any Subsequent Fund in new private equity markets (i.e., outside of North America and Western Europe), except for any existing funds sponsored or managed by CAM or any of its Affiliates that is currently investing in such new private equity markets (i.e., outside of North America and Western Europe) and except for any non-discretionary CAM accounts which may be established in the future. (JV Agreement §10).

We interpret the exclusivity clause to mean that CAM, NMP and their respective Affiliates must utilize the Investment Manager (which would sponsor only the Core Fund and any Subsequent Funds thereto and pursue opportunities on their behalf) in order to (1) sponsor vehicles that make investments in vehicles that, in turn, primarily invest in new private equity markets (regardless of the organizational purpose or allocations for investments in new private equity markets of such other CAM-, NMP- or affiliate-sponsored vehicles) or (2) pursue investment opportunities that are within the Core Fund's investment objective (essentially, funds or other vehicles investing in new private equity markets or other direct investments in new private equity markets), unless one of the two exceptions (existing CAM funds and non-discretionary accounts, both discussed below) is available. Based on this reading, not only vehicles sponsored by CAM, NMP or their affiliates that are organized primarily to invest in new private equity markets or have a majority of their investments in new private equity markets would be prohibited by the JV Agreement, but all vehicles sponsored by CAM, NMP or their affiliates that invest in vehicles that primarily invest in new private equity markets would be so prohibited.

B.    **Meaning of Existing Funds**

Second, CAM states that CAM funds "existing or in the process of being raised" (CAM Memorandum p. 3) are exempt from the JV Agreement's exclusivity clause, with existing CAM funds including "CAM Europe I, L.P., CAM IV, CAM-BVT VI, SOP, DEVK, [and] Signal Iduna." (CAM Memorandum p. 5). However, the JV Agreement states that one of the carve-outs to exclusivity is "any existing funds sponsored or managed by CAM or any of its Affiliates that is currently investing in such new private equity markets (i.e., outside of North America and Western Europe)." (JV Agreement §10 (emphasis added)). While "currently investing" is not otherwise defined in the JV Agreement, we believe that the "plain meaning" interpretation of the JV Agreement's language is that funds (x) sponsored or managed by CAM or any of its affiliates and (y) investing as of the date of the JV Agreement in new private equity markets are beyond the scope of the JV Agreement's exclusivity clause. However, any other funds that do not meet

---

[2] The JV Agreement defines "Business" to mean "to sponsor one or more funds or pooled investment schemes focused on investing in other funds [or] pooled investment or direct investment schemes that primarily invest in opportunities in new private equity markets." (JV Agreement §2.1).

[3] The JV Agreement defines "Potentially Suitable Investment" as investments which meet the "Investment Objective and Policy" of the "Initial Fund" or any "Subsequent Fund" (as applicable), with "Initial Fund" meaning the Core Fund, "Subsequent Fund" meaning any follow-on fund to the Core Fund and "Investment Objective and Policy" meaning the Initial Fund's or Subsequent Fund's investment objective and the policy for achieving that objective. (JV Agreement §1.1).

both criteria (existing *and* investing as of the date of the JV Agreement) would be prohibited by the JV Agreement's exclusivity clause. Under this interpretation, if any of the aforementioned vehicles that CAM states are "existing" CAM funds were not currently investing as of the date of the JV Agreement, such vehicles would be prohibited under the JV Agreement from investing in new private equity markets.

C.    Definition of "Affiliate"

Third, CAM states that "[w]hen reference is made to CAM and/or its affiliates such affiliates do not include Sal. Oppenheim and any of its affiliates other than CAM." (CAM Memorandum p. 2). This interpretation would permit Sal. Oppenheim and its affiliates to continue to manage existing vehicles, as well as create new vehicles, that could compete directly with the Core Fund.

However, as noted above, the JV Agreement's exclusivity clause applies to NMP, CAM and their respective "Affiliates," with "Affiliate" defined under the JV Agreement as:

> [A]s to any Person, a Person that is (a) controlled by, controls or is under common control with, such Person (collectively, a "Controlled Person"); or (b) controlled by, controls or is under common control with, any Controlled Person, in each case for so long as such control continues. For the purpose of this definition, "control" means the possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise) of the Controlled Persons. (JV Agreement §1.1).

With Sal. Oppenheim acquiring a majority stake of CAM in the summer of 2007, Sal. Oppenheim (and its Affiliates) would be an "Affiliate" of CAM under the JV Agreement and, therefore, should be subject to the JV Agreement's exclusivity clause.

II.    Limited Exclusivity

Based on these interpretations of the JV Agreement's exclusivity clause, the CAM Memorandum and/or the BVT Memorandum set forth exceptions to the JV Agreement's exclusivity clause that fall into four, basic categories: (a) other CAM funds and existing CAM funds, (b) retail funds, (c) non-discretionary accounts and (d) Sal. Oppenheim.

A.    Other CAM Funds and Existing CAM Funds

As noted above, CAM excludes from the Core Fund's exclusivity CAM-sponsored vehicles (including future funds) not organized primarily for the purpose of investing in new private equity markets[4] (excluding CAM non-discretionary accounts discussed below, "Other

---

[4] As noted in footnote 1 above, CAM states in other portions of the CAM Memorandum that allocations of investments are between (x) the Core Fund and (y) CAM funds not focused on investing in funds that primarily invest in opportunities in new private equity markets and existing CAM funds. (CAM Memorandum p. 3). For purposes of this memorandum, it is assumed that CAM's reference to other

CAM Funds") and CAM-sponsored vehicles existing or in the process of being raised, including CAM Europe I, L.P., CAM IV, CAM-BVT VI, SOP, DEVK, and Signal Iduna ("Existing CAM Funds"). With this framework, the CAM Memorandum proposes the following allocations between the Core Fund and such Other CAM Funds and Existing CAM Funds:

1.    100% of investment opportunities presented to the General Partner, the Investment Manager (but, as noted below, excluding CAM-appointed members of the General Partner or the Investment Manager), Tomoko Tatara or Marie-France Mathes (collectively, "NMP Sources") that are suitable for the Core Fund would be offered to the Core Fund without any obligation to present such opportunity to an Other CAM Fund or an Existing CAM Fund unless such investment opportunity exceeds the approved investment amount of the Core Fund, the Core Fund's co-investing limited partners and any successor fund managed by the Investment Manager, in which case such excess would be expected to be offered to the Other CAM Funds and Existing CAM Funds.

2.    Investment opportunities presented to CAM (including CAM-appointed members of the General Partner or the Investment Manager), its affiliates (other than Sal. Oppenheim and its affiliates) and CAM's staff will be offered to the Core Fund but CAM (including CAM-appointed members of the General Partner or the Investment Manager), its affiliates and its staff reserve the right to offer such opportunities to Other CAM Funds and Existing CAM Funds. Allocations to the Core Fund and such Other CAM Funds and Existing CAM Funds would be pro rata based on their respective amounts of committed capital (subject to certain mitigating factors), and the Core Fund and such Other CAM Funds and Existing CAM Funds would dispose of such investments at the same time, on the same terms and conditions and generally on a pro rata basis.

3.    The following investment opportunities need not be offered to the Core Fund:[5]

a.    Investment opportunities relating to "pre-existing investments" of NMP Sources;

b.    Investment opportunities presented to NMP Sources prior to the initial closing date of the Core Fund;

c.    Investment opportunities presented to Tomoko Tatara, Marie-France Mathes or affiliates of CAM in their capacity as directors of companies (or where fiduciary duties apply);

d.    Investment opportunities presented to CAM or any of its affiliates in connection with any Existing CAM Fund;[6]

---

funds means funds that are not primarily organized for the purpose of investing in new private equity markets.

[5] With the exception of clause e. (which currently appears in the draft partnership agreement for the Core Fund), these exclusions appear in the PPM.

e.     Investments of any permitted "successor fund"[7] to the Core Fund; or

f.     Investments intended to protect or enhance the value of investments included in any of clauses a. - e. above.

4.     If an investment opportunity is presented to a NMP Source and approved by Tomoko Tatara and Marie-France for the Core Fund, but not approved (in whole or in part) by CAM-appointed members of the Investment Manager's investment committee, then such investment opportunity (or rejected portion thereof) could be offered to an Other CAM Fund or an Existing CAM Fund only if approved by either (a) Tomoko Tatara and Marie-France or (b) the Core Fund's advisory board.

CAM's proposals would allow both CAM and CAM affiliates that are members of the General Partner, the Investment Manager or the Investment Manager's investment committee to offer opportunities to CAM-sponsored funds, which may contravene other interpretations of the language appearing in the JV Agreement (as discussed above) and the current language contained in the PPM[8] (which language was approved by both NMP and CAM) and may cause potential Core Fund investors to question the Core Fund's viability. In addition, the potential number and size of the Other CAM Funds, combined with the increased number of Existing CAM Funds, may decrease the allocations to the Core Fund which may, in turn, concern potential Core Fund investors.

