UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
NEWMARKETS PARTNERS, LLC, et al.,   :
                                    :
                  Plaintiffs,       :    08 Civ. 04213 (WHP)(THK)
                                    :
         -against-                  :    **MEMORANDUM OPINION AND**
                                    :              **ORDER**
                                    :
SAL. OPPENHEIM JR. & CIE. S.C.A.,   :
et al.,                             :
                                    :
                  Defendants.       :
-----------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Tomoko Tatara ("Tatara") brings this action derivatively on behalf of Newmarkets Partners, LLC ("NMP") against Defendants Marie-France Mathes ("Mathes"), CAM Private Equity Consulting & Verwaltungs GmbH ("CAM"), Sal. Oppenheim Jr. & Cie. S.C.A., ("Oppenheim"), and BVT Beratungs-, Verwaltungs-Und Treuhangesellschaft Fur International Vermongensanlagen MBH ("BVT"). Mathes and Tatara are the sole partners of NMP. Peter Farkas, Esq. ("Farkas") is Tatara's counsel, and purports to act as counsel for NMP inasmuch as Tatara's standing to sue derives from claims held by NMP.

Presently before the Court are Defendants' objections to the assertion of privilege by Plaintiffs over certain documents in the possession of both Mathes and Plaintiffs. Plaintiffs have created a privilege log identifying numerous communications among Mathes, Farkas, and Tatara, made between November 30, 2007, and January 17, 2008. During this time, Farkas sought to be retained as counsel

for NMP, Tatara, and Mathes for the purpose of advising the partnership and its individual partners in connection with CAM's alleged breach of a joint venture agreement between CAM and NMP (the "JV Agreement"). However, only Tatara, and not NMP, ultimately retained Farkas. Mathes did not sign an engagement letter with him, as would have been required to hire him on behalf of the partnership.

In the Amended Complaint, Plaintiffs allege that Mathes wrongfully refused to consent to the filing of this lawsuit, and conspired with the other Defendants to misappropriate NMP's intellectual property and usurp investment opportunities belonging to the NMP-CAM joint venture (the "JV") under the JV Agreement.[1] Mathes contends that ten of the documents listed on the privilege log are material to defending the claims against her, and asserts the right to rely on them. More broadly, all Defendants argue that Plaintiffs have no basis for claiming attorney-client privilege or work-product protection over any of the allegedly privileged documents. Each of the Defendants has moved to dismiss the case, in part on grounds that Tatara lacks standing to bring this action derivatively. Thus, CAM, Oppenheim, and BVT also seek all

---

[1] Oppenheim also owns a portion of CAM's equity. BVT and Oppenheim, according to Plaintiffs, entered the conspiracy for the purpose of marketing an investment fund created by BVT and CAM that would compete with the JV. (See generally Am. Compl., dated July 29, 2008, at 9-14.)

documents on the privilege log because of their relevance to the issue of Tatara's standing.

Given the unusual context in which Plaintiffs have invoked the protection of privilege, the Court agreed to conduct an in camera review of all documents listed on the log. For the reasons fully explained below, Plaintiffs can protect from disclosure only documents bearing the following bates stamps: MFM 2104-06; 5354-55; 5358-59; 5412; 5414-17; 5419-30; 5432-43; 5449-51; 5468-77; and 5514. These materials fall within an attorney-client privilege held by NMP that materialized despite the fact that the partnership never formally engaged Farkas. In some instances, the documents also qualify for work-product protection. However, should Mathes choose to rely on any of these documents in her defense — which she has indicated no intent to do — Plaintiffs cannot prevent her. As for the remaining documents, Plaintiffs have forfeited the protection of any privilege by putting them at issue in the case.

## I.   Can Plaintiffs Assert Any Valid Privilege?

Because Mathes never retained Farkas as her attorney, and she has not agreed to his representing NMP, Defendants' objections raise the threshold question of whether any valid privilege would protect communications among Tatara, Mathes, and Farkas. According to Plaintiffs' privilege log, all of these communications qualify as attorney-client privileged, and the majority are also protected under the work-product doctrine. (See Plaintiffs' Privilege Log, dated Dec. 1, 2008 ("Pls.' Log").)

3

A.    <u>Attorney-Client Privilege</u>

"The    attorney    client    privilege    protects    confidential
communications between client and counsel made for the purpose of
obtaining or providing legal assistance." <u>In re County of Erie</u>,
473 F.3d 413, 418 (2d Cir. 2007).[2]    "Attorney-client privilege
exists to protect not only the giving of professional advice to
those who can act on it but also the giving of information to the
lawyer to enable him to give sound and informed advice." <u>Upjohn v.</u>
<u>United States</u>, 449 U.S. 383, 390, 101 S. Ct. 677 (1981).

Although NMP never officially retained Farkas, some of the
documents in dispute nevertheless qualify for the partnership's

---

[2] The Amended Complaint asserts subject matter jurisdiction based
on both diversity of citizenship and on claims arising from
federal questions under the Lanham Act. (<u>See</u> Am. Compl. ¶ 8.)
The parties do not directly address the issue of what law applies
to Plaintiff's privilege claims.  In diversity actions, attorney-
client privilege issues should be "determined in accordance with
State law," pursuant to Rule 501 of the Federal Rules of
Evidence.  Fed. R. Evid. 501.; <u>see</u> <u>Application of American</u>
<u>Tobacco Co.</u>, 880 F.2d 1520, 1527 (2d Cir. 1989) ("[I]n a
diversity case the existence of a privilege is to be determined
by reference to state law . . . ."). Federal law, on the other
hand, governs attorney work-product issues.  <u>See</u> <u>Bowne of New</u>
<u>York City, Inc. v. AmBase Corp.</u>, 150 F.R.D. 465, 471 (S.D.N.Y.
1993).  However, under Rule 501, it is "intended that the Federal
law of privileges should be applied with respect to pendent State
law claims when they arise in a Federal question case." <u>See</u> Fed.
R. Evid. 501 advisory committee's note to 1974 Enactment;
<u>Woodward Governor Co. v. Curtiss Wright Flight Systems, Inc.</u>, 164
F.3d 123, 126 (2d Cir. 1999) ("[Q]uestions about privilege in
federal question cases are resolved by the federal common law.");
<u>accord</u> <u>First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim,</u>
<u>Appel, Dixon & Co.</u>, 110 F.R.D. 557, 560 (S.D.N.Y. 1986). Since
both parties cite cases from courts in the Second Circuit, as
well as from Delaware, the Court has considered the law of both
of those jurisdictions, as well as other federal law where
persuasive.