B.     Retail Funds

In addition to the Other CAM Funds and the Existing CAM Funds, CAM proposes that BVT-CAM Private Equity New Markets Fund ("BVT-NMP I") and BVT-CAM Private Equity Global Fund VI ("BVT VI" and, together with BVT-NMP I, the "Retail Funds") be exempt from the JV Agreement's exclusivity. As noted in the BVT Memorandum, BVT-NMP I expects to have €10-20 million of capital commitments and invest 100% in new private equity markets, and BVT VI expects to have €50 million of capital commitments and invest up to 30% in new private equity markets. (BVT Memorandum p. 1). The Retail Funds would be advised by the Investment Manager and CAM (BVT Memorandum p. 1) and have fees "significantly lower" than the Core Fund's management fee (BVT Memorandum p. 2). In addition, the annual management fee received by CAM and 50% of the carried interest generated by the Retail Funds would be shared by the Investment Manager and CAM in proportion to the funds

---

[6] While the PPM defined "Existing CAM Fund" to include only currently-investing CAM Funds (CAM Europe I, L.P.), CAM's proposal uses the more-expansive definition of "Existing CAM Fund" described above.

[7] "Successor fund" would be a pooled investment fund or similar entity with primary investment objectives substantially similar to those of the Core Fund that may be raised (x) after the Core Fund's investment period or (y) when 75% of the Core Fund's committed capital has been utilized or reserved.

[8] The PPM provides that "Any investment opportunity presented to the General Partner, the Investment Manager, CAM or the Principals [i.e., Tomoko Tatara and Marie-France Mathes] (x) that the Investment Manager, in good faith, believes is suitable for the Partnership [i.e., the Core Fund] and (y) the terms of which would permit its consummation by the Partnership, will be offered to the Partnership." (PPM p. 54).

6

proposed to be committed by investors referred by NewMarkets Partners and CAM. (BVT Memorandum p. 3).

With respect to investment allocations, CAM proposes that (a) the Investment Manager and the Core Fund may, but are not required to, offer investment opportunities to the Retail Funds, (b) the Retail Funds may, but are not required to, invest in the Core Fund's investments (i.e., no pro rata obligation for any Retail Fund to invest in each Core Fund investment) and (c) CAM would ensure that the Retail Funds have access to a "sufficient number of appropriate investment opportunities." (BVT Memorandum p. 2). CAM's proposal, therefore, would have the Retail Funds, with lower fee structures than that of the Core Fund, directly compete with the Core Fund while allowing affiliates of the Core Fund to receive compensation from such competing Retail Funds.

Note, however, that the JV Agreement does not expressly contemplate such Retail Funds. In addition, with the Investment Manager permitted to, and CAM expecting to, offer investment opportunities solely to the Retail Vehicles, the Core Fund's potential pool of investment opportunities may be diminished. Moreover, such Retail Funds may not be viewed favorably by potential Core Fund investors, as both the Investment Manager and CAM may benefit from the success of competing Retail Vehicles to which the Investment Manager and CAM may allocate (a) investment opportunities that are otherwise suitable for the Core Fund and (b) time that would otherwise be spent managing the Core Fund and its assets. Finally, the Retail Vehicles' and the Core Fund's overlapping management structures could cause the Retail Vehicles and the Core Fund to invest in and dispose of identical assets at different times and in different proportions, which may cause additional conflicts of interest to exist.

The Retail Vehicles establishment may be in violation of the JV Agreement's "no agency" clause, which provides that "None of the parties [i.e., CAM or NMP] shall be the agent, partner or legal representative of the other, either express or implied, nor shall any Party have the right or power to enter into any contractual obligation on behalf of the other, except as specifically provided herein [i.e., in this JV Agreement]." If the Retail Vehicles were established parallel to the Core Fund (rather than as feeder vehicles of the Core Fund), and such Retail Vehicles' marketing materials list Tomoko Tatara and Marie-France Mathes as involved in such Retail Vehicles' management, both without NMP's consent, such acts may be contrary to the intent of the JV Agreement's "no agency" clause.

C.    CAM Non-Discretionary Accounts

The third category of vehicles excluded from the JV Agreement's exclusivity clause are CAM non-discretionary accounts, which CAM defines as "all funds, pooled schemes, managed accounts etc [sic], managed by CAM but where CAM and/or its affiliates do not have discretionary investment decision making power." (CAM Memorandum p. 4). While such non-discretionary accounts are explicitly listed as carve-outs to the JV Agreement's exclusivity clause, CAM's proposals regarding such accounts raise concerns for potential investors in the Core Fund.

CAM's proposals neither discuss nor limit the potential number or size of such non-discretionary accounts, and do not address potential allocation issues between such non-discretionary accounts and the Core Fund. In addition, CAM states that the potential economic

NY1 1147998v4

benefits it may receive from such non-discretionary accounts are "not relevant." Such unlimited numbers or sizes of CAM non-discretionary accounts potentially create a large base of vehicles with which the Core Fund may need to compete for investment opportunities. The potential magnitude of such lost Core Fund opportunities may be difficult to determine without knowing the economic benefits CAM may receive from such non-discretionary accounts (as CAM's incentive to provide investment opportunities to such non-discretionary accounts in lieu of offering such opportunities to the Core Fund can not be quantified). Such uncertainty may also concern potential Core Fund investors, who would be unable to gauge the potential conflicts created by such non-discretionary accounts without receiving further disclosure regarding such vehicles.

D.    Sal. Oppenheim

As discussed above, CAM proposes that Sal. Oppenheim and its affiliates not be considered affiliates of CAM. Such exclusion of Sal. Oppenheim (and its affiliates) may create another large source of vehicles with which the Core Fund would compete for investment opportunities.

III.    Sourcing

CAM's proposals regarding the allocation of investment opportunities between each type of CAM-sponsored vehicle and the Core Fund hinge on whether (x) CAM, its affiliates and staff, on the one hand, or (y) NMP Sources, on the other hand, source the relevant investment opportunity. CAM's proposals, however, do not address how the "source" of an investment opportunity will be determined. For example, is a person or entity the "source" of an investment opportunity based on historical relationships, the first meeting, the first correspondence or the actual closing of the investment opportunity? Without guidance, the sourcing of investment opportunities may become a "race" between affiliated entities managing the Core Fund, creating competition that may be poorly regarded by potential Core Fund investors.

IV.    Proposed Solutions

The following are proposed alternatives to CAM's proposals that you may wish to consider:

A.    Certain Parameters

1.    Other CAM Funds. All funds and other pooled investment vehicles sponsored by CAM or any of its affiliates[9] that invest in vehicles that themselves primarily invest in new private equity markets would not be permitted. This prohibition on Other CAM Funds investing in vehicles that primarily invest in new private equity markets would exist regardless of the allocation such Other CAM Funds have to such vehicles that primarily

---

[9] For the avoidance of doubt, this would include any staff members employed by CAM or its affiliates. However, as noted below, a proposed compromise would be to allow Sal. Oppenheim and its affiliates to be exempt from the JV Agreement's exclusivity clause (and, therefore, be permitted to sponsor and manage vehicles that compete with the Core Fund) if Sal. Oppenheim agrees to have a vehicle participate as a "seed" investor in the Core Fund with a capital commitment of at least €50 million.

NY1 1147998v4

invest in new private equity markets. However, prohibited "Other CAM Funds" would not include: "CAM Existing Funds" or CAM's non-discretionary accounts, each of which would be permitted to invest in new private equity markets in accordance with the proposals below.

2.  <u>Existing CAM Funds</u>. "Existing CAM Funds" would include only those funds sponsored or managed by CAM or its affiliates that, as of the date of the JV Agreement, <u>both</u> existed <u>and</u> were investing in new private equity markets. As a potential compromise, you may wish to include CAM Europe I, L.P. (which may not yet be investing) as an "Existing CAM Fund" and, to the extent you determine it is feasible for the Core Fund, you may also wish to add additional funds as "Existing CAM Funds."

3.  <u>CAM Affiliates</u>. As a potential compromise, Sal. Oppenheim would be excluded as an affiliate of CAM for purposes of the JV Agreement's exclusivity clause (and, therefore, Sal. Oppenheim-sponsored vehicles would be permitted to compete with the Core Fund) <u>if</u> Sal. Oppenheim agrees to have a vehicle participate as a "seed" investor in the Core Fund with a capital commitment of at least €50 million.

4.  <u>Retail Funds</u>. Rather than being competitors to the Core Fund, the Retail Funds would be restructured to be feeder limited partners of the Core Fund.

B.   Sourcing

In order to avoid potential competition between NMP and CAM with respect to sourcing investment opportunities (and as a potential compromise), any sourced opportunity in new private equity markets (whether it is initially sourced by NMP, CAM, their respective affiliates or staff, the General Partner or the Investment Manager (each, an "<u>Originating Source</u>")) would be divided so that 80% of any such opportunity would be considered a "<u>Core Fund Opportunity</u>" (and, as discussed in greater detail below, offered to the Core Fund) and 20% of any such opportunity would be considered a "<u>CAM Opportunity</u>" (and, as discussed in greater detail below, offered to Existing CAM Funds and CAM's non-discretionary accounts in such proportions as CAM may determine).