4

attorney-client privilege.   An attorney-client relationship can arise prior to formal engagement.   As a result, privilege may attach to a prospective client's "initial statements" to an attorney who is not ultimately hired.   See United States v. Dennis, 843 F.2d 652, 656 (2d Cir. 1988).   "The key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential."   Id. at 657.   Thus, NMP's attorney-client privilege would encompass any "confidences and secrets" divulged to Farkas by Mathes and Tatara, to the extent they believed they were "approaching [Farkas] in a professional capacity with the intent to secure legal advice" for the partnership.   Diversified Group, Inc. v. Daugerdas, 304 F. Supp. 2d 507, 513 (S.D.N.Y. 2003) (citation omitted).   The same is true for e-mails from Farkas to Mathes and Tatara containing legal advice to NMP.   In each case, the privilege extends only to documents that reflect the purpose of obtaining or providing legal advice for NMP, as well as the parties' expectation of confidentiality.[3]

---

[3] Plaintiffs have taken what appear to be inconsistent positions on Farkas's relationship with Mathes.   Mathes has argued to the District Court that Farkas should be disqualified on conflict of interest grounds, because she was a former prospective client of his and disclosed confidences to him in that capacity.   No doubt in an effort to refute this claim, Plaintiffs have adopted the posture that Farkas's "communications with Mathes were as counsel for Ms. Tatara."   (See Letter from Lawrence G. Lee, Esq., dated Jan. 27, 2009, at 1.)   However, it is obvious that the presence of a third party — in this case Mathes — during communications between a lawyer and a client whom he represented in an individual capacity — in this case Farkas and Tatara — would

Many documents listed on Plaintiffs' privilege log meet this test. Notwithstanding the fact that Farkas had not been formally retained, Mathes and Tatara looked to him for legal advice on behalf of NMP, and Farkas provided such advice, in a number of e-mails beginning in November 2007. These include documents, or portions thereof that Plaintiffs presumably intend to redact, bates stamped MFM 2104-06, 5416-17, 5419-30, 5432-43, 5449-51, 5468-77, and 5514. Mathes also recorded legal advice to NMP from Farkas in handwritten notes taken during conversations with him, appearing at documents bates stamped MFM 5354-55, 5414-15, 5358-59, and 5412. Each of the foregoing documents displays an understanding that Mathes and Tatara were acting on behalf of NMP to obtain legal advice, and therefore carries the expectation of confidentiality. See Diversified Group, Inc., 304 F.Supp. 2d at 513.

However, several of the specific documents the parties have brought to the Court's attention do not qualify for any pre-engagement attorney-client privilege held by the partnership. This is true of various versions of the proposed engagement letter, from late December 2007, that would have retained Farkas on behalf of

---

destroy privilege notwithstanding the fact that the client and the third party are colleagues. Plaintiffs cite no law that suggests otherwise. The Court therefore construes their claim to privilege as based on the only plausible theory: that Mathes communicated with Farkas with the understanding that NMP, and not just Tatara individually, was his prospective client. (See Hearing Transcript, dated Jan. 21, 2009 ("Tr."), at 29:20-21 (Plaintiffs' counsel asserting that Farkas provided legal advice for the partnership).)

NMP and the individual partners.  In general, the "fact of retainer [and] identity of the client" are not privileged, because they do not qualify as "confidential communications" made for the purpose of securing legal advice.  See United States v. Pape, 144 F.2d 778, 782 (2d Cir. 1944).  "[F]ee information" is also not privileged.  In re Shargel, 742 F.2d 61, 62 (2d Cir. 1984); see Gaus v. Conair Corp., No. 94 Civ. 5693 (KTD)(FM), 2000 WL 358387, at *3 (S.D.N.Y. Apr. 7, 2000) ("The attorney-client privilege typically does not extend, however, to the identity of the client(s) or the fee arrangements that the client(s) may have entered into with the attorney.").  However, any content that "reveal[s] the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall[s] within the privilege."  Clarke v. Am. Commerce Nat. Bank, 974 F.2d 127, 129 (9th Cir. 1992); see Daugerdas, 304 F.Supp.2d at 514 (quoting Clarke for the standard used in determining whether attorney invoices to a client were privileged).

Here, the content of the draft engagement letters consists mainly of the proposed fee arrangement for Farkas, along with boilerplate termination and arbitration provisions.  (See MFM 5373-75; MFM 5493-5501.)  The letters also identify the broad purpose of Farkas's representation as "negotiat[ing] a financial settlement of on-going disputes involving the CAM-NewMarkets joint venture," and note the "short time schedule" involved.  (See id.)  None of these

7

statements contain legal advice.  Nor do they reveal undisclosed
motive, strategy, or the nature of the services provided.  <u>See</u>
<u>Daugerdas</u>, 304 F.Supp.2d at 514 (noting that because invoices did
not contain "details regarding the nature of the legal services
provided," they were "not privileged").  To the extent that they
identify the motive for retaining Farkas to be enforcing NMP's
legal rights under the JV Agreement against CAM, through litigation
or negotiation, Plaintiffs have already disclosed this goal in
their Amended Complaint.  (<u>See</u> Am. Compl. ¶ 12 (discussing "legal
action to enforce NMP's rights . . . against CAM, Oppenheim and
BVT").)

        Furthermore, the unexecuted retainer letters fall short of
conveying the expectation of confidentiality necessary for pre-
engagement privilege to attach.  Unlike the e-mail communications
identified above, the letters signal a divergence of interests
between Mathes and Tatara.  They purport to "set[] forth[] the
basic terms of [NMP's] engagement of [Farkas] on behalf of NMP, as
well as Tomoko Tatara and Marie-France Mathes individually."  (<u>See,</u>
<u>e.g.</u>, MFM 5373.)  Notwithstanding the earlier implied consent by
Mathes to have Farkas act on behalf of the company, there are no
communications between Mathes and Farkas identified on the
privilege log that show a similar consent to have him represent her
in her individual capacity.  The fact that she never signed any
version of the letter that would expressly grant Farkas this
authority — and, indeed, the fact that Farkas now represents a

8

party (Tatara) that has sued her — can be taken as a rejection of his offer to represent her individually.  The letters thus fail to establish the basis for attorney-client privilege called for by their own terms.  In fact, notes written by Mathes on one draft chronicle her negotiation of terms more favorable to her, as opposed to Tatara.  For instance, next to the proposed termination provisions, Mathes wrote, "limit TT's action depending on TT's behavior."  (See id.)