C.   Offering of Investment Opportunities

With the parameters and sourcing proposals above in place, the allocation of investment opportunities would differ from both NMP's initial proposals and CAM's proposals:

1.  100% of any Core Fund Opportunity that the Investment Manager believes (in good faith) is suitable for the Core Fund would be offered to the Core Fund. However, the following would not be required to be offered to the Core Fund:

a.  CAM Opportunities that are determined in good faith to be suitable and viable for any Existing CAM Fund or any CAM non-discretionary accounts (collectively, "<u>Participating CAM Vehicles</u>");

b.  investment opportunities related to "pre-existing investments" (<u>i.e.</u>, investments held by any Originating Source as of the Core Fund's initial closing date);

9

c.    investment opportunities originated by any Originating Source prior to the Core Fund's initial closing date;

d.    investment opportunities presented to any of Tomoko Tatara, Marie-France Mathes or an affiliate of CAM in his or her capacity as a director of a company and in similar circumstances where fiduciary duties apply;

e.    investments of any permitted "successor fund" to the Core Fund (i.e., pooled investment fund or similar entity with primary investment objectives substantially similar to those of the Core Fund that may be raised (x) after the Core Fund's investment period or (y) when 75% of the Core Fund's committed capital has been utilized or reserved); or

f.    investments intended to protect or enhance the value of investments included in above.

2.    <u>Conflicts Hypotheticals</u>.

a.    <u>Hypothetical 1</u>.  An Originating Source is presented with an opportunity to make a $20 million investment, such $20 million investment is determined in good faith by the applicable managers to be suitable for both the Core Fund and one or more of the Participating CAM Vehicles and each of the Core Fund and one or more of the Participating CAM Vehicles is able to consummate the investment.  How will this investment opportunity be allocated?

o  <u>Answer</u>.  80% of such investment opportunity (i.e., $16 million) would be deemed to be a Core Fund Opportunity and allocated to the Core Fund.  20% of such investment opportunity (i.e., $4 million) would be deemed to be a CAM Opportunity and allocated among the Participating CAM Vehicles.

b.    <u>Hypothetical 2</u>.  An Originating Source is presented with an opportunity to make a $20 million investment, such $20 million investment is determined in good faith by the applicable managers to be suitable for only the Core Fund and the Core Fund is able to consummate the investment.  How will this investment opportunity be allocated?

o  <u>Answer</u>.  100% of such investment opportunity (i.e., $20 million) would be allocated to the Core Fund (80% of such investment opportunity was already a Core Fund Opportunity and allocated to the Core Fund; the remaining 20% of such investment opportunity was deemed a CAM Opportunity but was not appropriate for any Participating CAM Vehicle and, therefore, would be allocated to the Core Fund).

c.    <u>Hypothetical 3</u>.  An Originating Source is presented with an opportunity to make a $20 million investment, such $20 million investment is determined in good faith by the <u>unanimous decision</u> of the Core Fund's Investment Manager and the applicable managers of the Participating CAM Vehicles to be suitable for only one or more of the Participating CAM Vehicles and such Participating CAM Vehicle(s) is able to consummate the investment.  How will this investment opportunity be allocated?

o   <u>Answer</u>.  100% of such investment opportunity (<u>i.e.</u>, $20 million) would be allocated to the Participating CAM Vehicle(s) in such proportions as determined by CAM (80% of such investment opportunity was deemed a Core Fund Opportunity but not appropriate for the Core Fund, so that 80% would be allocated to the Participating CAM Vehicles; the remaining 20% of such investment opportunity was already a CAM Opportunity and, therefore, allocated to the Participating CAM Vehicles).

d.      <u>Hypothetical 4</u>.  An Originating Source is presented with an opportunity to make a $20 million investment and such $20 million investment is determined in good faith by the applicable managers to be suitable for both the Core Fund and one or more of the Participating CAM Vehicles.  However, the applicable managers of the Participating CAM Vehicles determine that the Participating CAM Vehicles only have $2 million available for investment, but the Core Fund's Investment Manager determines that the Core Fund can make an investment of up to $20 million.  How will this investment opportunity be allocated?

o   <u>Answer</u>.  90% of such investment opportunity (<u>i.e.</u>, $18 million) would be allocated to the Core Fund and 10% (<u>i.e.</u>, $2 million) would be allocated to the Participating CAM Vehicles (80% of such investment opportunity was already a Core Fund Opportunity and allocated to the Core Fund; the remaining 20% of such investment opportunity was deemed a CAM Opportunity but only 10% of such investment opportunity could be consummated by the Participating CAM Vehicles, so the 10% that could be consummated by the Participating CAM Vehicles would be allocated to the Participating CAM Vehicles and the remaining 10% would be allocated to the Participating CAM Vehicles).

e.      <u>Hypothetical 5</u>.  An Originating Source is presented with an opportunity to make a $20 million investment and such $20 million investment is determined in good faith by the applicable managers to be suitable for both the Core Fund and one or more of the Participating CAM Vehicles.  However, the Core Fund's Investment Manager (<u>by unanimous decision</u>) determines that the Core Fund only has $14 million available for investment, but the applicable managers of the Participating CAM Vehicles determine that the Participating CAM Vehicles can make an investment of up to $20 million.  How will this investment opportunity be allocated?

o   <u>Answer</u>.  70% of such investment opportunity (<u>i.e.</u>, $14 million) would be allocated to the Core Fund and 30% of such investment opportunity (<u>i.e.</u>, $6 million) would be allocated to the Participating CAM Vehicles (80% of such investment opportunity was deemed a Core Fund Opportunity but only 70% of such investment opportunity could be consummated by the Core Fund, so the 70% that could be consummated by the Core Fund would be allocated to the Core Fund and the remaining 10% of the Core Fund Opportunity would be allocated to the Participating CAM Vehicles; the remaining 20% of such investment opportunity was already a CAM Opportunity and allocated to the Core Fund).

11

f.    Hypothetical 6.  An Originating Source is presented with an opportunity to make a $20 million investment, but all or a portion of such $20 million investment is approved by Tomoko Tatara and Marie-France Mathes but is not approved by one or more of the CAM-appointed members of the Core Fund's Investment Manager (either for suitability or financial reasons).    Can such rejected investment opportunity (or rejected portion thereof) be allocated to the Participating CAM Vehicles?

o    Answer.  Such rejected investment (or portion thereof) can only be offered to the Participating CAM Vehicles if approved by (i) Tomoko Tatara and Marie-France Mathes or (ii) the advisory board of the Core Fund.

2.    If the Core Fund and any Participating CAM Vehicle invests in the same opportunity, such investment shall be made on behalf of the Core Fund and such Participating CAM Vehicles in the proportions outlined above, but at the same time and on the same terms and conditions. Dispositions by the Core Fund and the Participating CAM Vehicles of the same investment would be at the same time, on the same terms and conditions and generally on a pro rata basis.[10]

## V.    Final Thoughts on Legal Fees and Ethical Conflicts

We reluctantly need to remind you and CAM that a significant amount of legal fees have been expended in connection with our attempt to resolve communication and language interpretation issues between NMP and CAM, such as the exclusivity provision and conflicts surrounding investment opportunities discussed above. We are mindful of these costs and have done our best to minimize them, but these costs are out of our control. Unfortunately, it appears that there is a fundamental disagreement regarding the very basis of the joint venture between NMP and CAM.  It will be difficult to continuing drafting agreements for the Core Fund and representing the Core Fund if this conflict between NMP and CAM is not resolved.  Please let us know if there is anything we can do to facilitate resolution of these issues so we can complete the documentation and assist with a first closing.

---

[10] Circumstances on which investments would not be disposed of on a pro rata basis could include where (1) necessitated by the obligation of any fund to redeem the interests of an investor in such fund, (2) if after the commitment period of any such fund, the general partner (or similar entity) of such fund determines in good faith that such non-pro rata disposition is appropriate, (3) the sale is made for a specific tax purpose or (4) any other reason where the respective general partners determine in good faith such non-pro rata disposition is appropriate.

NY1 1147998v4

**Exhibit D**

CONFIDENTIAL

------Original Message------
From: Burg, Emile van der
To: Marie-France Mathes
To: Dr Rolf Wickenkamp
To: Tomoko Tatara NewMarkets Partners New York
Cc: Constantin von Dziembowski
Cc: Eberhard Witt
Sent: Jan 11, 2008 3:56 AM
Subject: AW: CAM NewMarkets Partners Board Meeting Agenda, January 16th
in
NY

Dear Marie-France and Tomoko,

We suggest the following items to be included in the agenda prepared by
Marie-France:

1.    Minutes keeping.
2.    "Conflicts of interest" situation (see also the text below)
3.    Discussion of Annual Business Plan: milestones, achievements
to-date, action points (see the attachment to this mail)
4.    Budget: 2007 budget versus actual, budget 2008 submitted for
approval.
5.    Fundraising: strategy plan, achievements to-date, action points.
6.    Carry distribution
7.    Future board meeting schedule
8.    Any other business.