The parties also dispute whether various versions of the Memorandum of Understanding ("MOU") attached to the engagement letter drafts may be disclosed to all Defendants.  These exhibit an even starker divergence of interests between Mathes and Tatara.  The purpose of the MOUs was to impose "operational procedures" for Mathes and Tatara "individually as partners in NMP, and Peter Farkas," for the duration of Farkas's engagement in connection with the CAM dispute.  (See, e.g., MFM 5361-62.)  The terms contained in the MOUs place limits on how Mathes and Tatara can conduct business, engage in correspondence, use company information, and expend company finances.  As such, they purport to establish business obligations and restrictions between Mathes and Tatara.  Mathes aggressively negotiated terms that would have been favorable to her had she consented to retain Farkas, as notes appearing on one version of the MOU demonstrate.  (See Bates no. MFM 5362.)  Mathes penned in proposed alternative language, and wrote "No" next to two paragraphs and "OK" next to two others.  (See id.)

9

The adversity displayed in the MOUs is antithetical to the expectation of confidentiality that accompanies a request for legal advice. Furthermore, the MOUs appear to contain proposed business advice, not legal advice. Unlike the e-mails discussed above, neither the draft engagement letters nor the draft MOUs show Mathes looking to Farkas for legal advice, or Farkas proffering such advice to NMP.

B.   <u>Attorney Work-Product Protection</u>

Plaintiffs also make a blanket assertion that all but two of the documents listed on the privilege log may be protected from discovery as attorney work product. The work-product doctrine protects materials "prepared in anticipation of litigation or for trial by or for [a] party or its representative." Fed. R. Civ. P. 26(b)(3). The purpose of the doctrine is to "preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." <u>United States v. Adlman</u>, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting <u>Hickman v. Taylor</u>, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393-94 (1947)).

Materials revealing an attorney's "mental processes" in analyzing the legal aspects of a case are sacrosanct, and receive heightened protection. <u>United States v. Nobles</u>, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975). However, the work-product doctrine extends not only to documents containing "legal theories and strategy," but also to factual material. <u>Adlman</u>, 134 F.3d at 1197-

10

98. Thus, a document qualifies for work-product protection if, "in light of [its] nature . . . and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." Id. at 1202 (emphasis in original)(quoting Charles Alan Wright et al., 8 Federal Practice and Procedure § 2024, at 343 (1994)). Conversely, the doctrine "withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." Id.

Some of the documents identified above as attorney-client privileged between NMP and Farkas, or portions thereof that Plaintiffs intend to redact, are also entitled to protection as work product created by Farkas in anticipation of litigation. It is clear from the context and content of e-mails in which Farkas delivered legal advice to NMP, such as those appearing in documents bates stamped MFM 5416-17, 5419-30, 5432-35, 5449-51, 5468-77, and 5513-16, that they were prepared for NMP "because of the prospect" of litigation with CAM. See Adlman, 134 F.3d at 1202.

The draft MOUs present a closer question. Because they neither consist of "legal theories and strategy," id. at 1196, nor reflect Farkas's mental processes in "analyzing and preparing" NMP's case against CAM, Nobles, 422 U.S. at 238, 95 S. Ct. at 2170, they clearly fall outside the core of work-product protection. On the other hand, the draft MOUs arguably fit within the wider sphere

11

of factual materials that Rule 26 defines as work product.  Under
Adlman, they satisfy the test of having been prepared "because of"
anticipated litigation.   See 134 F.3d at 1202.   As Plaintiffs
contend, Farkas drafted the business arrangements set forth in the
MOU to address the "handling of operational matters during the
conduct of any litigation" with CAM.  (See Am. Compl. ¶ 12).  Thus,
the MOUs would not have been prepared but for the anticipated
litigation between CAM and NMP.  See Struogo v. BEA Associates, 199
F.R.D. 515, 521 (S.D.N.Y. 2001) ("An attorney must show merely that
the documents were prepared 'with an eye toward litigation.'")
(quoting Adlman).   Moreover, although the operational procedures
proposed by the MOU are devoid of legal advice or analysis, the
Court accepts that Farkas prepared them "to assist in . . .
business decision[s]" that he expected Tatara and Mathes to face
during litigation.   Adlman, 134 F.3d at 1198-99 (classifying
materials created primarily for a business purpose, yet containing
litigation risk assessments, as work product).

     As for the engagement letters, Plaintiffs' claim to work-
product protection is strained.   Like the MOUs, the engagement
letter drafts are clearly not entitled to heightened protection as
"core" work product, because they contain no legal analysis, and do
not reveal Farkas's mental processes about litigation.  It is true
that, like the draft MOUs, the draft letters would not exist but
for the dispute between CAM and NMP.  Yet this does not mean that

they are necessarily work product.[4]   Here, the draft engagement letters are more accurately defined as "byproduct[s] of the fact of the representation," and thus not entitled to work-product protection.   <u>Stonehenge/FASA-Texas, JDC, L.P. v. Miller</u>, No. Civ.A.3:94-CV-0912-G, 1998 WL 826880, at *2 (N.D. Tex. 1998) (describing attorney invoices); <u>see also</u> <u>Mordesovitch v. Westfield Ins. Co.</u>, 244 F. Supp. 2d 636, 643 (S.D. W. Va. 2003) (denying work-product protection to engagement letters).

Furthermore, allowing disclosure of the draft engagement letters is wholly consistent with the rationale for the sweeping definition of work product imposed by <u>Adlman</u>.   In that case, the Second Circuit extended work-product protection to materials prepared "because of" litigation, rather than only those prepared "primarily to assist in litigation."   <u>Adlman</u>, 134 F.3d at 1198-99. The decision emphasized that the broader standard is necessary to shelter materials that are primarily "prepared to assist in a business decision," yet also contain core work product in the form of legal analysis of expected litigation.   <u>Id.</u> at 1199.   Otherwise, a company would face "untenable choice[s]" between making business

---

[4] In interpreting <u>Adlman</u>, one might conclude that, for purposes of the work-product doctrine, the entire universe of documents that may be sought in discovery are either created in the "ordinary course of business" or "because of litigation," such that if one category does not apply, then the other must. 134 F.3d at 1202.   However, in the Court's view, and as further explained below, the facts and terms of representation are simply not the type of factual material intended to receive work-product protection under <u>Adlman</u>.

decisions that depend on thorough legal analysis, and alternatively "scimp[ing] on candor and completeness to avoid prejudicing its litigation prospects." Id. at 1200.  Here, denying work-product protection to the draft engagement letters triggers no such crisis for Plaintiffs, because, as previously stated, the letters contain no litigation analysis.

Ultimately, protecting the draft letters, even on the theory that they constitute non-core factual work product, would not serve the underlying purpose of the doctrine.  Disclosing them would allow no "unnecessary intrusion" into the "consider[ation of] . . . relevant [and] irrelevant facts" essential to effectively preparing for litigation.  Adlman, 134 F.3d at 1198; see Hickman, 329 U.S. at 510, 67 S. Ct. at 393) (identifying the "public policy underlying the orderly prosecution and defense of claims" protected by the work-product doctrine, without which "much of what is now put down in writing would remain unwritten").  There is no reason that the disclosure of engagement letters that contain neither confidential attorney-client communications, nor any legal or factual analysis in preparation for litigation, would impair such preparation.  Nor, for that matter, would the discoverability of engagement letters like those at issue discourage attorneys and their clients from negotiating the terms of retention.