On the "Conflicts of interest" situation:

We have read the Dewey memos.
We find the Dewey memo(s) a repetition of earlier stated positions and as
such they do not contribute much to what are business issues rather than
legal ones. To illustrate the point, let's just follow your (are you
completely backing the Dewey interpretations and proposed solutions?) and
Dewey's reading and consider the practical implications:

CAM and its affiliates (incl Sal.Oppenheim and its
controlled subsidiaries) must use CAM-NMP for all investments in new PE
markets (except for existing funds and non -discretionary accounts). Thus,
investments in new markets GP's out of (small) allocations for such
investments existing within CAM sponsored funds or accounts with a
diversified investment remit would have to be done through CAM-NMP. This,
however cannot be done as a feeder investment into CAM-NMP's core fund nor
as a parallel investment as these allocations (1) cannot be obliged to
accept all investments proposed and approved for the CAM-NMP core fund(s)

and (2) time-wise do not run concurrently, anyway. So, the only way CAM-NMP can get involved into filling such allocations is by acting as an advisor to such funds and accounts. As the economics of such funds and thus the new markets allocations of the same are likely to be less attractive than the economics of the CAM-NMP core fund(s) and CAM-NMP would have no obligation
to offer any investment opportunities to these funds and accounts anyway, CAM-NMP may not be in a position or interested to offer sufficient investment opportunities to such funds and therefore the advisory mandate will have to be of a non-exclusive nature so that CAM can ensure that the allocation will be properly invested. So, CAM-NMP either accepts such a role (which will not affect the position or attractiveness of the CAM-NMP core funds vis-a-vis (potential) investors as CAM-NMP has no obligation nor economic incentive to cater to these allocations within CAM funds at the detriment of the core fund(s), and being able to commit larger amounts to certain GP's albeit out of different pockets may in fact enhance your attractiveness as a LP), or, if it does not accept such a role as non-exclusive advisor, would force CAM not to have any allocations for new markets investments within any of its funds or accounts. The same sort of reasoning applies to the BVT NewMarkets vehicle currently being raised.

Sal Oppenheim and all its controlled affliates (like VCM) would have to refrain from any and all investing in new market funds except through CAM-NMP (and even if they were prepared to do so, the logic of point 1. would also apply here making it practically impossible to do so).

Sourcing: If and when CAM speaks or meets with a new markets GP, we will always mention CAM-NMP as an associated, dedicated new markets fund-of-funds as we will be obliged to offer the opportunity to CAM-NMP, anyway. In effect, if anything, you widen the net trawling for new investment opportunities. In the case of limited availability of allocations and also assuming CAM and CAM-NMP are both interested in investing, CAM-NMP
is not "competing" against CAM but against the entire universe of emerging markets funds-of-funds and acting in concert is just as likely, if not more likely, to obtain a bigger piece of the pie than CAM-NMP would be able to do on its own. Also, CAM not engaging with new markets GP's would imply CAM perhaps nor being able to fill allocations to new markets funds within diversified CAM managed funds or accounts (see above) which represents a major problem unless the position is that CAM should not have such allocations, anyway, within its funds or accounts.

In summary, the position taken by Dewey and you(?) would, unless CAM-NMP is be prepared to act as non-exclusive advisor to CAM funds, force CAM to refrain from offering any allocation to new markets investments within its diversified funds and oblige Sal. Oppenheim to also withdraw from such

investments, wherever its affliates operate. Clearly, this is totally impossible, was never CAM's intention, we could not possibly have agreed to it, we did not agree to it and the JV agreement is consistant with this position.

Regards,

Rolf Wickenkamp en Emile van der Burg

**EXHIBIT E**

LIMITED LIABILITY COMPANY AGREEMENT

OF

NEWMARKETS PARTNERS LLC
(a Delaware limited liability company)

Dated as of March 6, 2007

# LIMITED LIABILITY COMPANY AGREEMENT

## OF NEWMARKETS PARTNERS LLC

### TABLE OF CONTENTS

**Page**

ARTICLE I GENERAL PROVISIONS ....................................................................................1

Section 1.01    Definitions.................................................................................1
Section 1.02    Name ........................................................................................3
Section 1.03    Principal Office.........................................................................3
Section 1.04    Registered Office; Registered Agent .......................................3
Section 1.05    Formation; Term .......................................................................4
Section 1.06    Purpose.....................................................................................4

ARTICLE II POWERS; MANAGEMENT; LIABILITY .......................................................4

Section 2.01    Powers of the Company.............................................................4
Section 2.02    Management of the Company....................................................5
Section 2.03    Duties and Activities of the Members ......................................6
Section 2.04    Liability of Members. ...............................................................6
Section 2.05    Exculpation and Indemnification. .............................................6

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS;
        DISTRIBUTIONS; ALLOCATIONS ..................................................................8

Section 3.01    Capital Contributions................................................................8
Section 3.02    Capital Accounts.......................................................................8
Section 3.03    Distributions..............................................................................9
Section 3.04    Allocations. ...............................................................................9
Section 3.05    Special Allocations. .................................................................10
Section 3.06    Tax Advances...........................................................................11

ARTICLE IV DISSOLUTION; WINDING UP; TERMINATION ....................................11

Section 4.01    Dissolution ...............................................................................11
Section 4.02    Winding Up and Termination. ..................................................12
Section 4.03    Assets Reserved and Pending Claims. ....................................13

ARTICLE V ADDITIONAL MEMBERS; ASSIGNABILITY; WITHDRAWAL...........13

Section 5.01    Admission of New Members ....................................................13
Section 5.02    Assignability ...........................................................................14
Section 5.03    Withdrawal by Member ...........................................................14
Section 5.04    Change in Interests. .................................................................14
Section 5.05    Preemptive Rights. ..................................................................14
Section 5.06    Buy/Sell...................................................................................15

ARTICLE VI ACCOUNTING; FINANCIAL AND TAX MATTERS...........................16

i

Section 6.01   Books and Records ....................................................................16
Section 6.02   Accounting Basis ......................................................................16
Section 6.03   Bank Accounts ..........................................................................17
Section 6.04   Financial Reports ......................................................................17
Section 6.05   Tax Matters ...............................................................................17

ARTICLE VII MISCELLANEOUS ....................................................................17

Section 7.01   Amendments .............................................................................17
Section 7.02   Investment Representations ......................................................17
Section 7.03   Successors and Assigns ............................................................18
Section 7.04   No Waiver ................................................................................18
Section 7.05   Survival of Certain Provisions .................................................18
Section 7.06   Notices .....................................................................................18
Section 7.07   Severability ..............................................................................19
Section 7.08   Counterparts .............................................................................19
Section 7.09   Headings, Etc. ..........................................................................19
Section 7.10   Gender ......................................................................................19
Section 7.11   No Right to Partition ................................................................19
Section 7.12   No Third Party Rights ..............................................................19
Section 7.13   Entire Agreement .....................................................................19
Section 7.14   Rule of Construction ................................................................20
Section 7.15   Applicable Law ........................................................................20

Schedule 1:  Members' Capital Contribution and Percentage Interest

## LIMITED LIABILITY COMPANY AGREEMENT OF
## NEWMARKETS PARTNERS LLC

LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of NewMarkets Partners LLC (the "Company"), dated as of March 6, 2007, by and between Tomoko Tatara and Marie-France Mathes (each, a "Member" and collectively, the "Members") pursuant to and in accordance with the Limited Liability Company Act of the State of Delaware (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act").

WHEREAS, the Company was formed as a limited liability company under the Act pursuant to a Certificate of Formation that was filed with the Office of the Secretary of State of the State of Delaware on March 6, 2007; and

WHEREAS, the Members wish to set forth the terms and conditions for the operation of the Company;

NOW, THEREFORE, the parties hereto, in consideration of the premises and agreements of the parties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

### ARTICLE I

### GENERAL PROVISIONS

Section 1.01    Definitions.  For the purpose of this Agreement, the following terms shall have the following meanings:

"Act" shall have the meaning set forth in the recitals.

"Affiliate" shall mean, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or under common control with such Person; provided, however, that none of the Members shall be deemed to be an Affiliate of the Company.  For the purposes of this definition, the term "control" means the possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Buyout Notice" shall have the meaning set forth in Section 5.06(a).

"Buyout Price" shall have the meaning set forth in Section 5.06(a).

"Buy/Sell Event" shall mean (i) the occurrence of a transfer in violation of Article V by any Member or (ii) the failure of the Members to agree on any material Company decision in accordance with Section 2.02 for twenty (20) days after any



Member gives notice to the other Members that a deadlock over a material Company decision exists; provided, however, that in no event shall a Buy/Sell Event occur under this clause (ii) unless and until written notice is given by such Member to the other Members that a Buy/Sell Event will occur unless they fail to agree on the relevant decision within ten (10) days after the date such notice is given.

"Capital Account" shall have the meaning set forth in Section 3.02(a).

"Capital Contribution" shall mean, with respect to each Member, the amount of cash contributed by such Member to the capital of the Company from time to time pursuant to Section 3.01.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Company" shall have the meaning set forth in the recitals.