For these reasons, the Court rejects Plaintiffs' designation

14

of the draft engagement letters as Farkas's work product.[5] However, even assuming that the Court were to find otherwise, the draft engagement letters would still have to be produced.  Likewise, the MOUs must be produced notwithstanding the Court's finding that they may be considered work product.  As explained below, Plaintiffs have clearly forfeited the protection of any privilege over all documents that are not listed in Section I-A as protected by NMP's attorney-client privilege, including the draft MOUs and engagement letters.  For that reason, it is also unnecessary to determine whether the work-product doctrine applies to any of the remaining documents.

## II.  Can Tatara Limit Use of NMP's Privileged Documents by Mathes?

The next question is whether Tatara may prevent the use or disclosure of the documents listed above that do qualify as attorney-client privileged or work-product protected.  Because Mathes already rightfully possesses these materials, it would seem obvious that Plaintiffs cannot prevent her from relying on them in defending the lawsuit against her.  Unlike, for instance, in cases

---

[5] Sticking with a literal application of Rule 26, the engagement letters also cannot be categorized as materials "prepared . . . by or for [a] party or its representative."  As explained above, the engagement letter would have retained Farkas to represent Mathes in her individual capacity, but she neither explicitly nor implicitly gave him this authority.  Therefore, Farkas failed to qualify as a "representative" of the relevant parties on the terms required by the engagement letter itself. Neither is it fair to conclude that he prepared documents designed to secure his entitlement to legal fees "for" Mathes, Tatara, or NMP, rather than "for" himself.

where parties inadvertently disclose privileged material to an adversary, Plaintiffs cannot claim that Mathes's access to the documents in the first place is the result of a mistake, and that they must be returned to avoid prejudice to Plaintiffs. See, e.g., Bus. Integration Servs., Inc. v. AT&T Corp., 251 F.R.D. 121, 131 (S.D.N.Y. 2008) (considering whether allowing the plaintiff to retain inadvertently produced privileged documents would prejudice the defendant).

Furthermore, Mathes's entitlement to use NMP's privileged documents also follows from a doctrine that treats a director and a corporation as "joint clients" of the company's attorneys for purposes of privilege claims.  "When two or more persons . . . jointly consult an attorney, their confidential communications with the attorney . . . will of course be privileged in a controversy of either or both of the clients with the outside world."  Kenneth S. Broun et al., 1 McCormick On Evid. § 91.1 (Thompson Reuters/West 6th Ed. 2006).  However, where "the two original clients . . . fall out between themselves and become engaged in a controversy," it is "clear that the privilege is inapplicable."  Id.; see Garner v. Wolfinbarger, 430 F.2d 1093, 1103 (5th Cir. 1970) ("In many situations in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other.").

These principles govern the assertion of privilege by a company in litigation against one of its board members over

16

"documents generated during [the director's] tenure." See Am. S.S. Owners Mut. Protection and Indem. Ass'n, Inc. v. Alcoa S.S. Co., 232 F.R.D. 191, 198-99 (S.D.N.Y. 2005) (discussing a situation in which a former director and a corporation "later become adverse," with the result that "neither is permitted to assert the attorney-client privilege as to communications occurring during the period of common interest") (quoting Gottlieb v. Wiles, 143 F.R.D. 241, 247 (D. Colo. 1992)), modified in part on other grounds, No. 04 Civ. 4309 (LAK)(JCF) 2005 WL 2254463 (S.D.N.Y. Sept. 15, 2005).

Thus, "as a general matter, a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during a director's tenure."[6] Moore Business Forms, Inc.

---

[6] The cases Plaintiffs cite in support of their claim to privilege do not refute this general principle. Hallett v. Carnet Holding Corp., 809 A.2d 1159 (Del. 2002), appeal dismissed in part, No. 499, 2002, 820 A.2d 372 (Del. Feb. 4, 2003) (unpublished table decision), available at 2003 WL 1978743, merely found that the Delaware Court of Chancery did not abuse its discretion by preventing a former general counsel of a company, who was a defendant in a derivative action, from relying on e-mails between the company and outside counsel.  It did not address the reasons for the decision, other than to recite that the Court of Chancery found that "the contested documents 'on their face' constituted work-product and attorney-client privileged communications."  2003 WL 1978743, at *2.  Unlike a director, an employee such as a general counsel is not primarily "responsible for the proper management of the corporation."  See Kirby, 1987 WL 14862, at *7.  It is therefore inappropriate to consider a general counsel to be the "joint client" of a company's outside counsel.  In re Dow Corning Corp., 261 F.3d 280, 284 (2d Cir. 2000), is also inapposite, because it involved shareholder plaintiffs in a derivative suit seeking privileged documents that were not in their possession, but instead held by the company.  See id. at 282 (noting that the plaintiffs sought minutes from a board meeting).  Here, Mathes possesses the disputed documents and was privy to their creation.  The relevant

17

v. Cordant Holdings Corp., Civ. A. Nos. 13911, 14595, 1996 WL
307444, at *4 (Del. Ch. June 4, 1996), appeal refused, 682 A.2d 625
(Del. 1996); see Kirby v. Kirby, C.A. No. 8604, 1987 WL 14862, at
*7 (Del. Ch. July 29, 1987)("[T]he issue is whether the directors,
collectively, were the client at the time the legal advice was
given. . . . The directors are all responsible for the proper
management of the corporation, and it seems consistent with their
joint obligations that they be treated as the 'joint client' when
legal advice is rendered to the corporation through one of its
officers or directors."). The same rule prevents a company from
denying a director access to work product created by its attorneys
when the director served on the board. See Gottlieb, 143 F.R.D. at
247 (noting the rule that "[a]n attorney may not withhold work
product from his own client," which would "clearly require counsel
to provide work product to the company's board of directors")
(citing Spivey v. Zant, 683 F.2d 881, 885 (5th Cir. 1982)).[7]

_____

portion of Dow Corning relates to an inapplicable doctrine,
established in the Garner case, that imposes a "fiduciary duty"
exception to attorney-client privilege in derivative actions.
See Garner, 430 F.2d at 1103-04. The doctrine allows shareholder
plaintiffs to pierce a company's privilege upon a showing of
"good cause," because directors obtaining legal advice for a
company do so as fiduciaries on behalf of its owners. In Dow
Corning, the Second Circuit acknowledged that it was "unable to
determine on [the existing] record . . . whether grounds may
exist for . . . the application of the shareholder 'good cause'
exception . . . announced in Garner." 261 F.3d at 286.