"Dissolution Event" shall have the meaning set forth in Section 4.01.

"Fiscal Year" shall mean each fiscal year of the Company (or portion thereof), which shall end on December 31; provided, however, that upon Termination (as defined below) of the Company, "Fiscal Year" shall mean the period from the January 1 immediately preceding such Termination to the date of such Termination.

"Initial Capital Contribution" shall mean, with respect to each Member, the amount of cash contributed by such Member to the capital of the Company as of the date hereof pursuant to Section 3.01.

"Liabilities" shall have the meaning set forth in Section 2.05(b).

"Maximum Capital Contribution" shall mean, with respect to any Member, the aggregate Capital Contributions that such Member shall be permitted to make to the Company, as set forth on Schedule 1 hereto, such that the aggregate Maximum Capital Contributions of all Members shall not exceed $100,000.

"Members" shall have the meaning set forth in the recitals.

"Net Income" or "Net Loss" shall mean, for any Fiscal Year (or portion thereof), the net income, gain or loss of the Company during such Fiscal Year (or portion thereof), as determined for United States federal income tax purposes, except that such Net Income or Net Loss shall be determined: (i) by including any income earned by the Company that is exempt from United States federal income tax; (ii) by deducting the amount of any expenditures accrued by the Company that are described in Section 705(a)(2)(B) of the Code or are treated as described in Section 705(a)(2)(B) of the Code pursuant to Regulation Section 1.704-1(b)(2)(iv)(i); and (iii) by excluding any amount of income, gain, loss or deduction specially allocated pursuant to the provisions of Section 3.05 (Special Allocations).

"<u>Offeree Member</u>" shall have the meaning set forth in Section 5.06(a).

"<u>Offeror Member</u>" shall have the meaning set forth in Section 5.06(a).

"<u>Percentage Interest</u>" shall mean, with respect to any Member, the ratio of such Member's Capital Contributions to the aggregate Capital Contributions of all Members as set forth on Schedule 1 hereto, as adjusted from time to time pursuant to Article 5.

"<u>Person</u>" shall mean an individual, a corporation, a company, a voluntary association, a partnership, a joint venture, a limited liability company, a trust, an estate, an unincorporated organization, a governmental authority or other entity.

"<u>Prime Rate</u>" shall mean the rate of interest published from time to time in The Wall Street Journal, Eastern Edition, and designated as the prime rate.

"<u>Protected Person</u>" shall mean: (i) the Members and their respective Affiliates and each officer, director, controlling person, partner, employee or shareholder of any Member or an Affiliate of a Member; and (ii) any Person who serves at the request of the Company as an officer, director, partner, member or employee of any other Person.

"<u>Regulations</u>" shall mean the regulations promulgated under the Code.

"<u>Reply Notice</u>" shall have the meaning set forth in Section 5.06(b).

"<u>Tax Advances</u>" shall have the meaning set forth in Section 3.06.

"<u>Termination</u>" shall mean the date of the cancellation of the Certificate of Formation of the Company following the end of the Winding Up Period (as defined below) by the filing of a Certificate of Cancellation in the Office of the Secretary of State of the State of Delaware.

"<u>Winding Up Period</u>" shall mean the period from the Dissolution Event to the Termination of the Company.

Section 1.02    Name.  The name of the Company shall be "NewMarkets Partners LLC".

Section 1.03    Principal Office.  The principal office of the Company shall be located at such place or places inside or outside the State of Delaware in the United States of America as may from time to time be designated by the Members in accordance with Section 2.02 hereof.

Section 1.04    Registered Office; Registered Agent.  The street address of the registered office of the Company in Delaware shall be at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The registered agent of the Company upon whom process against it may be served at such address is Corporation Service Company.

Section 1.05    Formation; Term.  The Company was formed upon the execution of the Certificate of Formation of the Company by Daniel Patrick Farrell and the filing of such Certificate on March 6, 2007 with the Secretary of State of the State of Delaware, Daniel Patrick Farrell being authorized to take such actions.  The regular business activities of the Company shall continue until the Dissolution Event.

Section 1.06    Purpose.  The purpose of the Company is to carry on any lawful business, purpose or activity permitted under the Act and to engage in any and all activities necessary, convenient, desirable or incidental to the foregoing.

## ARTICLE II

## POWERS; MANAGEMENT; LIABILITY

Section 2.01    Powers of the Company.

The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 1.06, including, but not limited to, the power:

(i)    to make, own, manage or dispose of investments and rights to investments and to engage in activities incidental or ancillary to such transactions, whether directly or indirectly through the management, control or ownership of direct or indirect interests in other Persons;

(ii)    to possess, transfer, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to property held or owned by it;

(iii)    to employ, retain or consult, or terminate the services of, such Persons for the operation and management of the Company including, without limitation, brokers, accountants, attorneys, actuaries or specialists in any field of endeavor whatsoever;

(iv)    to deposit and withdraw the funds of the Company in any bank or trust company and to entrust to such bank or trust company any of the investments, monies, documents and papers belonging to or relating to the Company; to deposit in and entrust to any brokerage firm that is a member of any national securities exchange any of said funds, investments, monies, documents and papers belonging to or relating to the Company; or to enter into custodial arrangements with any Person with respect to the assets of the Company;

(v)    to invest, pay, retain and distribute its funds in a manner consistent with the provisions of this Agreement, including, without limitation, to make distributions to the Members in cash, in kind or otherwise;

4

(vi)     to borrow monies and incur liabilities and in connection therewith to issue, accept, endorse and execute promissory notes, guarantees, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing by pledge, conveyance or assignment in trust of the whole or any part of the property whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such obligations for its purposes;

(vii)    to set aside funds for reasonable reserves, reasonably anticipated contingencies and reasonable working capital;

(viii)   to make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss and deduction, and as to all other relevant matters, including, without limitation, elections referred to in Section 754 of the Code, determination of which items of cash outlay are to be capitalized or treated as current expenses, and selection of the method of accounting and bookkeeping procedures to be used by the Company;

(ix)     to sue, prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment in respect of claims against the Company and to execute all documents and make all representations, admissions and waivers in connection therewith;

(x)      to enter into, make and perform all contracts, agreements, instruments and other undertakings necessary, advisable or incidental to the carrying out of the foregoing objects and purposes; and

(xi)     to take all actions that may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the Act and of each other jurisdiction in which such action is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged.

Section 2.02    Management of the Company.   The management of the Company shall be vested in the Members in proportion to the then current Percentage Interests owned by all of the Members, acting by written agreement of the Members, each in its discretion.   The decision of Members possessing aggregate Percentage Interests of not less than one hundred percent (100%), excluding those Members who expressly abstain from participating in such written agreement, shall control in each instance.    It is agreed that no Member shall be under any obligation to take into account the interests of any other Member or the Company in so acting.   The Members may designate and direct in any such written agreement any Person consenting to do so to take any or all actions necessary to implement the actions described in such written agreement.

Section 2.03    Duties and Activities of the Members.   No Member or Affiliate or representative thereof shall be required to devote time or attention to the business of the Company.

Section 2.04    Liability of Members.

(a)    *Limited Liability of Members*. The liability of the Members shall be limited as provided in the Act and as set forth in this Agreement. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficits in its Capital Account or the Capital Account of any other Member (if such deficits occur).

(b)    *Return of Previously Distributed Amounts*. In accordance with the Act, a member of a limited liability company may, under certain circumstances, be required to return to such limited liability company, for the benefit of limited liability company creditors, amounts previously distributed to such member. To the extent that a Member may be required to return capital to the Company under the Act, it is the intent of the Members that any obligation to return any such distributions pursuant to Section 3.03 or Article 4 shall be deemed to be compromised by the consent of all Members, and the Member to whom any money or property is distributed shall not be required to return any such money or property to the Company or any creditor of the Company. However, if any court of competent jurisdiction or regulatory body with jurisdiction over the matter holds that, notwithstanding the provisions of this Agreement, any Member is obligated to return to the Company any amounts previously distributed to such Member, such obligation shall be the obligation of such Member and not of any other Person.

Section 2.05    Exculpation and Indemnification.

(a)    *Exculpation*. No Protected Person shall be liable to the Company, any Member or any Affiliate of any Member for any action taken or omitted to be taken by it or by any other Member or other Person, including, without limitation, any negligent act or failure to act, except in the case of a liability resulting from such Protected Person's own fraud, willful malfeasance or bad faith. Subject only to the preceding sentence, any Protected Person may consult with legal counsel and accountants with respect to Company affairs (including interpretations of this Agreement) and shall be fully protected and justified in any action or inaction which is taken or omitted in the absence of bad faith and in reliance upon and in accordance with the opinion or advice of such counsel or accountants. In determining whether a Protected Person acted with the requisite degree of care, such Protected Person shall be entitled to rely on written or oral reports, opinions, certificates and other statements of the directors, officers, employees, consultants, attorneys, accountants and professional advisors of the Company, selected with reasonable care, provided that no such Protected Person may rely upon such statements if it believed that such statements were materially false. Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Member shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company,

could be taken by the Company and the Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner, shareholder, fiduciary or otherwise) or to recommend to others any such particular investment opportunity.