[7] Some cases outside the Second Circuit and Delaware reject
the joint-client exception in the corporate context. See, e.g.,
Montgomery v. eTreppid Technologies, LLC, 548 F. Supp. 2d 1175,
1187 (D. Nev. 2008) (concluding that "the privilege belongs to

Mathes served as a partner of NMP when the disputed documents were created, but is now adverse to Tatara and the partnership. Her relationship to them, like that of an ex-director in litigation with her former company and a shareholder, fits the analogy to a party who becomes adverse to former co-clients.[8]  See Garner, 430 F.2d at 1103 (noting that the former joint-client exception to attorney-client privilege "applies to partners").    In such a setting, Tatara cannot, on behalf of NMP, "assert the [attorney-client] privilege to deny [Mathes] access" to any of the disputed documents, or prevent her from relying on them in preparing her defense.   See Moore Business Forms, Inc., 1996 WL 307444, at *4;

_____

the corporation, [and] can be asserted or waived only by management").  While the Court declines to follow such authority here, other cases, including Alcoa S.S. Co., limit the exception by stressing the "distinction between a board member's personal role and his role as a director."  232 F.R.D. at 198.  This approach might prevent Mathes from securing any privileged documents created at a time when she was acting in her own interests, rather than during a "period of common interest."  See Gottlieb, 143 F.R.D. at 247.  This lawsuit is evidence that the interests of Mathes and Tatara did diverge at some point in late 2007 or early 2008.  However, since Mathes already possesses all the allegedly privileged documents, the Court need not decide whether they display a "common interest" between Mathes and Tatara for purposes of deciding whether she can rely on them in her defense.

   [8] This is consistent with the Court's conclusion above that the documents in dispute do not reveal any implicit consent by Mathes to have Farkas represent her in her individual capacity.  In litigation between a company and a director, "a director seeking information furnished to the board that is the subject of the privilege claim is a 'client' not in his or her individual capacity, but as a member of the collective body (the board) of which the director is one member."   Moore Business Forms, Inc., 1996 WL 307444, at *4 n.4.

see also In re Tri-River Trading, LLC, 329 B.R. 252, 268-69 (B.A.P. 8th Cir. 2005) (allowing an attorney to testify about his confidential communications with an LLC, in litigation between the company and one of its members, on one side, and another member, on the other).  For the same reason, Tatara cannot prevent Mathes from using, in furtherance of her defense, disputed materials that qualify as Farkas's work product.

On the other hand, because adversity between former co-clients does not eliminate assertions of privilege or work-product protection against third parties, Mathes cannot "disseminate confidential information [she] has received as a [Partner]" to other parties.  See Alcoa S.S. Co., 232 F.R.D. at 198 (limiting the ability of an individual director of a mutual indemnity insurance association to pierce the association's privilege and distribute its privileged materials).  As a result, the other Defendants may not procure everything to which Mathes is entitled.

The parties have not fully addressed what procedures should govern Mathes's use of documents covered by NMP's privileges that are not subject to the forfeiture of privilege discussed below. Plaintiffs argue that "the Court can seal privileged documents sought to be used by an individual defendant for his advantage in a derivative proceeding" (see Letter from Bernard Daskal, Esq., dated Dec. 15, 2008, at 3), and cite Dow Corning.  See 261 F.3d at 284 & n.2 (citing In re Perrigo Co., 128 F.3d 430 (6th Cir. 1997), in which the Sixth Circuit affirmed a district court's protective

20

order allowing limited disclosure of privileged material to derivative plaintiff shareholders). However, the Court need not resolve this issue at this time. Mathes does not identify any of the privileged documents listed above in Section I-A — which are the only materials that would be fair game for her to use, but could not be disclosed to the other Defendants — as critical to her defense. In all likelihood, there is no compelling need for any party to rely on these materials, as they are only marginally relevant to, and not particularly probative of, the key issues in contention. The Court will therefore refrain from ordering any procedures to govern the use of NMP's protected documents until such time as Mathes seeks to rely on them.

## III. Plaintiffs' Forfeiture of Privilege Over Materials They Have Put at Issue in the Case

Even if the Court accepted Plaintiffs' assertion of privilege over all the documents on the privilege log that have not yet been specifically addressed, they would still have to be disclosed. Plaintiffs have forfeited the protection of any privilege by placing these materials at issue in the case.

"[I]n certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003). Also known as "implied waiver" or "at-issue waiver," forfeiture of privilege may arise

21

"when the party attempts to use the privilege both as 'a shield and a sword'" by "partially disclos[ing] privileged communications or affirmatively rely[ing] on [them] to support its claim or defense and then shield[ing] the underlying communications from scrutiny." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); see United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (observing that a party may waive privilege by "assert[ing] a claim that in fairness requires examination of protected communications"); see also In re Von Bulow, 828 F.2d 94, 102 (2d Cir. 1987) ("[T]estimony as to part of a privileged communication, in fairness, requires production of the remainder.").

"Forfeiture of this nature is justified by considerations of fairness to the adversary." John Doe Co., 350 F.3d at 302. "This notion implicates only 'the type of unfairness to the adversary that results . . . when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" County of Erie, 546 F.3d at 229 (quoting John Doe Co., 350 F.3d at 306). "Whether fairness requires disclosure" should be "decided on a case by case basis, and depends primarily on the specific context in which the privilege is asserted." Grand Jury Proceedings, 219 F.3d at 183.

Specifically, a court should determine whether, given the particular circumstances of a case, "it would be unfair for a party asserting contentions . . . to then rely on its privileges to

22

deprive its adversary of access to material that might disprove or undermine the party's contentions." John Doe Co., 350 F.3d at 302; accord Kingsway Fin. Servs., Ind. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB)(HBP), 2008 WL 5423316, at *11 (S.D.N.Y. Dec. 31, 2008); Employees Committed for Justice v. Eastman Kodak Co., 251 F.R.D. 101, 107 (W.D.N.Y. May 15, 2008).  If the answer is yes, and a party therefore "places the substance of the documents for which the protection is claimed at issue," then the party "also impliedly waives work product protection." John Doe Co., 350 F.3d at 302 (quoting James Wm. Moore et al., 6 Moore's Federal Practice 26.70[6][c], at 22-226 (3d ed. 1997)); see also Worthington v. Endee, 177 F.R.D. 113, 117-118 (N.D.N.Y. 1998) (finding that a party waived both attorney-client privilege and work-product protection by relying on the subject matter of privileged documents in its defense).