    (b)    *Indemnification.*

    (i)    To the fullest extent permitted by law, the Company shall indemnify, hold harmless, protect and defend each Protected Person against any losses, claims, damages or liabilities, including without limitation reasonable legal fees or other expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims approved by the Company (collectively, "Liabilities"), to which any Protected Person may become subject:

    (A)    by reason of any act or omission or alleged act or omission (even if negligent) performed or omitted to be performed in connection with the activities of the Company;

    (B)    by reason of the fact that it is or was acting in connection with the activities of the Company in any capacity or that it is or was serving at the request of the Company as a partner, stockholder, member, director, officer, employee or agent of any Person; or

    (C)    by reason of any other act or omission or alleged act or omission arising out of or in connection with the activities of the Company;

unless such Liability results from such Protected Person's own fraud, bad faith or willful malfeasance.

    (ii)    The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this Section 2.05(b), provided that such Protected Person executes a written undertaking to repay the Company for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this Section 2.05(b).

    (iii)    The provisions of this Section 2.05(b) shall continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under this Section 2.05(b) and regardless of any subsequent amendment to this Agreement, provided that no such amendment shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

(iv)     Any indemnification under this Section 2.05(b) or otherwise shall be paid out of and to the extent of the Company's assets only.

## ARTICLE III

## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS

Section 3.01     Capital Contributions.  Any contribution to the Company shall be in proportion to such Member's Percentage Interest; provided, however, that any Member, upon the admission of any additional Member to the Company or other change in the Percentage Interests of any Member in accordance with Article V hereof, may make additional Capital Contributions to the Company in any amount that would not result in such Member's aggregate Capital Contributions to exceed such Member's Maximum Capital Contribution.   The Initial Capital Contribution to the Company of each Member is set forth opposite such Member's name on Schedule 1 hereto.  Each Member shall be obligated to make additional Capital Contributions in such amounts as are necessary to satisfy any reasonable operating requirements of the Company (including the fees of counsel) as determined by the Members in accordance with Section 2.02 hereto and not to exceed the Maximum Capital Contribution amount set opposite their names on Schedule 1.  Except as otherwise expressly provided in this Agreement, no Member shall have the right to withdraw capital from the Company, to receive interest on such Member's Capital Contributions or to receive any distribution or return of such Member's Capital Contributions.  Except as provided in this Section 3.01, no Member shall be required to contribute any capital to the Company.

Section 3.02     Capital Accounts.

(a)     Maintenance of Capital Accounts.  The Company shall maintain a "Capital Account" for each Member on the books of the Company in accordance with the following provisions:

(i)     Each Member's Capital Account shall be increased by the amount of: (A) such Member's contributions to the capital of the Company pursuant to Section 3.01; (B) any Net Income or other item of income or gain allocated to such Member pursuant to Section 3.04 or Section 3.05; and (C) Company liabilities, if any, assumed by such Member or secured, in whole or in part, by any Company assets that are distributed to such Member.

(ii)     Each Member's Capital Account shall be decreased by the amount of: (A) cash and the fair market value on the date of distribution of any other Company property distributed to such Member pursuant to Section 3.03 and Section 4.02; (B) any Net Loss or other item of loss or deduction allocated to such Member pursuant to Section 3.04 or Section 3.05; and (C) liabilities, if any, of such Member assumed by the Company.

(b)    *Succession to Capital Accounts.*  In the event any Person becomes a substituted Member in accordance with this Agreement, such substituted Member shall succeed to the Capital Account of the transferor Member to the extent such Capital Account relates to the transferred interest (or portion thereof).

Section 3.03    Distributions.

(a)    *General.*  Distributions shall be made to the Members as determined by the Members in accordance with Section 2.02 hereof and, if made, shall be in proportion to their respective Percentage Interests.  The Members may establish reserves for working capital, contingencies or other items and for the satisfaction of liabilities (including contingent liabilities) of the Company.

(b)    *Distributions in Kind.*  Distributions may be made in cash or in kind.  Any distributions of securities or other property, shall be made, to the extent practicable, so that the relative proportion of such securities and other property (as well as any cash distributed therewith) shall be the same for all Members.  The amount by which the fair market value of any property to be distributed in kind to the Members exceeds or is less than the basis of such property shall, to the extent not otherwise recognized by the Company, be taken into account in computing gain or loss of the Company for purposes of crediting or charging the Capital Accounts of the Members pursuant to Section 3.04 (Allocations).

(c)    *Limitations on Distributions.*  Notwithstanding any provision contained in this Agreement, the Company shall not make a distribution to any Member if such distribution would violate Section 18-607 of the Act (Limitations on Distributions) or other applicable law.

Section 3.04    Allocations.

(a)    *Net Income.*  Net Income for each Fiscal Year (or portion thereof) shall be allocated among the Members in proportion to their respective Percentage Interests.

(b)    *Net Loss.*  Net Loss for each Fiscal Year (or portion thereof) shall be allocated among the Members in proportion to their respective Percentage Interests.

(c)    *Tax Allocations.*  For United States federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under Sections 3.04 and 3.05, except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Regulations thereunder and Regulation Section 1.704-1(b)(4)(i).

Section 3.05    Special Allocations.

(a)    *Regulatory Compliance.* The provisions of Sections 3.02, 3.03, 3.04 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. In furtherance of the foregoing, this Agreement shall be deemed to include a "qualified income offset" in accordance with Regulation Section 1.704-1(b)(2)(ii)(d). The Members shall be authorized to make appropriate amendments to the allocations of items pursuant to Section 3.04 if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder, provided that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(b)    *No Negative Balance in Capital Accounts.* Notwithstanding any provision set forth in Section 3.04, no item of deduction or loss shall be allocated to a Member to the extent the allocation would cause a negative balance in such Member's Capital Account (after taking into account the adjustments, allocations and distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)) that exceeds the amount that such Member would be required to reimburse the Company pursuant to this paragraph or under applicable law. In the event some but not all of the Members would otherwise have such excess Capital Account deficits as a consequence of such an allocation of loss or deduction, the limitation set forth in this Section 3.05(b) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible deduction or loss to each Member under Regulation Section 1.704-1(b)(2)(ii)(d). All deductions and losses in excess of the limitations set forth in this Section 3.05(b) shall be allocated to the Members. In the event any loss or deduction shall be specially allocated to a Member pursuant to either of the two preceding sentences, an equal amount of income of the Company shall be specially allocated to such Member prior to any allocation pursuant to Section 3.04.

(c)    *Adjustments of Capital Accounts.* The Capital Accounts of the Members shall be adjusted in accordance with Regulation Section 1.704-1(b)(2)(iv)(f) to reflect the fair market value of Company property whenever an interest in the Company is relinquished to the Company, whenever an additional Member is admitted to the Company and the amount of capital contributed by such Member upon its admission reflects changes in the value of Company assets in accordance with Section 3.01, upon a liquidation of the Company within the meaning of Section 708 of the Code, and when the Company is wound up pursuant to Article 4, and shall be adjusted in accordance with Regulation Section 1.704-1(b)(2)(iv)(e) in the case of a distribution of any property (other than cash).

Section 3.06    Tax Advances. To the extent the Company is required by law to withhold or to make tax payments on behalf of or with respect to any Member (e.g., back-up withholding) ("Tax Advances"), the Company may withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Member, plus interest thereon at a rate equal to the Prime Rate plus 2.0% per annum determined from time to time by the Members while outstanding, shall (a) be promptly

paid to the Company by the Member on whose behalf such Tax Advances were made (such payment not to constitute a Capital Contribution), or (b) with the consent of the Members in accordance with Section 2.02 hereof, be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member. Whenever repayment of a Tax Advance by a Member is made as described in clause (b) of the preceding sentence, for all other purposes of this Agreement such Member shall be treated as having received all distributions (whether before or upon Termination) unreduced by the amount of such Tax Advance and interest thereon. Each Member hereby agrees to reimburse the Company for any liability with respect to Tax Advances (including interest thereon) required or made on behalf of or with respect to such Member (including penalties imposed with respect thereto), such amount not to exceed the aggregate amount of distributions received by such Member from the Company.

## ARTICLE IV

## DISSOLUTION; WINDING UP; TERMINATION

Section 4.01    Dissolution.  The Company shall commence its winding up upon the first to occur of the following (the "Dissolution Event"):

(a)    the insolvency or bankruptcy of the Company;

(b)    the sale of all or substantially all of the Company's assets;

(c)    the affirmative agreement of the Members in accordance with Section 2.02 hereof; or

(d)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

The Dissolution Event shall be effective on the day on which such event occurs and immediately thereafter the Company shall commence the Winding Up Period during which its affairs shall be wound up in accordance with Sections 4.02 and 4.03.

Section 4.02    Winding Up and Termination.