"The quintessential example" of privilege forfeiture occurs when a party "asserts an advice-of-counsel defense and is thereby deemed to have waived his [attorney-client] privilege with respect to the advice that he received." In re Sims, 534 F.3d 117, 132 (2d Cir. 2008) (quoting Grand Jury Proceedings, 219 F.3d at 183).  It may also arise where a defendant's claim that he believed his actions were lawful places his knowledge of the law at issue, see Bilzerian, 926 F.2d at 1292 (finding a waiver of privilege resulting from a "good faith" defense), or where a corporation "disclos[es] privileged materials in a forum where disclosure was

23

voluntary and calculated to benefit the disclosing party," see Grand Jury Proceedings, 219 F.3d at 184; In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 470-71 (S.D.N.Y. 1996) (holding that a company had waived privilege for the underlying subject matter of a report prepared by counsel that had been provided to the SEC and the public).

Here, Tatara claims standing to sue derivatively on behalf of NMP because Mathes wrongfully refused Tatara's demand that the partnership sue CAM for violating the JV Agreement.   Under Plaintiffs' interpretation of the law, to qualify for derivative standing, Tatara must "establish a reasonable doubt" that Mathes "exercised [her] independent and disinterested business judgment in responding to a demand."   In re Veeco Instruments, Inc. Sec. Litig., 434 F. Supp. 2d 267, 276 (S.D.N.Y. 2006).   Conversely, to defeat Tatara's standing, Defendants must demonstrate, among other things, that Mathes exercised "due care" in conducting a "reasonable investigation" into the merits of the lawsuit, see In re 1st Rochdale Co-op Group, Ltd., No. 07 Civ. 7852 (DC), 2008 WL 170410, at *1 (S.D.N.Y. Jan. 17, 2008) (applying New York law), that she was "disinterested and independent," meaning that she did not act to benefit herself or third parties at the expense of the company, see Rales v. Blasband, 634 A.2d 927, 932, 936 (Del. 1993), and that she acted in good faith.  (See Plaintiffs' Opposition to Sal. Oppenheim's Motion to Dismiss, dated Nov. 17, 2008 ("Pls.' Opp."), at 6-9 (citing Veeco Instruments, 1st Rochdale Co-op Group,

Ltd., and Rales).)

The Amended Complaint alleges that Tatara "made significant efforts to secure" Mathes's consent by engaging in "numerous exchanges of emails" designed "to explain the nature of a proposed action."   (Am. Compl. ¶ 12.)   According to Plaintiffs, "Mathes rejected legal action . . . without any investigation into the proposed claims."   (Id. ¶ 37.)   They argue that Mathes acted in bad faith, and attribute her actions to a conspiracy with Defendants to usurp investment opportunities to which the JV would have been entitled.   (See id. ¶¶ 21, 36-37.)

As additional evidence that Mathes's rejection of Tatara's demand was wrongful, Plaintiffs cite the circumstances of Mathes's refusal to hire Farkas and sign the MOU.   The Amended Complaint lists the "negotiation of [the MOU] between . . . Tatara and . . . Mathes" as another instance of Tatara's efforts to effect the demand for litigation.   (Id. ¶ 12.)   "The MOU was to address Tatara and Mathes' [sic] business relationship and handling of operational matters during the conduct of any litigation.   However after the parties essentially agreed to an MOU, . . . Mathes sought to condition NMP's hiring of [Farkas]" — which, as described above, would have involved signing MOU appended to the engagement letter — "on an agreement that no legal action to enforce NMP's rights would ever be brought" against the other Defendants.   (Id.)

Plaintiffs also make allegations about Mathes's interpretation of a legal opinion provided by Dewey & LeBoeuf LLP to the JV in

December 2007 (the "Dewey Opinion" or the "Opinion").  The Amended
Complaint quotes at length from the Dewey Opinion, and attaches it
as an exhibit.  The Opinion concluded that CAM's interpretation of
the JV Agreement could "adversely affect the marketability" of the
JV, and that there was a "fundamental disagreement regarding the
very basis of the joint venture between NMP and CAM."  (Am. Compl.
¶¶ 108, 111 & Exhibit ("Ex.") C.)   Plaintiffs cite the Dewey
Opinion as evidence that "the dispute among the parties is real
[and] intractable," and thus as justification for legal action
against CAM.  (Id. ¶ 113.)  To support the accusation that Mathes
"enter[ed] the conspiracy" with the other Defendants (id. at 36),
Plaintiffs allege that she "never voiced any disagreement with the
Dewey Opinion . . . and has failed to conduct an investigation as
to any claims" Tatara proposed asserting in this action.  (Id. ¶
120.)  In other words, the fact that Mathes failed to investigate
the proposed lawsuit, yet at the same time did not dispute a legal
opinion identifying a "fundamental disagreement" between NMP and
CAM, is best explained by her participation in the conspiracy.

     In light of the foregoing allegations, Plaintiffs' assertions
of privilege over many of the documents in the privilege log create
the "type of unfairness" that requires a finding of forfeiture.
See John Doe Co., 350 F.3d at 306.  On one hand, Plaintiffs claim
that they made concerted efforts to get Mathes to agree to bring
legal action against Defendants, but that she rebuffed their
approaches without investigation and in bad faith.  On the other,

they seek to prevent disclosure of e-mails listed in the privilege log that were exchanged between Tatara, Mathes and Farkas in which they discuss the possibility of suing CAM and how to navigate the dispute over the JV Agreement.   These communications are the same documents described in the Amended Complaint that concern the "nature of a proposed action" (see Am. Compl. ¶ 12), and were designed to get Mathes to agree to the lawsuit.   They necessarily bear on Mathes's opinion about whether or not to bring such an action, and whether her refusal conferred derivative standing on Tatara.[9]   Because these documents are "potentially capable of

---

[9] Plaintiffs suggest that they cannot have waived privilege simply by complying with Rule 23.1(b)(3), which requires a derivative plaintiff to "state with particularity" efforts "to obtain the desired [legal] action" from a company's directors. Fed. R. Civ. P. 23.1(b)(3).   However, there is no reason to think this provision of Rule 23.1 is simply pro forma.   Rather, a reasonable interpretation is that the rule serves the substantive purpose of putting a defendant on notice of the basis for a plaintiff's standing in instances where the company has refused demand.   In any demand-refused derivative action, the sufficiency of the demand itself, and the reasons it is refused, are potentially dispositive issues.   See, e.g., Halpert Ents., Inc. v. Harrison, No. 07-1144-cv, 2008 WL 4585466, at *1-3 (2d Cir. Oct. 15, 2008) (affirming dismissal of a derivative action because the plaintiffs had not raised a doubt about the adequacy of a company's investigation following a demand); Nemazee v. Premier, Inc., 232 F. Supp. 2d 172, 178-81 (S.D.N.Y. 2002) (applying the standard for judging the sufficiency of a demand under Delaware law).   Therefore, derivative plaintiffs should be on notice that a demand and its surrounding communications will be the subject of scrutiny, and may have to be disclosed notwithstanding claims of privilege.   In a related context, courts impose a similar result on some defendants in demand-excused derivative cases.   Although the rule is not grounded in the forfeiture doctrine, where a company seeks dismissal on grounds that a special litigation committee has investigated the plaintiff's claims and determined that bringing the lawsuit would not benefit the company, it must divulge the committee's report

rebutting the assertion" that Mathes did not know enough to have acted with "due care" in refusing the demand, fairness to Defendants requires that they be disclosed. See John Doe Co., 350 F.3d at 306.