(a)    *Winding Up*.  Upon the occurrence of the Dissolution Event, the property and business of the Company shall be wound up by the Members.  Subject to the requirements of applicable law and the further provisions of this Section 4.02, the Members shall determine whether to sell or otherwise dispose of Company assets or to distribute the same in kind and the timing and manner of such disposition or distribution.

(b)    *Distributions Upon Winding Up*.  Within a reasonable period of time following the occurrence of the Dissolution Event, after allocating all Net Income, Net Loss and other items of income, gain, loss or deduction pursuant to Sections 3.04 and

11

3.5, the Company's assets (except for assets reserved pursuant to Section 4.03) shall be applied and distributed in the following manner and order of priority:

(i)    the claims of all creditors of the Company (including Members except to the extent not permitted by law) shall be paid and discharged other than liabilities for which reasonable provision for payment has been made;

(ii)    to the Members in accordance with the positive balances of their respective Capital Accounts; and

(iii)    thereafter, to the Members in proportion to their Percentage Interests.

Notwithstanding anything to the contrary in this Agreement, liquidating distributions shall be made no later than the last to occur of (x) 90 days after the date of disposition (including pursuant to Section 4.03) of the last remaining asset of the Company and (y) the end of the Company's taxable year in which the disposition referred to in clause (x) above shall occur. This Section 4.02(b) is intended to comply with, and shall be interpreted consistently with, the requirements of Regulation Section 1.704-1(b)(2)(ii)(b)(2).

(c)    *Distributions In Kind.* Securities for distribution in kind shall be allocated to the Members. Notwithstanding any other provision of this Agreement, the amount by which the fair market value of any property to be distributed in kind to the Members (including property distributed in liquidation, and property distributed pursuant to Section 3.03) exceeds or is less than the adjusted basis of such property shall, to the extent not otherwise recognized by the Company, be taken into account in computing income, gains and losses of the Company for purposes of crediting or charging the Capital Accounts of, and distributing proceeds to, the Members, pursuant to this Agreement.

(d)    *Termination.* When the Members have completed the winding up described in this Section 4.02, the Members shall cause the Termination of the Company.

Section 4.03    Assets Reserved and Pending Claims.

(a)    *Assets Reserved.* If, upon a Dissolution Event, there are any assets that, in the judgment of the Members, cannot be sold or distributed in kind without sacrificing a significant portion of the value thereof or where such sale or distribution is otherwise impractical at the time of the Dissolution Event, such assets may be retained by the Company if the Members determine that the retention of such assets is in the best interests of the Members. Upon the sale of such assets or a determination by the Members that circumstances no longer require their retention, such assets (at their fair market value) or the proceeds of their sale shall be taken into account in computing Capital Accounts on winding up and amounts distributable pursuant to Section 4.02(b), and distributed in accordance with such value.

12

(b)    *Pending Claims*.  If there are any claims or potential claims (including potential Company expenses in connection therewith) against the Company (either directly or indirectly, including potential claims for which the Company might have an indemnification obligation) for which the possible loss cannot, in the judgment of the Members, be definitively ascertained, then such claims shall initially be taken into account in computing Capital Accounts upon winding up and distributions pursuant to Section 4.02(b) at an amount estimated by the Members to be sufficient to cover any potential loss or liability on account of such claims (including such potential Company expenses), and the Company shall retain funds (or assets) determined by the Members as a reserve against such potential losses and liabilities, including expenses associated therewith.  The Members may obtain insurance or create escrow accounts or make other similar arrangements with respect to such losses and liabilities.  Upon final settlement of such claims (including such potential Company expenses) or a determination by the Members that the probable loss therefrom can be definitively ascertained, such claims (including such potential Company expenses) shall be taken into account in the amount at which they were settled or in the amount of the probable loss therefrom in computing Capital Accounts on winding up and amounts distributable pursuant to Section 4.02(b), and any excess funds retained shall be distributed.

## ARTICLE V

## ADDITIONAL MEMBERS; ASSIGNABILITY; WITHDRAWAL

Section 5.01    Admission of New Members.  No additional Members shall be admitted to the Company, except:  (a) additional Members approved by the Members in accordance with Section 2.02 hereof; or (b) as transferees of the interests in the Company of existing Members pursuant to Section 5.02.  A Person shall be deemed admitted as a Member at the time that such Person:  (i) executes an amendment, counterpart or supplement to this Agreement and such other instruments as the Members may reasonably deem necessary or desirable to evidence such Person's agreement to be bound by and to comply with the terms and provisions hereof; (ii) makes a Capital Contribution to the Company in an amount not to exceed such additional Member's Maximum Capital Contribution as stated in the instruments required to be executed pursuant to clause (i) of this Section 5.01 and (iii) is named on the books and records of the Company.

Section 5.02    Assignability.  No Member may assign, transfer or grant any interest in the Company, except with the consent of the Members in accordance with Section 2.02 hereof or as otherwise provided in Section 5.06 hereof.  Any purported assignment, transfer or grant by any Member of any interest in the Company not made strictly in accordance with the requirements of this Section 5.02 or otherwise permitted by this Agreement shall be entirely null and void.

Section 5.03    Withdrawal by Member.  Upon the withdrawal of a Member from the Company for any reason, such Member shall cease to have any further right to or interest in distributions pursuant to Section 3.03.

13.

Section 5.04    Change in Interests.  Upon any change in the Percentage Interests of the Members, whether by reason of the admission or withdrawal of a Member or otherwise, the Members' shares of all Company items shall be determined, except as otherwise required by law, by an interim closing of the Company's books.

Section 5.05    Preemptive Rights.

(a)    Subject to the terms of this Agreement, the Members shall have the preemptive right to purchase, on a pro rata basis, any interests issued by the Company or any like securities in any successor entity (or any option on or other security convertible or exchangeable for interests or any such securities), whether now authorized or not that the Company may, from time to time, propose to sell and issue after the date hereof for cash or otherwise ("New Interests").

(b)    If the Company intends to issue New Interests under this Section 5.05, it shall give the Members written notice of such intention, describing the New Interests to be issued, the price thereof and the general terms upon which the Company proposes to effect such issuance.  The Members shall have fifteen (15) days from the date of any such notice to agree to purchase all or part of their pro rata share of the New Interests to be so issued.  For purposes of this Section 5.05, a Member's pro rata share of the New Interests shall mean such Member's Percentage Interest.

(c)    If a Member fails to exercise the foregoing preemptive right with respect to any of the New Interests within such fifteen (15) day period, the Company may within 120 days thereafter, so long as it does not contravene this Agreement, sell all or any part of the New Interests not agreed to be purchased by the Members at a price and on general terms no more favorable to the purchasers thereof than as specified in the notice given to the Members pursuant to Section 5.05(a) above.  In the event the Company has not sold such New Interests within such 120-day period, the Company shall not thereafter issue or sell any New Interests without first offering such New Interests to the Members in the manner provided above.

Section 5.06    Buy/Sell.

(a)    At any time during the continuance of a Buy/Sell Event, any Member (an "Offeror Member") may give written notice (a "Buyout Notice") to the other Member (an "Offeree Member") stating that the Offeror Member desires to implement the provisions of this Section 5.06 and stating a price (the "Buyout Price"), and stating that the Offeror Member will either (i) pay to the Offeree Member the Buyout Price in exchange for the Offeree Member's entire interest in the Company or (ii) sell the Offeror Member's entire interest in the Company to the Offeree Member for the Buyout Price.  The Buyout Notice shall be deemed to constitute both an offer by the Offeror Member to purchase the Offeree Member's entire interest in the Company for a price equal to the Buyout Price and an offer by the Offeror Member to sell the Offeror Member's entire interest in the Company for a price equal to the Buyout Price.  The Offeree Member shall be entitled to accept either offer as set forth in Section 5.06(b), provided, however, that the Offeree Member must select one of the offers within the time period specified in

14

Section 5.06(b) (failing which, such Offeree Member shall be deemed to have elected to sell as provided in Section 5.06(b)): Upon request by either the Offeree Member or Offeror Member (which may be made at any time after a Buyout Notice is given) each Member shall deliver to the requesting Member all information in the possession of the Member to whom the request was made and which is no more than six months old regarding the valuation of the Company or any potential offer or interest in buying any of the interests in the Company or any of the Company's material assets.

(b)     The Offeree Member shall have a period of thirty (30) days after the receipt of a Buyout Notice within which to notify the Offeror Member (the "Reply Notice") whether the Offeree Member shall (i) sell all of the Offeree Member's interest in the Company to the Offeror Member for the Buyout Price or (ii) purchase all of the Offeror Member's interest in the Company from the Offeror Member for the Buyout Price. In the event that the Offeree Member fails to give the Reply Notice prior to the expiration of such thirty (30) day period, the Offeree Member shall be deemed to have elected to sell all of its interest in the Company for the Buyout Price on such thirtieth (30th) day.