By the same reasoning, Plaintiffs cannot both claim that Mathes wrongfully obstructed litigation by reversing her position on hiring counsel and entering the MOU, and then also prevent disclosure of documents setting forth Mathes's objections to the terms of the engagement letter and MOU, or documents concerning the conditions upon which she would have been willing to sign them. Indeed, by relying upon and disclosing the substance of her overriding objection — namely, that she would not sign the documents without "an agreement that no legal action" be taken (Am. Compl. ¶ 12.) — Plaintiffs have opened the door to disclosing all communications on the issue of her consent to engaging Farkas and

_____

and all underlying privileged material. See Joy v. North, 692 F.2d 880, 894 (2d Cir. 1982)(reversing a protective order sealing a special litigation committee's report).

Furthermore, the Court is not concerned about unleashing a flood of claims that derivative plaintiffs automatically waive privilege by pleading demand refusal. The necessity of abrogating the privilege here results from NMP's organization as a partnership. The only reason the demand and surrounding communications are even arguably privileged is that Tatara, as a limited partner of NMP, is both a shareholder and responsible for securing legal advice on behalf of the business. In actions involving corporations, and any derivative plaintiff stockholder who is not a director, there is no reason that a demand, or other communications between the derivative plaintiff's attorney and the company's directors, would be subject to the corporation's privilege. Thus, discovery of such communications would not interfere with any privilege.

28

entering the MOU.

Neither can Plaintiffs fairly rely on the Dewey Opinion's conclusions and allege that Mathes accepted them, yet withhold communications between Mathes, Farkas and Tatara about what options for resolving the dispute with CAM should be included in the Dewey Opinion, and what proposals to make to CAM when transmitting it.[10]

Defendants are entitled to argue that NMP's privileged documents bearing on each of the foregoing topics "might disprove or undermine [Plaintiffs'] contentions." See John Doe Co., 350 F.3d at 302; see also Employees Committed for Justice, 251 F.R.D. at 107 (requiring the defendant in an employment discrimination action to disclose privileged human resources documents where it claimed that oversight by the legal department "constrained improper subjectivity" in personnel decisions). The circumstances of this case sharpen the unfairness to Defendants that would otherwise result. Unlike, for instance, in an "advice-of-counsel" case, Plaintiffs here do not merely assert protection for confidential discussions between themselves and their attorneys. They also seek the suppression of a Defendant's own statements about the facts underlying the claims against her. In fact, many

---

[10] In addition, the fact that Mathes has already divulged some of the contents of these communications in an affidavit supporting her motion to dismiss, without any objection from Plaintiffs, further erodes their claim to privilege. (See Declaration of Marie-France Mathes, dated Oct. 14, 2008 ("Mathes Decl.") ¶ 8.) Mathes declares that a draft of the Dewey Opinion "contained a number of business solutions," but that "Tatara . . . demanded that [these] solutions be removed." (Id.)

of the very same statements form the asserted basis for Mathes's misconduct, and Tatara's standing to sue the other Defendants.

It is immaterial that, according to Plaintiffs, the disputed documents do not conclusively answer the question of "whether Mathes['s] beliefs were justified, independent and unbiased and arrived at with due care, and whether they constitute legal justification for her demand refusal." (See Letter from Lawrence G. Lee, Esq., dated Jan. 27, 2008, at 4-5.)   Forfeiture of privilege is not conditioned on whether the privileged documents ultimately will prove Mathes's defense.   There can be no dispute that the e-mails in question contain discussions between Mathes, Tatara, and Farkas about various courses of action NMP could take to address concerns over the viability of the JV.   The Court has reviewed these materials, and determined that they contain evidence of Mathes's reasoning and reservations in considering the possibility of litigation.   Plaintiffs cannot plausibly claim that these documents are not material to whether Mathes "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," while at the same time asserting in the Amended Complaint that the documents reflect Plaintiffs' efforts to secure Mathes's agreement and cooperation.   Baron v. Siff, No. 15152, 1997 WL 666973, at *2 (Del. Ch. Oct. 17, 1997) (reviewing the refusal of a demand under Delaware law according to the business judgment rule) (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).

Plaintiffs are of course free to argue that the documents do not demonstrate that Mathes was sufficiently informed or proceeding in good faith.  They may contend that she should have gathered additional information beyond what she discussed with Farkas and Tatara.  But the conclusions Plaintiffs draw about the legal significance of these materials does not alter their relevant subject matter.  Even under Plaintiffs' interpretation of the business judgment rule, the disputed communications bear directly on whether Mathes "exercise[d] reasonable diligence in gathering and considering material information, [and] ma[de] an informed decision after a reasonable investigation."  1st Rochdale Co-op Group, 2008 WL 170410, at *1.

For the reasons set forth above, certain documents appearing on Plaintiffs' privilege log must be produced to all Defendants.  The scope of Plaintiffs' forfeiture is limited to "the subject matter of the documents for which privilege has been surrendered."  Malletier v. Dooney & Bourke, Inc., No. 04 Civ. 5316 (RMB)(MHD), 2006 WL 347673, at *5 (S.D.N.Y. Nov. 30, 2006).  Yet, the subject matter Plaintiffs have put at issue does extend beyond the ten documents on which Mathes and Plaintiffs have briefed the Court in detail.  Plaintiffs must therefore produce additional documents in which the subject matter is one of the specific topics they have raised in this litigation.  See Kidder Peabody Sec. Litig., 168 F.R.D. at 470-71 (establishing the scope of waiver as the underlying subject matter of a privileged report upon which a party

affirmatively relied in its defense); <u>Weizmann Inst. of Science v.</u>
<u>Neschis</u>, No. 00 Civ. 7850 (RMB), 2004 WL 540480, at *6 (S.D.N.Y.
Mar. 17, 2004) (finding that a party had forfeited attorney-client
privilege as a matter of fairness "with respect to the subject
matter of their . . . attorneys' advice concerning the decision to
participate in . . . arbitration," a topic that the plaintiffs had
put at issue in the case); <u>see also</u> <u>United States v. Locascio</u>, 357
F. Supp. 2d 536, 550 (E.D.N.Y. 2004) ("A party can only waive the
attorney-client privilege as to certain subjects as a whole, and
may not select only certain testimony or documents to produce while
leaving other evidence shrouded in privilege") (quoting <u>Brock</u>
<u>Equities Ltd. v. Josephthal, Lyon, & Ross, Inc.</u>, No. 92 Civ. 8588
(JSM), 1993 WL 350026, at *1 (S.D.N.Y. Sept. 16, 1993)); <u>cf.</u>
<u>Convole, Inc. v. Compaq Computer Corp.</u>, No. 00 Civ. 5141 (GBD),
2006 WL 2788234, at *2 (S.D.N.Y. Sept. 27, 2006) ("[T]he scope of
[a party's] waiver of the attorney-client and work-product
privileges [is] a determination that lies within the sound
discretion of the district court . . . .") (citing <u>Wills v. Amerada</u>
<u>Hess Corp.</u>, 379 F.3d 32, 41 (2d Cir. 2004) (noting district courts'
discretion to manage discovery)).