(c)     Closing of the transfer of the Offeror Member's or Offeree Member's entire interest in the Company in accordance with the Offeree Member's election (or deemed election) pursuant to Section 5.06(b) shall take place on the thirtieth (30th) day (or the next business day if such thirtieth (30th) day is not a business day) after receipt by the Offeror Member of the Reply Notice (or on the thirtieth (30th) day after the end of the thirty (30) day period referred to in Section 5.06(b) in the event that no Reply Notice is received by the Offeror Member within such period), unless the parties mutually agree otherwise. In connection with any transfers by a Member of all of its interest in the Company pursuant to this Section 5.06, the transferor Member shall be obligated to convey all of its interest in the Company free and clear of any and all liens or encumbrances (other than encumbrances under applicable securities laws and this Agreement) pursuant to an assignment agreement containing customary representations and warranties, including, without limitation, applicable representations and warranties as to: (1) the due organization, valid existence and good standing of the assignor; (2) the corporate power and due authorization of and due execution and delivery by, and enforceability against, the assignor, with respect to the assignment agreement; (3) the ownership and non-encumbrance of the interest in the Company by the assignor; (4) no violation of organizational documents, laws or agreements affecting the assignor; and (5) no approvals or consents required for the assignor's execution and delivery of the assignment agreement. Such representations and warranties shall survive the closing and the transferee Member shall pay the Buyout Price and deliver an acknowledgement to the assignment agreement making customary representations and warranties, including, without limitation, those set forth in clauses 1, 2, 4, and 5 above (as applicable) and containing an indemnity holding the assignor harmless from all liabilities, direct or contingent, debts, obligations or claims which any Person may have against the Company or its Affiliates to the extent of any liability, debt or other obligation the assignor may have in the assignor's capacity as a Member or as a guarantor of any obligations of the Company, occurring prior to or following the date of such indemnity, except such

15

liabilities, debts, obligations or claims arising out of resulting from an act or omission of the assignor that is in violation of this Agreement.

(d)     Should any Member default in its obligations under Section 5.06(a)-(c) for ten (10) days after written notice from the other Member, the defaulting Member shall be liable to the non-defaulting Member for any damages suffered by the non-defaulting Member or the Company as a result of such default, and in addition the non-defaulting Member may either (i) buy all of the defaulting Member's interest in the Company on the same terms and conditions as set forth in this Section 5.06, except that the purchase price shall be eighty-five percent (85%) of the Buyout Price set forth in the Buyout Notice or (ii) be entitled to specific performance and/or other equitable relief, including, without limitation, interest on the unpaid amount at the Prime Rate plus 2%/annum.

## ARTICLE VI

## ACCOUNTING; FINANCIAL AND TAX MATTERS

Section 6.01     Books and Records.  The books and records of the Company shall be maintained at the Company's office and shall be available for examination there by any Member or his or her duly authorized representatives at any and all reasonable times.  Any Member, or his or her duly authorized representatives, upon paying the costs of duplication, shall be entitled to copies of the Company's books and records; provided, however, that such information shall be used only for purposes reasonably related to such Member's interest as a member of the Company.

Section 6.02     Accounting Basis.  The books and records and financial statements and reports of the Company shall be kept on an accrual basis.  Additional determinations with respect to accounting principles shall be made by the Members.

Section 6.03     Bank Accounts.  Funds of the Company shall be deposited in a Company account or accounts in the bank or banks as selected by the Members in accordance with Section 2.02 hereof.  Withdrawals from bank accounts shall only be made by the Members or such other parties as may be approved by the Members in accordance with Section 2.02 hereof.

Section 6.04     Financial Reports.  Within 120 days after the end of each Fiscal Year, the Company shall prepare and deliver to each Member a report setting forth, at the end of such fiscal year: (a) a balance sheet of the Company; (b) a statement of the net income or net loss for such year and such Member's share thereof; (c) a statement of changes in financial position; (d) such Member's Capital Account; and (e) the amount of such Member's share in the Company's taxable income or loss for such year, in sufficient detail to enable such Member to prepare his or her federal, state and other tax returns. The Company shall also cause to be delivered to each Member upon request such other information as shall be reasonably needed by such Member in order to enable such Member to file timely any of his or her tax returns.

16

Section 6.05    Tax Matters. The Company shall prepare and file all tax returns of the Company and the Members shall make all determinations as to tax elections by the Company.  Unless otherwise required by law, any person designated by the Members in accordance with Section 2.02 hereof shall be the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code, provided that the "tax matters partner" shall not be authorized to approve any tax settlement unless such settlement has been approved by the Members in accordance with Section 2.02 hereof. Prompt notice shall be given to the Members upon receipt of advice that the Internal Revenue Service or other taxing authority intends to examine any income tax return or record or books of the Company.

## ARTICLE VII

## MISCELLANEOUS

Section 7.01    Amendments.  Except as otherwise expressly provided in this Agreement, any provision of this Agreement may be amended or waived by an instrument in writing executed and consented to by the Members in accordance with Section 2.02 hereof.

Section 7.02    Investment Representations.  Each Member hereby represents and warrants to the Company that; (a) the membership interest of the Member is being acquired for investment purposes only for its own account and not with a view to or in connection with any distribution, reoffer, resale, or other disposition not in compliance with the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Securities Act") and applicable state securities laws; (b) the Member possesses such expertise, knowledge, and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that it is capable of evaluating the merits and economic risks of acquiring and holding it membership interest, and it is able to bear all such economic risks now and in the future; (c) the Member has had access to all of the information with respect to its membership interest that it deems necessary to make a complete evaluation thereof and has had the opportunity to question the Company concerning such membership interest; (d) the Member's decision to acquire its membership interest for investment has been based solely upon the evaluation made by it; (e) the Member is aware that it must bear the economic risk of its investment in the Company for an indefinite period of time because membership interests in the Company have not been registered under the Securities Act or under the securities laws of various states, and, therefore, cannot be sold unless the membership interests are subsequently registered under the securities act and any applicable state securities laws or an exemption from registration is available; (f) the Member is aware that the Member's tax liability with respect to such Member's interest in the Company may exceed any distributions made to such Member and that the Company is under no obligation to make any such distributions to such Member to pay any related taxes; and (g) the Member has not relied upon any other Member or agent or counsel thereof for any tax, securities law or other advice with respect to such Member's interest in the Company.

Section 7.03    Successors and Assigns.  This Agreement shall inure to the benefit of, and shall be binding upon, the successors and permitted assigns of the Members.

Section 7.04    No Waiver.  The failure of any Member to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 7.05    Survival of Certain Provisions.  Each of the Members agrees that the covenants and agreements set forth in Sections 2.04, 2.05 and 7.02 shall survive the Termination of the Company.

Section 7.06    Notices.  All notices hereunder shall be in writing and shall be given by personal delivery, mailed by Federal Express, U.S. overnight mail or international air courier service, or sent by telecopy or other electronic means, and addressed: if to the Company, at its principal office and, if to a Member, to such Member at its last known address as disclosed on the records of the Company.  Notices shall be deemed to have been given as of the date delivered (upon confirmed receipt by the delivery service) or telecopied (upon confirmed receipt).  The Company and any Member may change the address for notices by delivering or mailing as aforesaid, a notice stating the change and setting forth the changed address.

Section 7.07    Severability.  In case any provision in this Agreement shall be deemed to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired hereby.

Section 7.08    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

Section 7.09    Headings, Etc.  The headings in this Agreement are inserted for convenience of reference only and shall not affect the interpretation of this Agreement.

Section 7.10    Gender.  As used herein, masculine pronouns shall include the feminine and neuter, neuter pronouns shall include the masculine and the feminine, and the singular shall be deemed to include the plural.

Section 7.11    No Right to Partition.  The Members, on behalf of themselves and their shareholders, partners, successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any interest which is considered to be Company property, regardless of the manner in which title to such property may be held.

18

Section 7.12    No Third Party Rights.  Except as expressly provided in this Agreement, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

Section 7.13    Entire Agreement.  This Agreement constitutes the entire agreement among the Members with respect to the matters described herein and supercedes any prior agreement or understanding among them with respect to such subject matter.

Section 7.14    Rule of Construction.  The general rule of construction for interpreting a contract, which provides that the provisions of a contract should be construed against the party preparing the contract, is waived by the parties hereto.  Each party acknowledges that such party was represented by separate legal counsel in this matter who participated in the preparation of this Agreement or such party had the opportunity to retain counsel to participate in the preparation of this Agreement but elected not to do so.

Section 7.15    Applicable Law.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

*[Remainder of Page Intentionally Left Blank]*

19

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

**Tomoko Tatara**

Member Address: 400 East 52nd Street, Apt 14D
New York, NY 10022
Member Fax: 484 762-5146
Member Phone: 917 605-1593

**Marie-France Mathes**

Member Address: 2853 Brandywine Street NW
Washington, D.C. 20008
Member Fax: 240-392 6281
Member Phone: 202-4154145

20

## SCHEDULE 1
### As of March 6, 2007

| Member Name | Initial Capital Contribution | Aggregate Capital Contributions To Date | Maximum Capital Contribution | Percentage Interest |
|---|---|---|---|---|
| Tomoko Tatara | $100 | $100 | $100,000 | 50% |
| Marie-France Mathes | $100 | $100 | $100,000 | 50% |
| TOTAL | $200 | $200 | $200,000 | 100.00% |