        In particular, documents bates stamped MFM 5360, 5363-66,
5371-72, 5484-86, 5487-92, 5502, 5503-09, 5519-20, 5546-49, 5555,
5560-61, and 5567-68 must be produced because they contain or refer
to discussions among Mathes, Farkas, and Tatara about how to
resolve the dispute with CAM, and whether legal action was

required.   Documents bates stamped 5517-18, 5539-41, 5543, 5545, 5551, 5553, 5556, and 5558-59 must be produced because they contain or refer to discussions among Mathes, Farkas and Tatara about retaining Farkas and negotiating the MOU.   Because Mathes's negotiation of the terms of the engagement letter and MOU is reflected on the drafts of these documents, they must also be produced.   The drafts are bates stamped 5361-62, 5373-75, 5493, 5501, 5518, 5542, 5544, and 5552.   Additionally, documents bates stamped MFM 5456-58, 5467, 5478-80, 5483, 5513, 5515-16, and 5530 must be produced because they contain or refer to discussions between the three individuals about what proposals the Dewey Opinion should contain, and how NMP should use the Opinion in the dispute with CAM.[11]   See Worthington, 177 F.R.D. at 117-118 (ordering, in a sexual harassment action where defendants claimed they "took prompt, appropriate, and remedial action by initiating an investigation," that "the entire report and notes from the investigation" be disclosed as "relevant and necessary with respect to plaintiff's claim that she was subjected to a hostile work environment"); Granite Partners v. Bear, Stearns & Co., Inc., 184 F.R.D. 49, 55-56 (S.D.N.Y. 1999) (ordering disclosure of a report and underlying documents prepared by a bankruptcy trustee over the assertion of work-product protection on fairness grounds, where the report concerned the claims asserted and damages claimed by a

---

[11] The subject matter of these documents often includes more than one of the three topics Plaintiffs have put at issue.

debtor against defendants, who could not effectively defend against the claims otherwise); see also Bowne, 150 F.R.D. at 489 ("It may fairly be argued that by asserting counterclaims that depend on assessing who was to blame for [a] delay [in mailing a proxy statement], [the defendant] has put into issue the discussions that it had with its attorneys as to the arrangement, preparation and printing of the materials, as well as [their] . . . instructions to other participants concerning . . . the mailing . . . .").

Together, the documents listed above comprise all materials on the privilege log not identified in Section I-A as attorney-client privileged between Farkas and NMP.

Two final observations buttress the Court's decision. First, Plaintiffs have undermined their position by producing to Defendants e-mails that qualify as pre-retainer attorney-client communications between NMP and Farkas. One of these is an e-mail chain from December 4 and 5, 2007, among Mathes, Farkas, and Tatara, in which Mathes copies language proposed by Farkas for an e-mail to CAM. (See MFM 5418.) The text reflects Farkas's legal advice about how to approach negotiations with CAM over the potential dispute regarding the JV Agreement.[12] A number of other e-mails produced by Plaintiffs, some in multiple copies, also show Mathes looking to Farkas for legal advice about what information to

---

[12] Since this e-mail also meets the test of having been created "because of" potential litigation, it would also arguably qualify for protection as Farkas's work product. See Adlman, 134 F.3d at 1202.

divulge to CAM in light of the disagreement about the JV Agreement, what rights NMP might have in addressing inaccurate information published by a trade association, and employment issues.  (See, e.g., MFM 2526, 4360, 5383.)

While the e-mails relate only tangentially to the topic of why Mathes refused demand, the selective disclosure of any privileged documents supports the conclusion that Plaintiffs have forfeited their privileges with respect to other communications on the same subject.  See Bilzerian, 926 F.2d at 1292 (stating that a party "may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes"); Granite Partners, 184 F.R.D. at 54 (explaining that a party may waive privilege by making "selective use of privileged materials, for example, by releasing only those portions of the material that are favorable to his position, while withholding unfavorable positions") (quotation marks and citation omitted).

Second, even assuming that the Court had concluded that the draft engagement letters constituted work product, Defendants have overcome Plaintiffs' assertions of work-product protection over both the letters and the draft MOUs by another route.  By showing a "substantial need," a party may procure work product that does not contain an attorney's mental impressions or legal strategy, provided that it "cannot, without undue hardship," obtain the material by other means.  See Fed. R. Civ. P. 26(b)(3).  For the reasons explained above, Mathes has demonstrated that the draft

35

MOUs and engagement letters contain facts material to "essential elements of [her] prima facie [defense]," under Plaintiffs' interpretation of the law.   See 6 Moore's Federal Practice 26.70[5][c] (explaining the standard for proving "substantial need"); In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 185 (2d Cir. 2007) ("Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had.") (quoting Hickman v. Taylor, 329 U.S. 495, 511, 67 S. Ct. 385, 394 (1947)).   Similarly, the other Defendants have demonstrated that the drafts contain facts material to "essential elements" of Tatara's derivative standing — also according to the legal standard cited by Plaintiffs — which is a potentially dispositive issue in the case.   There is no other source besides Mathes and Tatara for these materials.   Consequently, Defendants have also established a "substantial need" for the draft MOUs and engagement letters sufficient to trump work-product protection.

CONCLUSION

To summarize: the attorney-client privilege held by NMP protects documents bates stamped MFM 2104-06, 5354-55, 5358-59, 5412, 5414-17, 5419-30, 5432-43, 5449-51, 5468-77, and 5514 from disclosure to CAM, Oppenheim, and BVT.   In some instances, the work-product doctrine also applies to these documents.   Plaintiffs have forfeited attorney-client privilege and work-product protection over the remaining documents listed in the privilege

36

log.

Plaintiffs are hereby ordered to produce each of these documents to Defendants by no later than March 5, 2009.

So Ordered.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: February 26, 2009
New York, New York

37